# EXHIBIT A

57th District Court

## Case Summary

### Case No. 2024CI16604

| | | | |
|---|---|---|---|
| **Reagent Lonestar Group, LLC ET AL VS Massachusetts Mutual Life Insurance Company ET AL** | § § § | Location: | **57th District Court** |
| | | Judicial Officer: | **57th, District Court** |
| | | Filed on: | **08/05/2024** |

---

## Case Information

| | |
|---|---|
| Case Type: | OTHER REAL PROPERTY |
| Case Status: | **08/05/2024   Pending** |

## Assignment Information

**Current Case Assignment**
Case Number      2024CI16604
Court                    57th District Court
Date Assigned    08/05/2024
Judicial Officer   57th, District Court

---

## Party Information

| | | *Lead Attorneys* |
|---|---|---|
| **Plaintiff** | **Daniels, Mark** | **HELSTOWSKI, JOHN G** *Retained* |
| | **Reagent Lonestar Group, LLC** | **HELSTOWSKI, JOHN G** *Retained* |
| **Defendant** | **Lonestar Capital Holdings, LLC** | |
| | **Massachusetts Mutual Life Insurance Company** | |
| | **Shellpoint Mortgage Servicing** | |

---

## Events and Orders of the Court

| | |
|---|---|
| 08/05/2024 | New Cases Filed (OCA) |
| 08/05/2024 | PETITION |
| 08/05/2024 | TEMPORARY RESTRAINING ORDER (OCA)     (Judicial Officer: Gonzales, Norma) |
| 08/05/2024 | CERTIFICATE OF *Conference* |
| 08/06/2024 | CASH BOND *TRO BOND; $1000.00 CASH DEPOSIT IN LIEU OF* |
| 08/12/2024 | LETTER TO DISTRICT CLERK *Requesting Copies-em 8/13/24* |
| 08/12/2024 | REQUEST FOR SERVICE AND PROCESS |
| 08/14/2024 | MOTION TO *EXTEND TEMPORARY RESTRAINING ORDER* |
| 08/19/2024 | **SETTING ON TEMPORARY RESTRAINING ORDER**   (9:00 AM) *DROPPED BY ATTORNEY* |

57th District Court

## Case Summary

### Case No. 2024CI16604

| | | |
|---|---|---|
| 08/19/2024 | ORIGINAL | |
| | *TEMPORARY RESTRAINING ORDER* | |

08/26/2024 **Citation**
Massachusetts Mutual Life Insurance Company
Served: 09/03/2024
Shellpoint Mortgage Servicing
Served: 08/30/2024
Lonestar Capital Holdings, LLC
Unserved

08/26/2024 **Temporary Restraining Order**
Massachusetts Mutual Life Insurance Company
Served: 09/03/2024
Shellpoint Mortgage Servicing
Served: 08/30/2024

08/30/2024 **SETTING ON TEMPORARY INJUNCTION**   (9:00 AM)
*ATTY JH*

09/09/2024 RETURN OF SERVICE - SUCCESSFUL
*MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY*

09/09/2024 RETURN OF SERVICE - SUCCESSFUL
*MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY*

09/09/2024 RETURN OF SERVICE - SUCCESSFUL
*Shellpoint Mortgage Servicing*

09/09/2024 RETURN OF SERVICE - SUCCESSFUL
*Shellpoint Mortgage Servicing*

09/26/2024 CASH BOND
*TRO BOND; $500.00 CHECK DEPOSIT IN LIEU OF*

09/26/2024 TEMPORARY RESTRAINING ORDER (OCA)     (Judicial Officer: Hortick, Christine)

10/10/2024 **SETTING ON TEMPORARY INJUNCTION**   (9:00 AM)
*JH*

FILED
8/5/2024 3:07 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Madison Gamache
Bexar County - 57th District Court

**2024CI16604**

CAUSE NO. _____

| | | |
|---|---|---|
| **REAGENT LONESTAR GROUP, LLC and MARK DANIELS,** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | _____ **JUDICIAL DISTRICT** |
| | § | |
| **MASSACHUSETTS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY, SHELLPOINT** | § | |
| **MORTGAGE SERVICING, and LONESTAR** | § | |
| **CAPITAL HOLDINGS, LLC, its/their** | § | |
| **successors and/or assigns,** | § | **OF BEXAR COUNTY, TEXAS** |
| | | |
| **Defendants.** | | |

## PLAINTIFFS' ORIGINAL VERIFIED PETITION FOR TRESPASS TO TRY TITLE AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES Reagent Lonestar Group, LLC and Mark Daniels, hereinafter called Plaintiffs, complaining of and about Massachusetts Mutual Life Insurance Company, Shellpoint Mortgage Servicing, and Lonestar Capital Holdings, LLC, its/their successors and/or assigns, as Defendants, and for its claims and causes of action set forth herein below, respectfully shows unto the Court the following.

### I.

### DISCOVERY CONTROL PLAN LEVEL

1.      Plaintiff intends that discovery be conducted under Discovery Level 2.

### II.

### PARTIES AND SERVICE

2.      Plaintiff, Reagent Lonestar Group, LLC ("Plaintiff"), is a limited liability

Copy from re:SearchTX

company is doing business in the state of Texas whose present address is 1209 Orange Street, Wilmington, DE 19801.

3.      Plaintiff, Mark Daniels, individually and the managing member of Reagent Lonestar Group, LLC, is an individual whose present address is at 1209 Orange Street, Wilmington, DE 19801. The last three digits of Plaintiff's driver's license number are XXX, and the last three digits of her social security number are XXX.

4.      Defendant, Massachusetts Mutual Life Insurance Company ("Massachusetts Mutual"), is a corporation company doing business in the State of Texas and purports to be the current mortgagee and holder and owner of Plaintiff's mortgage loan made the subject of this suit, and is not registered with the Secretary of State and does not maintain a registered agent for service in the State of Texas, nor any business offices in the State of Texas; and therefore, Defendant Funding Door may be served pursuant to the Texas Long-Arm Statute, TEX. CIV. PRAC. & REM. CODE 17.044 et seq., by the Texas Secretary of State, Citations Unit, James E. Rudder Building, 1019 Brazos Street, Room 105, Austin, Texas 78701, with two (2) copies of the citation and petition, who may then serve the same upon any authorized officer, director or designated agent of Defendant Funding Door located at its last known home office address of 55 Beattie Place, Suite 100, Greenville, SC 29601.

5.      Defendant, Shellpoint Mortgage Servicing ("Shellpoint"), is a domestic limited liability company doing business in the State of Texas and purports to be the servicer under the Deed of Trust for the subject property and may be served and may be served with process by serving its registered agent, Corporation Service Company, 211 E. 7th St., Ste. 620, Austin, TX 78701. Service of process upon said Defendant as described above can be effectuated by personal delivery to its registered agent identified herein.

Copy from re:SearchTX

6.    Defendant, Lonestar Capital Holdings, LLC ("Lonestar"), is a domestic limited liability company doing business in the State of Texas and purports to be the borrower under the Deed of Trust for the subject property and may be served and may be served with process by serving its registered agent, Weatherby Echols Law Group, PLLC, 20333 SH 249, Ste. 200, Houston, Texas 77070. Service of process upon said Defendant as described above can be effectuated by personal delivery to its registered agent identified herein.

## III.

## JURISDICTION AND VENUE

7.    The subject matter in controversy is within the jurisdictional limits of this court.

8.    Plaintiffs seek:

a.    monetary relief of more than $200,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees; and,

b.    injunctive relief in the form of a temporary restraining order and temporary injunction; and,

c.    declaratory relief concerning Plaintiff's right, title, and interest in the real property made the subject of this suit.

9.    This court has personal jurisdiction herein because the Defendant routinely engages in or transact business in the State of Texas with sufficient minimum contacts.

10.    Venue is proper in Bexar County in this cause pursuant to TEX. CIV. PRAC. & REM. CODE §15.011 et seq., because this action involves real property and the location of such real property is situated entirely in Bexar County, Texas.

## IV.

Copy from re:SearchTX

## FACTUAL ALLEGATIONS

11.      On March 28, 2023, Plaintiffs first came into contact with Defendant Lonestar Capital Holdings which is the original purchaser of the subject property. The original purchaser and named Defendant Lonestar Capital Holdings, LLC, purchased the real property and improvements commonly known as 2422 West Commerce Street, San Antonio, Texas 78207, and legally described to wit:

**LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF A.P.N.: 130067. ("Property")**

On February 23, 202. Defendant Lonestar was a fee simple owner of the subject Property. A true and correct copy of the General Warranty Deed With Vendor's Lien recorded as Instrument No. 20210059905 in the official real property records of the Bexar County Clerk's office is attached hereto marked Exhibit "A" and incorporated herein by reference for all purposes.

12.      On August 22, 2022, the original purchaser and named Defendant Lonestar Capital Holdings, LLC, applied for and obtained a mortgage loan from Funding Door, LLC ("original lender") evidenced by a promissory note in the original principal amount of $380,000.00 ("Note") and secured by a Deed of Trust of even date to Brett M. Shanks, as Trustee. A true and correct copy of the Deed of Trust recorded as Instrument No. 20220208977 in the official real property records of the Bexar County Clerk's office is attached hereto marked Exhibit "B" and incorporated herein by reference for all purposes. The Deed of Trust are hereinafter referred to as the "Loan".

13.      Plaintiff spoke with the managing member of Lonestar, Andy Patlan, regarding the sale of the property management company which managed several properties including the subject property. Plaintiff found the listing on a website called bizybuysell.com along with a

Copy from re:SearchTX

portion of the real estate portfolio. At the time, Plaintiff was interested in acquiring the property management company. Plaintiff made the decision not to acquire Lonestar's portfolio or property management company, Andy, managing member of Defendant Lonestar, expressed to Plaintiff a need for an investment of approximately $1.1 million in third-party capital. Plaintiff agreed to purchase 12 assets from Andy and Defendant Lonestar for approximately $1.1 million.

14.     On April 27, 2023, Plaintiff created his limited liability company in order to purchase the 12 properties from Defendant Lonestar Capital Holdings. A true and correct copy of the Operating Agreement of Reagent Lonestar Group, LLC is attached hereto marked Exhibit "C" and incorporated herein by reference for all purposes.

15.     On May 30, 2023, Plaintiff purchased six of the twelve properties including the subject property. A true and correct copy of the HUD settlement statement is attached hereto marked Exhibit "D" and incorporated herein by reference for all purposes.

16.     At the same time, Plaintiff Reagent purchased the real property and improvements commonly known as 2422 West Commerce Street, San Antonio, Texas 78207, and legally described to wit:

**LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF A.P.N.: 130067. ("Property")**

A true and correct copy of the Warranty Deed Subject to Existing Deed of Trust recorded as Instrument No. 20230099529 in the official real property records of the Bexar County Clerk's office is attached hereto marked Exhibit "E" and incorporated herein by reference for all purposes.

17.     Thereafter, Plaintiff Reagent entered into a Real Estate Sales Contract agreement with Andy, the other managing members of Lonestar and Defendant Lonestar, subject to which

Copy from re:SearchTX

Andy and Defendant Lonestar would collect and keep all rents from tenants at the properties and pay all expenses, including monthly mortgage amounts, regardless of the magnitude of these rents or costs. A true and correct copy of the Real Estate Sales Contract agreement is attached hereto marked Exhibit "F" and incorporated herein by reference for all purposes.

18.     Andy as managing member of Defendant Lonestar, continually assured Plaintiffs that all expenses were being paid. However, Andy as managing member for Defendant Lonestar was reluctant to provide any financial statements for the performance of the properties. Andy and Defendant Lonestar became increasingly hard to reach, missed multiple meetings to discuss performance, and refused to provide Plaintiffs with any reports.

19.     On or about December 2023, when Plaintiffs continued to inquire on the financial statements and performance of the properties, Defendant Lonestar, through its managing member, Andy, admitted that finances were tough but assured Plaintiffs that all property taxes and mortgage were being paid and all necessary repairs and maintenance was being completed. During this time, the loan was assigned to Defendant Massachusetts Mutual and Defendant Shellpoint as the servicer.

20.     Plaintiffs did some research and learned that the property taxes had not been paid and that the properties had fallen into a state of despair.

21.     Plaintiff was unable to verify any information regarding whether mortgage on the properties existed or whether they were being paid. Plaintiff asked Andy, managing member for Defendant Lonestar, to help Plaintiffs find buyers for the property. Andy and Defendant Lonestar found a prospective buyer for the subject property. However, on March 14, 2024, he provided a mortgage payoff letter for the property showing a principal balance of $376,193.06 and a total payoff amount of $442,669.00 with excess $66,476 primarily resulting from missed payments,

Copy from re:SearchTX

late fees, default interest, past due escrow amounts, other penalties, etc. Plaintiff was shocked to his conscious has he had been repeatedly assured that Defendant Lonestar was keeping current with the mortgage.

22.     Plaintiffs made several attempts to gain contact information for Defendant Massachusetts Mutual and finally obtained the information from Defendant Lonestar through Andy. Defendant Lonestar signed a letter authorizing Plaintiffs to speak directly to Defendant Massachusetts Mutual.

23.     On April 5, 2024, Plaintiffs, after realizing, Defendant Lonestar through its managing member, Andy, had completely let all of the properties grow into a state of disrepair and let substantial mortgage balances and penalties accrue, terminated the management agreement. It was then that Plaintiff learned that Andy, managing member for defendant Lonestar, spend the security deposits of all of the tenants for all twelve (12) properties, and was unable to transfer them to Plaintiffs' new property manager. Plaintiff Mark, wrote a check himself for approximately $9,950.00 in April so that the tenants' security deposit accounts would be current. Defendant Lonestar through Andy, claimed that it was fine to use the security deposits for any other uses provided he received verbal permission from the tenants to do so.

24.     Later in April, 2024 Plaintiffs reached out to Defendants Massachusetts Mutual and Shellpoint to inform them of the issues they were having with Defendant Lonestar and started to negotiate a lower payoff to try to get current with Defendants Massachusetts Mutual and Shellpoint. Plaintiffs requested relief from Defendant Massachusetts Mutual and Shellpoint but were unsuccessful. Plaintiff spoke with the short-sale department at defendant Shellpoint to work out a settlement agreement whereby Plaintiff would pay an amount out of pocket to pay off the entire loan, hopefully at a discount to the current principal balance. Defendant Shellpoint

Copy from re:SearchTX

engaged a third-party inspector to appraise the property, and they came up with a valuation of $360,000.00, with anticipated net proceeds in case of a fully marketed sale at $331,200.00 and less, upon a short sale or foreclosure process, as auctions have substantial fees and do not generate the same level of returns as a fully marketed sale process.

25.    On June 5, Plaintiff submitted a formal settlement offer (attached), at the request of defendant Shellpoint, via which Plaintiff offered to pay the full expected proceeds of $331,200.00 to the investor should they pursue a full marketed process. After pushing for a response for several weeks, Defendant Shellpoint waited until the day before they believed the property was to go into foreclosure, before responding, specifying that they would not accept anything less than the full payoff amount of $442,669.00 even though that was substantially more than they would get via foreclosure.  A true and correct copy of the offer submitted to Defendant Shellpoint is attached hereto marked Exhibit "G" and incorporated herein by reference for all purposes.

26.    Plaintiffs feeling desperate to save the subject property from going to foreclosure hired the undersigned counsel of record. Plaintiffs' undersigned counsel of record obtained the notice of foreclosure sale from the Bexar county real property records. It was only then that Plaintiffs learned the property was posted for foreclosure auction for August 6, 2024. A true and correct copy of the Notice of Foreclosure sale is attached hereto marked Exhibit "H" and incorporated herein by reference for all purposes.

**V.**

**FIRST CAUSE OF ACTION –**
**APPLICATION FOR TEMPORARY RESTRAINING ORDER**
**AND TEMPORARY INJUNCTION**

Copy from re:SearchTX

26.     Plaintiffs hereby incorporate by reference and realleges all material allegations of fact set forth in Section IV above as if fully set forth herein.

27.     Pursuant to Rule 680 of the Texas Rules of Civil Procedure, Plaintiffs hereby seek immediate relief in the form of a Temporary Restraining Order wherein this Court orders, restrains and prohibits each of the Defendant, and/or any of their agents, employees, attorneys, trustees, substitute trustees, successors and/or assigns from foreclosing upon Plaintiffs' property for a period of at least fourteen (14) days until a temporary injunction hearing is held by this Court concerning whether Plaintiffs have a probable right of recovery for its various claims and causes of action pleaded herein. There presently exists an imminent threat of irreparable harm to Plaintiffs in the form of the Defendant, and/or their agents, employees, attorneys, trustees and/or substitute trustees stated intent to complete a foreclosure sale and divest Plaintiff of his fee simple title and ownership interest in and to its property unless this Court immediately restrains such acts or conduct as requested herein.

**VI.**

**SECOND CAUSE OF ACTION –**
**BREACH OF CONTRACT AND FAILURE OF CONDITION PRECEDENT**

28.     Plaintiff hereby incorporates by reference and realleges all material allegations of fact set forth in Section IV and V above as if fully set forth herein.

29.     The acts, conduct or omissions of the Defendants as described herein, *supra*, also constitute a material breach of the Deed of Trust and a violation of the Texas Property Code, and a failure of condition precedent as to their alleged acceleration of the Decedent's Loan and posting of Plaintiff's homestead property for foreclosure sale, and which material breach is the proximate cause of the actual damages sustained and incurred by Plaintiff in excess of the minimum jurisdictional limits of this Court.

Copy from re:SearchTX

30.     Specifically, Defendants have failed or refused to provide any details, accounting or breakdown of the amounts claimed due and owing to Plaintiff or any of the people who have sought to call them, even after he was able to speak to and reinstate the loan, and failed to provide any notice of default and opportunity to cure notice and failed to provide any notice of the foreclosure sale all as specifically required under paragraph 22 of the Deed of Trust (*see* Exhibit "B") and Tex. Prop. Code 51.002(b) and (d), and instead, Defendants have purported to accelerate the Loan and post the subject property for foreclosure sale, all of which acts, conduct or omissions constitute a material breach of the Deed of Trust and a failure of condition precedent that must occur before the power of sale provision in the Deed of Trust can be exercised, and are a producing cause of the actual damages sustained and incurred by Plaintiff in excess of the minimum jurisdictional limits of this Court.

**VII.**

**THIRD CAUSE OF ACTION –**
**TRESPASS TO TRY TITLE TO REAL PROPERTY**

31.     Plaintiff hereby incorporate by reference and realleges all material allegations of fact set forth in Sections IV, V, and VI above as if fully set forth herein.

32.     Plaintiff, each succeeded to all of the Decedent's right, title, and interest in the subject Property pursuant to the 2016 Mortgage Servicing Rule amendments to RESPA and TILA that were enacted by the United States Consumer Financial Protection Bureau (CFPB) and became effective as of April 2018.

33.     The CFPB stated that these amendments were necessary because, ***"it had received reports of servicers either refusing to speak to a successor in interest (as is the case here), or demanding documents to prove the successor in interest's claim to the property that either did not exist or were not reasonably available."***. 81 Fed. Reg. 72, 160 at 72, 165. **Under these**

Copy from re:SearchTX

**amendments, a "confirmed" successor in interest now has the same rights as the original borrower under RESPA and TILA rules**. *Id.* (emphasis added).

34.     Further, under these amendments, a successor in interest is defined as "a person to whom an ownership interest in a property securing a mortgage loan subject to this subpart is transferred from a borrower, provided that the transfer is:

> *(1) a transfer by devise, descent, or operation of law on the death of a joint tenant or tenant by the entirety;*
> *(2) a transfer to a relative resulting from the death of a borrower;*
> *(3)* ***a transfer where the spouse or children of the borrower become the owner of the property***;
> *(4) a transfer resulting from a decree of a dissolution of marriage, legal separation agreement, or from an incidental property settlement agreement, by which the spouse of the borrower becomes an owner of the property; or*
> *(5) a transfer into an inter vivos trust in which the borrower is and remains a beneficiary and which does not relate to a transfer of the rights of occupancy in the property." See* 12 C.F.R. §1024.31. (emphasis added).

35.     The Amendments further provide that a servicer is under an obligation to respond when they receive *actual notice* from someone who claims to be a successor in interest and when they receive *inquiry notice* that someone might be a successor in interest. Servicers must have policies and procedures to ensure that they **"promptly facilitate communication with any potential or confirmed successors in interest" upon receipt of "notice of the death of a borrower or of** ***any transfer*** **of the property."** 12 C.F.R. §1204.38(b)(1)(vi)(A). (emphasis added).

36.     Upon receipt of any such notice, servicers must "promptly" request documents, determine the status of the person, and notify the person, **"that the servicer has confirmed the person's status, has determined that additional documents are required (and what those documents are), or has determined that the person is not a successor in interest.".** 12 C.F.R. §1204.38(b)(1)(vi)(B) and (C). (emphasis added).

Copy from re:SearchTX

37.     While is it unclear what constitutes a "prompt" determination, the CFPB amendments further provide that a determination is NOT prompt, "**if is unreasonably interferes with a successor in interest's ability *to apply for loss mitigation options according to the procedures provided in §1024.41.*"** *See* 81 Fed. Reg. 72, 160 at 72, 380. (emphasis added).

38.     As noted herein, *supra*, Plaintiff notified Defendant MUTUAL LIFE, SHELL POINT AND LONESTAR of the Decedent's death and requested information, help, and assistance from the Defendant concerning the mortgage loan, and the Defendant wholly failed to offer any assistance or guidance, and refused to speak to Plaintiff about the loan or provide any information concerning reinstatement or loss mitigation options of any kind, and instead accelerated the Decedent's Loan and have posted the subject property for foreclosure sale, which if that occurs Plaintiff and the other surviving heirs-at-law would be unlawfully, and any without due process, divested of their legal right, title, and ownership interests that each acquired upon the death of the Decedent.

39.     Accordingly, and pursuant to TEX. PROP. CODE §22.001 et seq., Plaintiff hereby seeks a judgment from this Court declaring that Plaintiff's right, title, and interest in the subject property is superior to that of the Defendant's claimed lien, and that Plaintiff cannot and should not be divested of any right, title, or interest in the subject Property until he has been afforded the opportunity to exercise his legal rights as a successor-in-interest to the Decedent's real property and loan, including the opportunity to cure the default and apply for loss mitigation assistance under the 2016 Mortgage Servicing Rule amendments to RESPA and TILA, and for an award of all actual damages sustained and incurred in excess of the minimum jurisdictional limits of this Court.

Copy from re:SearchTX

40. All conditions precedent for this Court to enter a judgment for trespass to try title as requested herein have occurred or have been met.

**VIII.**

**FOURTH CAUSE OF ACTION -**
**VIOLATIONS OF RESPA AND REGULATION X AND THE 2016 AMENDMENTS**

41. Plaintiff hereby incorporates by reference and realleges all material allegations of fact set forth in Sections IV, V, VI, and VII above as if fully set forth herein.

42. The acts, conduct and/or omissions of Defendant MUTUAL LIFE, SHELL POINT AND LONESTAR, which at all material times hereto was acting in its alleged capacity as "mortgage servicer" of Decedent's Loan, also constitute violations of RESPA, 12 U.S.C. §2605 et seq., and the 2016 Amendments to RESPA and TILA as described herein, *supra*, because the Defendant, and/or its various agents, representatives or employees, committed violations of this statute by failing to respond to Plaintiff's numerous inquiries and requests for information and loss mitigation assistance, and have unreasonably interfered with Plaintiff's ability to assume the loan and apply for loss mitigation options all as described herein, and those statutory violations are a producing cause of the actual damages sustained and incurred by Plaintiff in excess of the minimum jurisdictional limits of this Court.

43. Pursuant the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §2605(f), Plaintiff has a private right of action providing for remedies for the claimed breaches of RESPA and the 2016 amendments to RESPA and TILA as described herein, *supra*, including actual damages, costs, statutory damages and attorney's fees.

44. The subject Loan is a "federally related mortgage loan" as that term is defined by 12 C.F.R. § 1026.41(e)(4), and the Defendant is subject to these regulations and does not qualify for the exception for a "qualified lender" or "small servicer" as defined in 12 C.F.R. §617.700.

Copy from re:SearchTX

45.     Specifically, Defendant MUTUAL LIFE, SHELL POINT AND LONESTAR's acts, conduct and/or omissions described herein, *supra*, of failing, neglecting or refusing to ever provide Plaintiff with any information concerning the loan or any loss mitigation options that may be available after having been informed by Plaintiff that the borrower had died, and instead proceeded to accelerate the Loan and post the subject homestead property for foreclosure sale each constitute violations of RESPA and Regulation X, 12 C.F.R. §1024(f)(2)(i) and the 2016 Amendments thereto, and are a producing cause of the actual damages sustained and incurred by Plaintiff in excess of the minimum jurisdictional limits of this Court.

46.     As each of the acts, conduct and/or omissions of the Defendant herein that constitute violations of RESPA and Regulation X were committed intentionally, knowingly and/or with malice, or a conscious indifference as to the rights of Plaintiff, Plaintiff is entitled to and hereby seeks an award of exemplary damages in excess of the minimum jurisdictional limits of this Court.

## IX.

## FIFTH CAUSE OF ACTION - VIOLATIONS OF THE TEXAS DEBT COLLECTION ACT

47.     Plaintiff hereby incorporates by reference and realleges all material allegations of act set forth in Sections IV, V, VI, VII, and VIII above as if fully set forth herein.

48.     The acts, conduct and/or omissions of Defendant MUTUAL LIFE, SHELL POINT AND LONESTAR, which at all times was acting in its capacity as a "third-party debt collector collecting the debt of another that was past due" of failing, neglecting, or refusing to ever provide Plaintiff with information and documentation to submit to assume the loan and become the confirmed successor in interest concerning the loan, even after being informed that the Decedent had died and that her estate was being probated, nor any required Notice of Default

PLAINTIFF'S ORIGINAL VERIFIED PETITION, etc.– Reagent Lone Star Group, LLC    Page 14

Copy from re:SearchTX

and Opportunity to Cure notice, nor the Notice of Foreclosure Sale as required under the express terms of the Deed of Trust and TEX. PROP. CODE §51.002(d) prior to acceleration and posting of his homestead property for foreclosure sale, and of failing to provide Plaintiff them with any details of how much was actually claimed due and owing, each constitute the intentional and/or knowing misrepresentation of the character, amount or extent of the debt to be collected in violation of the Texas Debt Collection Act, TEX. FIN. CODE §392.001 et seq., and is a producing cause of the actual damages sustained and incurred by Plaintiff in excess of the minimum jurisdictional limits of this Court.

49.    Specifically, the acts, conduct, or omissions of Defendant MUTUAL LIFE, SHELL POINT AND LONESTAR constitute violations of the following provisions of the Texas Debt Collection Act: §392.301(a)(8) - threatening to take an action prohibited by law; and §392.304(a)(8) – misrepresenting the character, extent, or amount of a consumer debt, or misrepresenting the consumer's debt status in a judicial or governmental proceeding; and §392.304(a)(19) – using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer, and which violations are a producing cause of the actual damages sustained and incurred by Plaintiffs in excess of the minimum jurisdictional limits of this Court.

50.    As each of the acts, conduct, and/or omissions of Defendant MUTUAL LIFE, SHELL POINT AND LONESTAR as described herein that constitute violations of the Texas Debt Collection Act and were committed intentionally, knowingly and/or with malice, or a conscious indifference as to the rights of Plaintiff, Plaintiff is entitled to and hereby seeks an award of exemplary damages in excess of the minimum jurisdictional limits of this Court.

**X.**

Copy from re:SearchTX

## EXEMPLARY DAMAGES

51.    Plaintiff hereby incorporates by reference and realleges all material allegations of fact set forth in Sections IV, V, VI, VII, VIII, and IX above as if fully set forth herein.

52.    Plaintiff would further show that the various acts, conduct and/or omissions of each of the Defendants complained of herein were committed knowingly, willfully, intentionally, and with actual awareness, and with the specific and pre-determined intention of enriching said Defendants at the expense of Plaintiff. In order to punish said Defendants for such unconscionable overreaching and to deter such actions and/or omissions in the future, Plaintiff also seeks recovery from Defendants for exemplary damages as provided by Section 41.003(a)(1) of the Texas Civil Practice and Remedies Code.

## XI.

## ATTORNEY'S FEES

53.    Request is made for all costs and reasonable and necessary attorney's fees incurred by or on behalf of Plaintiff herein, including all fees necessary in the event of an appeal of this cause to the Court of Appeals and the Supreme Court of Texas, as the Court deems equitable and just, as provided by: (a) Section 37.001 et seq. of the Texas Civil Practices and Remedies Code; (b) RESPA and the 2016 Amendments to RESPA and, 12 U.S.C. §2605(f); (c) the Texas Debt Collection Act, Tex. Fin. Code §392.001 et seq., and (d) common law.

## XII.

## JURY DEMAND

54.    Plaintiff hereby requests that all issues of fact be tried before a jury.

Copy from re:SearchTX

## XIII.

## <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs, Reagent Lonestar Group, LLC and Mark Daniels, respectfully pray that the Defendant be cited to appear and answer herein, and that the Plaintiffs be granted immediate relief in the form of a temporary restraining order and temporary injunction preventing the Defendant, and/or any of its respective agents, employees, attorneys, trustees, substitute trustees, successors and/or assigns from foreclosing or attempting to foreclose upon Plaintiffs' property as described herein until the merits of its various claims and causes of action pled herein may be fairly adjudicated; and that upon the final trial of this cause,  judgment be entered in favor of Plaintiffs, and against Defendant, jointly and/or severally, for breach of contract and failure of condition precedent, for violations of RESPA and the 2016 Amendments to RESPA and TILA Regulation X, and for violations of the Texas Debt Collection Act, and for an award of all economic and actual damages requested hereinabove in an amount in excess of the minimum jurisdictional limits of the Court, including exemplary damages, together with pre-judgment and post-judgment interest at the maximum rate allowed by law, and for an award of all attorney's fees and costs of court incurred, and for such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**J. GANNON HELSTOWSKI LAW FIRM**

Copy from re:SearchTX

*/s/ John G. Helstowski*
John G. Helstowski
Texas State Bar No. 24078653
5209 Heritage Ave., Suite 510
Colleyville, TX 76034
Telephone: (817) 382-3125
Facsimile: (817) 382-1799
Email: jgh@jghfirm.com
Attorney for Plaintiffs

Copy from re:SearchTX

## **VERIFICATION**

STATE OF TEXAS                                      §
                                                   §
COUNTY OF **BEXAR**                                §

        "My name is **MARK DANIELS**    I am the Plaintiff named in the attached and
foregoing PLAINTIFF'S ORIGINAL VERIFIED PETITION. I am over the age of 21 years and
have never been convicted of a felony or other crime involving moral turpitude. I have personal
knowledge of all of the facts set forth in the PLAINTIFF'S ORIGINAL PETITION and hereby
state that every factual statement set forth therein is true and correct.

        FURTHER AFFIANT SAYETH NOT."

        EXECUTED this **1ST** day of **AUGUST**, 2024.


_____          **MARK J. DANIELS**_____
Signature                                           Print

        **SUBSCRIBED AND SWORN BEFORE ME** on this 1st day of August, 2024, by
Client, to certify which witness my hand and official seal.


_____
Notary Public in and for the State of Texas  Massachusetts

**Nicole L. Reeves**_____
Printed Name of Notary Public

My Commission Expires on: **8/2/2030**_____

Copy from re:SearchTX

## SPECIAL WARRANTY DEED WITH VENDOR'S LIEN

GF#: CE1903-TX-3513535
Property Address: 2422 West Commerce Street, San Antonio, TX 78207-3831
PIN/Tax ID# 02317-012-0070

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REVOKE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

| | |
|---|---|
| **Date:** | February 23, 2021 |
| **Grantor:** | **Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets Trust 2007-3, Mortgage-Backed Pass-Through Certificates Series 2007-3** |
| **Grantor's Address** | C/O PHH Mortgage Corporation<br>1 Mortgage Way<br>Mount Laurel, NJ 08054 |
| **Grantee:** | **LONESTAR CAPITAL HOLDINGS LLC** |
| **Grantee's Address:** | 2422 West Commerce Street, San Antonio, TX 78207-3831 |

**Consideration:** TEN AND NO/100 DOLLARS ($10.00); and other good and valuable consideration in hand paid by the Grantee, the receipt and sufficiency of which is hereby acknowledged;

AND, THE FURTHER CONSIDERATION of the execution and delivery by Grantee of that one certain promissory note in the original principal sum of **$277,000.00**, bearing interest as therein specified and being due and payable as therein provided to the order of **Sentinel Security Life Insurance Company** ("Lender"); and secured by the Vendor's Lien and Superior Title retained herein; and being additionally secured by a Deed of Trust of even date therewith describing the Note to **Joel Robert Cote**, as Trustee; on the condition that this Vendor's Lien is cumulative of and without prejudice of or to said Deed of Trust;

**Property (including any improvements):**

**LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF.**

**Reservations from and Exceptions to Conveyance and Warranty:** This conveyance is made and accepted subject to all easements, reservations, conditions, covenants and restrictive covenants as the same appear of record in the Office of the County Clerk of the County in which the Property is situated; any apparent easements, whether visible or not, rights-of-ways and prescriptive rights, whether of record or not, to the extent that the same apply to the property described herein; rights of adjoining owners in any walls and fences situated in a common boundary; any discrepancies, conflicts or shortages in area or boundary lines; any encroachments or overlapping of improvements; and taxes for the current year and all subsequent years, and for prior years resulting from a change in the use or ownership of the Property, the payment of which Grantee assumes.

GRANTOR, for and in Consideration and subject to the Reservations from and Exceptions to Conveyance and Warranty, GRANTS, SELLS, and CONVEYS to GRANTEE the Property, together with all and singular the rights and appurtenances thereto in any wise belonging, to have and hold it to Grantee, Grantee's heirs, executors, administrators, successors, or assigns forever. Grantor binds Grantor and Grantor's successors, administrators, and assigns to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, executors, administrators, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from and Exceptions to Conveyance and Warranty, by, through or under Grantor, but not otherwise.

The Vendor's Lien against and superior title to the Property herein conveyed are retained until each note described herein is fully paid according to its terms, at which time this Deed shall become absolute. Lender, at Grantee's request, has paid in cash to Grantor that portion of the purchase price of the Property that is evidenced by the note. The first and superior vendor's lien against and superior title to the Property are retained for the benefit of Lender and are transferred to Lender, without recourse against Grantor.

As a material part of the Consideration for this special warranty deed, Grantor and Grantee agree that Grantee is taking the Property "AS IS" with any and all latent and patent defects and that there is no warranty by Grantor that the Property has a particular financial value or is fit for a particular purpose. Grantee acknowledges and stipulates that Grantee is not relying on any representation, statement, or other assertion with respect to the Property condition but is relying on Grantee's examination of the Property. Grantee takes the Property with the express understanding and stipulation that there are no express or implied warranties.

**EXHIBIT A**

Copy from re:SearchTX

When the context requires, singular nouns and pronouns include the plural.

**GRANTOR:**

Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets Trust 2007-3, Mortgage-Backed Pass-Through Certificates Series 2007-3

By its attorney-in-fact PHH Mortgage Corporation   2/23/2021

BY: _____

NAME: ____Beonide Durandisse_____

TITLE: ____Contract Management Coordinator_____

## ACKNOWLEDGMENT

THE STATE OF ___Florida_____   §
                                    §
COUNTY OF _____Palm Beach_____    §

The foregoing instrument was acknowledged before me by means of ☒ physical presence or ☐ online notarization, this __23__, day of _____February_____ 2021, by _____Beonide Durandisse_____, ____Contract Management Coordinator____ of its attorney-in-fact PHH Mortgage Corporation for **Deutsche Bank National Trust Company, as Trustee for American Home Mortgage Assets Trust 2007-3, Mortgage-Backed Pass-Through Certificates Series 2007-3** who is underlined personally known to me or who has produced _____ as identification.

_____
Signature of Notary Public

Name of Notary Public: ____**Carlene Reid**____
Notary Commission Expiration Date: _____
Personally known: ___X___
OR Produced Identification: _____

CARLENE REID
Notary Public - State of Florida
Commission # GG 962671
My Comm. Expires Apr 28, 2024
Bonded through National Notary Assn.

**POA recorded simultaneously herewith**

AFTER RECORDING RETURN TO:

LONESTAR CAPITAL HOLDINGS LLC
2422 West Commerce Street
San Antonio, TX 78207-3831

Copy from re:SearchTX

**File Information**

**eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY**
**LUCY ADAME-CLARK, BEXAR COUNTY CLERK**

| | |
|---|---|
| **Document Number:** | 20210059905 |
| **Recorded Date:** | March 09, 2021 |
| **Recorded Time:** | 9:36 AM |
| **Total Pages:** | 3 |
| **Total Fees:** | $30.00 |

**\*\* THIS PAGE IS PART OF THE DOCUMENT \*\***

**\*\* Do Not Remove \*\***

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on: 3/9/2021 9:36 AM

Lucy Adame-Clark
**Lucy Adame-Clark**
**Bexar County Clerk**

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF   Document 1-1   Filed 09/27/24   Page 26 of 205

After Recording Return To:
CHURCHILL FUNDING I LLC - ATTN: DOC INTAKE
1415 VANTAGE PARK DRIVE, SUITE 240
CHARLOTTE, NORTH CAROLINA 28203
Loan Number: FD-DSCR-9936

——————————— [Space Above This Line For Recording Data] ———————————

# DEED OF TRUST

**MIN:** 1016547-1000010070-0          **MERS Phone: 888-679-6377**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined under the caption TRANSFER OF RIGHTS IN THE PROPERTY and in Sections 3, 4, 10, 11, 12, 16, 19, 24, and 25. Certain rules regarding the usage of words used in this document are also provided in Section 17.

## Parties

(A) "Borrower" is LONESTAR CAPITAL HOLDINGS LLC, A TEXAS LIMITED LIABILITY COMPANY

currently residing at 7500 RIALTO BLVD., STE. 250, AUSTIN, TEXAS 78735

Borrower is the grantor under this Security Instrument.

(B) "Lender" is FUNDING DOOR LLC

Lender is a DELAWARE LIMITED LIABILITY COMPANY    organized and existing under the laws of DELAWARE . Lender's address is 33 S WOOD AVE SUITE 600, ISELIN, NEW JERSEY 08830

Lender includes any holder of the Note who is entitled to receive payments under the Note. The term "Lender" includes any successors and assigns of Lender.

———————————————————————————————————————————

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)
Form 3044  07/2021        Page 1 of 20        ☆DocMagic

**Recorded by: KW VT-22-1128**



EXHIBIT
B

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF   Document 1-1   Filed 09/27/24   Page 27 of 205

(C)  "Trustee" is  BRETT M. SHANKS

Trustee's address is  15810 PARK TEN PLACE, SUITE 205, HOUSTON, TEXAS 77084

The term "Trustee" includes any substitute/successor Trustee.

(D)  "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

## Documents

(E)  "Note" means the promissory note dated  August 22, 2022 , and signed by each Borrower who is legally obligated for the debt under that promissory note, that is in either (i) paper form, using Borrower's written pen and ink signature, or (ii) electronic form, using Borrower's adopted Electronic Signature in accordance with the UETA or E-SIGN, as applicable. The Note evidences the legal obligation of each Borrower who signed the Note to pay Lender  THREE HUNDRED EIGHTY THOUSAND AND 00/100
Dollars (U.S. $ 380,000.00 ) plus interest.
Each Borrower who signed the Note has promised to pay this debt in regular monthly payments and to pay the debt in full not later than  September 1, 2052 .

(F)  "Riders" means all Riders to this Security Instrument that are signed by Borrower. All such Riders are incorporated into and deemed to be a part of this Security Instrument. The following Riders are to be signed by Borrower [check box as applicable]:

| | |
|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider |
| ☒ 1-4 Family Rider | ☐ Planned Unit Development Rider |
| ☐ Second Home Rider | ☒ Other(s) [specify]: Vacant Land Rider; SFR Entity Borrower Rider |

(G)  "Security Instrument" means this document, which is dated  August 22, 2022 , together with all Riders to this document.

## Additional Definitions

(H)  "Applicable Law" means all controlling applicable federal, state, and local statutes, regulations, ordinances, and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(I)  "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments, and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association, or similar organization.

(J)  "Default" means: (i) the failure to pay any Periodic Payment or any other amount secured by this Security Instrument on the date it is due; (ii) a breach of any representation, warranty, covenant, obligation, or agreement in this Security Instrument; (iii) any materially false, misleading, or inaccurate information or statement to Lender

Copy from re:SearchTX

provided by Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent, or failure to provide Lender with material information in connection with the Loan, as described in Section 8; or (iv) any action or proceeding described in Section 12(e).

(K) **"Electronic Fund Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone or other electronic device capable of communicating with such financial institution, wire transfers, and automated clearinghouse transfers.

(L) **"Electronic Signature"** means an "Electronic Signature" as defined in the UETA or E-SIGN, as applicable.

(M) **"E-SIGN"** means the Electronic Signatures in Global and National Commerce Act (15 U.S.C. § 7001 *et seq.*), as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

(N) **"Escrow Items"** means: (i) taxes and assessments and other items that can attain priority over this Security Instrument as a lien or encumbrance on the Property; (ii) leasehold payments or ground rents on the Property, if any; (iii) premiums for any and all insurance required by Lender under Section 5; (iv) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 11; and (v) Community Association Dues, Fees, and Assessments if Lender requires that they be escrowed beginning at Loan closing or at any time during the Loan term.

(O) **"Loan"** means the debt obligation evidenced by the Note, plus interest, any prepayment charges, costs, expenses, and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(P) **"Loan Servicer"** means the entity that has the contractual right to receive Borrower's Periodic Payments and any other payments made by Borrower, and administers the Loan on behalf of Lender. Loan Servicer does not include a sub-servicer, which is an entity that may service the Loan on behalf of the Loan Servicer.

(Q) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(R) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or Default on, the Loan.

(S) **"Partial Payment"** means any payment by Borrower, other than a voluntary prepayment permitted under the Note, which is less than a full outstanding Periodic Payment.

(T) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3.

(U) **"Property"** means the property described below under the heading "TRANSFER OF RIGHTS IN THE PROPERTY."

(V) **"Rents"** means all amounts received by or due Borrower in connection with the lease, use, and/or occupancy of the Property by a party other than Borrower.

(W) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 *et seq.*) and its implementing regulation, Regulation X (12 C.F.R. Part 1024), as they may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter. When used in this Security Instrument, "RESPA" refers to all requirements and restrictions that would apply to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(X) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

(Y) **"UETA"** means the Uniform Electronic Transactions Act, as enacted by the jurisdiction in which the Property is located, as it may be amended from time to time, or any applicable additional or successor legislation that governs the same subject matter.

---

Copy from re:SearchTX

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender (i) the repayment of the Loan, and all renewals, extensions, and modifications of the Note, and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the

| | COUNTY | of | BEXAR | : |
|---|---|---|---|---|
| | [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF.
A.P.N.: 130067

which currently has the address of    2422 W. COMMERCE STREET
                                      [Street]

            SAN ANTONIO          , Texas       78207         ("Property Address");
            [City]                             [Zip Code]

TOGETHER WITH all the improvements now or subsequently erected on the property, including replacements and additions to the improvements on such property, all property rights, including, without limitation, all easements, appurtenances, royalties, mineral rights, oil or gas rights or profits, water rights, any strips or gores of real property between such real property and abutting or adjacent properties, and fixtures now or subsequently a part of the property. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER REPRESENTS, WARRANTS, COVENANTS, AND AGREES that: (i) Borrower lawfully owns and possesses the Property conveyed in this Security Instrument in fee simple or lawfully has the right to use and occupy the Property under a leasehold estate; (ii) Borrower has the right to grant and convey the Property or Borrower's leasehold interest in the Property; and (iii) the Property is unencumbered, and not subject to any other ownership interest in the Property, except for encumbrances and ownership interests of record. Borrower warrants generally the title to the Property and covenants and agrees to defend the title to the Property against all claims and demands, subject to any encumbrances and ownership interests of record as of Loan closing.

THIS SECURITY INSTRUMENT combines uniform covenants for national use with limited variations and non-uniform covenants that reflect specific Texas state requirements to constitute a uniform security instrument covering real property.

---

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)
Form 3044   07/2021                         Page 4 of 20                          ☆DocMagic

Copy from re:SearchTX

**UNIFORM COVENANTS.** Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower will pay each Periodic Payment when due. Borrower will also pay any prepayment charges and late charges due under the Note, and any other amounts due under this Security Instrument. Payments due under the Note and this Security Instrument must be made in U.S. currency. If any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (d) Electronic Fund Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 16. Lender may accept or return any Partial Payments in its sole discretion pursuant to Section 2.

Any offset or claim that Borrower may have now or in the future against Lender will not relieve Borrower from making the full amount of all payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Acceptance and Application of Payments or Proceeds.**

(a) **Acceptance and Application of Partial Payments.** Lender may accept and either apply or hold in suspense Partial Payments in its sole discretion in accordance with this Section 2. Lender is not obligated to accept any Partial Payments or to apply any Partial Payments at the time such payments are accepted, and also is not obligated to pay interest on such unapplied funds. Lender may hold such unapplied funds until Borrower makes payment sufficient to cover a full Periodic Payment, at which time the amount of the full Periodic Payment will be applied to the Loan. If Borrower does not make such a payment within a reasonable period of time, Lender will either apply such funds in accordance with this Section 2 or return them to Borrower. If not applied earlier, Partial Payments will be credited against the total amount due under the Loan in calculating the amount due in connection with any foreclosure proceeding, payoff request, loan modification, or reinstatement. Lender may accept any payment insufficient to bring the Loan current without waiver of any rights under this Security Instrument or prejudice to its rights to refuse such payments in the future.

(b) **Order of Application of Partial Payments and Periodic Payments.** Except as otherwise described in this Section 2, if Lender applies a payment, such payment will be applied to each Periodic Payment in the order in which it became due, beginning with the oldest outstanding Periodic Payment, as follows: first to interest and then to principal due under the Note, and finally to Escrow Items. If all outstanding Periodic Payments then due are paid in full, any payment amounts remaining may be applied to late charges and to any amounts then due under this Security Instrument. If all sums then due under the Note and this Security Instrument are paid in full, any remaining payment amount may be applied, in Lender's sole discretion, to a future Periodic Payment or to reduce the principal balance of the Note.

If Lender receives a payment from Borrower in the amount of one or more Periodic Payments and the amount of any late charge due for a delinquent Periodic Payment, the payment may be applied to the delinquent payment and the late charge.

When applying payments, Lender will apply such payments in accordance with Applicable Law.

(c) **Voluntary Prepayments.** Voluntary prepayments will be applied as described in the Note.

(d) **No Change to Payment Schedule.** Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note will not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.**

(a) **Escrow Requirement; Escrow Items.** Borrower must pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum of money to provide for payment of amounts due for all Escrow

Copy from re:SearchTX

Items (the "Funds"). The amount of the Funds required to be paid each month may change during the term of the Loan. Borrower must promptly furnish to Lender all notices or invoices of amounts to be paid under this Section 3.

(b) **Payment of Funds; Waiver.** Borrower must pay Lender the Funds for Escrow Items unless Lender waives this obligation in writing. Lender may waive this obligation for any Escrow Item at any time. In the event of such waiver, Borrower must pay directly, when and where payable, the amounts due for any Escrow Items subject to the waiver. If Lender has waived the requirement to pay Lender the Funds for any or all Escrow Items, Lender may require Borrower to provide proof of direct payment of those items within such time period as Lender may require. Borrower's obligation to make such timely payments and to provide proof of payment is deemed to be a covenant and agreement of Borrower under this Security Instrument. If Borrower is obligated to pay Escrow Items directly pursuant to a waiver, and Borrower fails to pay timely the amount due for an Escrow Item, Lender may exercise its rights under Section 9 to pay such amount and Borrower will be obligated to repay to Lender any such amount in accordance with Section 9.

Lender may withdraw the waiver as to any or all Escrow Items at any time by giving a notice in accordance with Section 16; upon such withdrawal, Borrower must pay to Lender all Funds for such Escrow Items, and in such amounts, that are then required under this Section 3.

(c) **Amount of Funds; Application of Funds.** Lender may, at any time, collect and hold Funds in an amount up to, but not in excess of, the maximum amount a lender can require under RESPA. Lender will estimate the amount of Funds due in accordance with Applicable Law.

The Funds will be held in an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender will apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender may not charge Borrower for: (i) holding and applying the Funds; (ii) annually analyzing the escrow account; or (iii) verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on the Funds, Lender will not be required to pay Borrower any interest or earnings on the Funds. Lender will give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

(d) **Surplus; Shortage and Deficiency of Funds.** In accordance with RESPA, if there is a surplus of Funds held in escrow, Lender will account to Borrower for such surplus. If Borrower's Periodic Payment is delinquent by more than 30 days, Lender may retain the surplus in the escrow account for the payment of the Escrow Items. If there is a shortage or deficiency of Funds held in escrow, Lender will notify Borrower and Borrower will pay to Lender the amount necessary to make up the shortage or deficiency in accordance with RESPA.

Upon payment in full of all sums secured by this Security Instrument, Lender will promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower must pay (a) all taxes, assessments, charges, fines, and impositions attributable to the Property which have priority or may attain priority over this Security Instrument, (b) leasehold payments or ground rents on the Property, if any, and (c) Community Association Dues, Fees, and Assessments, if any. If any of these items are Escrow Items, Borrower will pay them in the manner provided in Section 3.

Borrower must promptly discharge any lien that has priority or may attain priority over this Security Instrument unless Borrower: (aa) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing under such agreement; (bb) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which Lender determines, in its sole discretion, operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (cc) secures from the holder of the lien an agreement satisfactory to Lender that subordinates the lien to this Security Instrument (collectively, the "Required Actions"). If Lender determines that any part of the Property is subject to a lien that has priority or may attain priority over this Security Instrument and Borrower has not taken any of the Required Actions in regard to such lien, Lender may give Borrower a notice identifying the lien.

Copy from re:SearchTX

Within 10 days after the date on which that notice is given, Borrower must satisfy the lien or take one or more of the Required Actions.

**5. Property Insurance.**

(a) **Insurance Requirement; Coverages.** Borrower must keep the improvements now existing or subsequently erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes, winds, and floods, for which Lender requires insurance. Borrower must maintain the types of insurance Lender requires in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan, and may exceed any minimum coverage required by Applicable Law. Borrower may choose the insurance carrier providing the insurance, subject to Lender's right to disapprove Borrower's choice, which right will not be exercised unreasonably.

(b) **Failure to Maintain Insurance.** If Lender has a reasonable basis to believe that Borrower has failed to maintain any of the required insurance coverages described above, Lender may obtain insurance coverage, at Lender's option and at Borrower's expense. Unless required by Applicable Law, Lender is under no obligation to advance premiums for, or to seek to reinstate, any prior lapsed coverage obtained by Borrower. Lender is under no obligation to purchase any particular type or amount of coverage and may select the provider of such insurance in its sole discretion. Before purchasing such coverage, Lender will notify Borrower if required to do so under Applicable Law. Any such coverage will insure Lender, but might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard, or liability and might provide greater or lesser coverage than was previously in effect, but not exceeding the coverage required under Section 5(a). Borrower acknowledges that the cost of the insurance coverage so obtained may significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender for costs associated with reinstating Borrower's insurance policy or with placing new insurance under this Section 5 will become additional debt of Borrower secured by this Security Instrument. These amounts will bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(c) **Insurance Policies.** All insurance policies required by Lender and renewals of such policies: (i) will be subject to Lender's right to disapprove such policies; (ii) must include a standard mortgage clause; and (iii) must name Lender as mortgagee and/or as an additional loss payee. Lender will have the right to hold the policies and renewal certificates. If Lender requires, Borrower will promptly give to Lender proof of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy must include a standard mortgage clause and must name Lender as mortgagee and/or as an additional loss payee.

(d) **Proof of Loss; Application of Proceeds.** In the event of loss, Borrower must give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Any insurance proceeds, whether or not the underlying insurance was required by Lender, will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and determines that Lender's security will not be lessened by such restoration or repair.

If the Property is to be repaired or restored, Lender will disburse from the insurance proceeds any initial amounts that are necessary to begin the repair or restoration, subject to any restrictions applicable to Lender. During the subsequent repair and restoration period, Lender will have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Lender will not be required

Copy from re:SearchTX

to pay Borrower any interest or earnings on such insurance proceeds unless Lender and Borrower agree in writing or Applicable Law requires otherwise. Fees for public adjusters, or other third parties, retained by Borrower will not be paid out of the insurance proceeds and will be the sole obligation of Borrower.

If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the insurance proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

(e) **Insurance Settlements; Assignment of Proceeds.** If Borrower abandons the Property, Lender may file, negotiate, and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 26 or otherwise, Borrower is unconditionally assigning to Lender (i) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note and this Security Instrument, and (ii) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, to the extent that such rights are applicable to the coverage of the Property. If Lender files, negotiates, or settles a claim, Borrower agrees that any insurance proceeds may be made payable directly to Lender without the need to include Borrower as an additional loss payee. Lender may use the insurance proceeds either to repair or restore the Property (as provided in Section 5(d)) or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower must occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and must continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent will not be unreasonably withheld, or unless extenuating circumstances exist that are beyond Borrower's control.

7. **Preservation, Maintenance, and Protection of the Property; Inspections.** Borrower will not destroy, damage, or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower must maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless Lender determines pursuant to Section 5 that repair or restoration is not economically feasible, Borrower will promptly repair the Property if damaged to avoid further deterioration or damage.

If insurance or condemnation proceeds are paid to Lender in connection with damage to, or the taking of, the Property, Borrower will be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower remains obligated to complete such repair or restoration.

Lender may make reasonable entries upon and inspections of the Property. If Lender has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender will give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower will be in Default if, during the Loan application process, Borrower or any persons or entities acting at Borrower's direction or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan, including, but not limited to, overstating Borrower's income or assets, understating or failing to provide documentation of Borrower's debt obligations and liabilities, and misrepresenting Borrower's occupancy or intended occupancy of the Property as Borrower's principal residence.

Copy from re:SearchTX

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**

(a) **Protection of Lender's Interest.** If: (i) Borrower fails to perform the covenants and agreements contained in this Security Instrument; (ii) there is a legal proceeding or government order that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien that has priority or may attain priority over this Security Instrument, or to enforce laws or regulations); or (iii) Lender reasonably believes that Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and/or rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions may include, but are not limited to: (I) paying any sums secured by a lien that has priority or may attain priority over this Security Instrument; (II) appearing in court; and (III) paying: (A) reasonable attorneys' fees and costs; (B) property inspection and valuation fees; and (C) other fees incurred for the purpose of protecting Lender's interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, exterior and interior inspections of the Property, entering the Property to make repairs, changing locks, replacing or boarding up doors and windows, draining water from pipes, eliminating building or other code violations or dangerous conditions, and having utilities turned on or off. Although Lender may take action under this Section 9, Lender is not required to do so and is not under any duty or obligation to do so. Lender will not be liable for not taking any or all actions authorized under this Section 9.

(b) **Avoiding Foreclosure; Mitigating Losses.** If Borrower is in Default, Lender may work with Borrower to avoid foreclosure and/or mitigate Lender's potential losses, but is not obligated to do so unless required by Applicable Law. Lender may take reasonable actions to evaluate Borrower for available alternatives to foreclosure, including, but not limited to, obtaining credit reports, title reports, title insurance, property valuations, subordination agreements, and third-party approvals. Borrower authorizes and consents to these actions. Any costs associated with such loss mitigation activities may be paid by Lender and recovered from Borrower as described below in Section 9(c), unless prohibited by Applicable Law.

(c) **Additional Amounts Secured.** Any amounts disbursed by Lender under this Section 9 will become additional debt of Borrower secured by this Security Instrument. These amounts may bear interest at the Note rate from the date of disbursement and will be payable, with such interest, upon notice from Lender to Borrower requesting payment.

(d) **Leasehold Terms.** If this Security Instrument is on a leasehold, Borrower will comply with all the provisions of the lease. Borrower will not surrender the leasehold estate and interests conveyed, or terminate or cancel the ground lease. Borrower will not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title will not merge unless Lender agrees to the merger in writing.

10. **Assignment of Rents.**

(a) **Assignment of Rents.** If the Property is leased to, used by, or occupied by a third party ("Tenant"), Borrower is unconditionally assigning and transferring to Lender any Rents, regardless of to whom the Rents are payable. Borrower authorizes Lender to collect the Rents, and agrees that each Tenant will pay the Rents to Lender. However, Borrower will receive the Rents until (i) Lender has given Borrower notice of Default pursuant to Section 26, and (ii) Lender has given notice to the Tenant that the Rents are to be paid to Lender. This Section 10 constitutes an absolute assignment and not an assignment for additional security only.

(b) **Notice of Default.** If Lender gives notice of Default to Borrower: (i) all Rents received by Borrower must be held by Borrower as trustee for the benefit of Lender only, to be applied to the sums secured by the Security Instrument; (ii) Lender will be entitled to collect and receive all of the Rents; (iii) Borrower agrees to instruct each Tenant that Tenant is to pay all Rents due and unpaid to Lender upon Lender's written demand to the Tenant; (iv) Borrower will ensure that each Tenant pays all Rents due to Lender and will take whatever action is necessary to collect such Rents if not paid to Lender; (v) unless Applicable Law provides otherwise, all Rents collected by Lender

Copy from re:SearchTX

will be applied first to the costs of taking control of and managing the Property and collecting the Rents, including, but not limited to, reasonable attorneys' fees and costs, receiver's fees, premiums on receiver's bonds, repair and maintenance costs, insurance premiums, taxes, assessments, and other charges on the Property, and then to any other sums secured by this Security Instrument; (vi) Lender, or any judicially appointed receiver, will be liable to account for only those Rents actually received; and (vii) Lender will be entitled to have a receiver appointed to take possession of and manage the Property and collect the Rents and profits derived from the Property without any showing as to the inadequacy of the Property as security.

(c) **Funds Paid by Lender.** If the Rents are not sufficient to cover the costs of taking control of and managing the Property and of collecting the Rents, any funds paid by Lender for such purposes will become indebtedness of Borrower to Lender secured by this Security Instrument pursuant to Section 9.

(d) **Limitation on Collection of Rents.** Borrower may not collect any of the Rents more than one month in advance of the time when the Rents become due, except for security or similar deposits.

(e) **No Other Assignment of Rents.** Borrower represents, warrants, covenants, and agrees that Borrower has not signed any prior assignment of the Rents, will not make any further assignment of the Rents, and has not performed, and will not perform, any act that could prevent Lender from exercising its rights under this Security Instrument.

(f) **Control and Maintenance of the Property.** Unless required by Applicable Law, Lender, or a receiver appointed under Applicable Law, is not obligated to enter upon, take control of, or maintain the Property before or after giving notice of Default to Borrower. However, Lender, or a receiver appointed under Applicable Law, may do so at any time when Borrower is in Default, subject to Applicable Law.

(g) **Additional Provisions.** Any application of the Rents will not cure or waive any Default or invalidate any other right or remedy of Lender. This Section 10 does not relieve Borrower of Borrower's obligations under Section 6.

This Section 10 will terminate when all the sums secured by this Security Instrument are paid in full.

11. **Mortgage Insurance.**

(a) **Payment of Premiums; Substitution of Policy; Loss Reserve; Protection of Lender.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower will pay the premiums required to maintain the Mortgage Insurance in effect. If Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, and (i) the Mortgage Insurance coverage required by Lender ceases for any reason to be available from the mortgage insurer that previously provided such insurance, or (ii) Lender determines in its sole discretion that such mortgage insurer is no longer eligible to provide the Mortgage Insurance coverage required by Lender, Borrower will pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender.

If substantially equivalent Mortgage Insurance coverage is not available, Borrower will continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use, and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve will be non-refundable, even when the Loan is paid in full, and Lender will not be required to pay Borrower any interest or earnings on such loss reserve.

Lender will no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance.

If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower will pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender

Copy from re:SearchTX

providing for such termination or until termination is required by Applicable Law. Nothing in this Section 11 affects Borrower's obligation to pay interest at the Note rate.

(b) **Mortgage Insurance Agreements.** Mortgage Insurance reimburses Lender for certain losses Lender may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance policy or coverage.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. Any such agreements will not: (i) affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan; (ii) increase the amount Borrower will owe for Mortgage Insurance; (iii) entitle Borrower to any refund; or (iv) affect the rights Borrower has, if any, with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 (12 U.S.C. § 4901 *et seq.*), as it may be amended from time to time, or any additional or successor federal legislation or regulation that governs the same subject matter ("HPA"). These rights under the HPA may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

12. **Assignment and Application of Miscellaneous Proceeds; Forfeiture.**

(a) **Assignment of Miscellaneous Proceeds.** Borrower is unconditionally assigning the right to receive all Miscellaneous Proceeds to Lender and agrees that such amounts will be paid to Lender.

(b) **Application of Miscellaneous Proceeds upon Damage to Property.** If the Property is damaged, any Miscellaneous Proceeds will be applied to restoration or repair of the Property, if Lender deems the restoration or repair to be economically feasible and Lender's security will not be lessened by such restoration or repair. During such repair and restoration period, Lender will have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect the Property to ensure the work has been completed to Lender's satisfaction (which may include satisfying Lender's minimum eligibility requirements for persons repairing the Property, including, but not limited to, licensing, bond, and insurance requirements) provided that such inspection must be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed, depending on the size of the repair or restoration, the terms of the repair agreement, and whether Borrower is in Default on the Loan. Lender may make such disbursements directly to Borrower, to the person repairing or restoring the Property, or payable jointly to both. Unless Lender and Borrower agree in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender will not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If Lender deems the restoration or repair not to be economically feasible or Lender's security would be lessened by such restoration or repair, the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds will be applied in the order that Partial Payments are applied in Section 2(b).

(c) **Application of Miscellaneous Proceeds upon Condemnation, Destruction, or Loss in Value of the Property.** In the event of a total taking, destruction, or loss in value of the Property, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property (each, a "Partial Devaluation") where the fair market value of the Property immediately before the Partial Devaluation is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the Partial Devaluation, a percentage of

Copy from re:SearchTX

the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument unless Borrower and Lender otherwise agree in writing. The amount of the Miscellaneous Proceeds that will be so applied is determined by multiplying the total amount of the Miscellaneous Proceeds by a percentage calculated by taking (i) the total amount of the sums secured immediately before the Partial Devaluation, and dividing it by (ii) the fair market value of the Property immediately before the Partial Devaluation. Any balance of the Miscellaneous Proceeds will be paid to Borrower.

In the event of a Partial Devaluation where the fair market value of the Property immediately before the Partial Devaluation is less than the amount of the sums secured immediately before the Partial Devaluation, all of the Miscellaneous Proceeds will be applied to the sums secured by this Security Instrument, whether or not the sums are then due, unless Borrower and Lender otherwise agree in writing.

(d) **Settlement of Claims.** Lender is authorized to collect and apply the Miscellaneous Proceeds either to the sums secured by this Security Instrument, whether or not then due, or to restoration or repair of the Property, if Borrower (i) abandons the Property, or (ii) fails to respond to Lender within 30 days after the date Lender notifies Borrower that the Opposing Party (as defined in the next sentence) offers to settle a claim for damages. "Opposing Party" means the third party that owes Borrower the Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to the Miscellaneous Proceeds.

(e) **Proceeding Affecting Lender's Interest in the Property.** Borrower will be in Default if any action or proceeding begins, whether civil or criminal, that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a Default and, if acceleration has occurred, reinstate as provided in Section 20, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower is unconditionally assigning to Lender the proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property, which proceeds will be paid to Lender. All Miscellaneous Proceeds that are not applied to restoration or repair of the Property will be applied in the order that Partial Payments are applied in Section 2(b).

**13. Borrower Not Released; Forbearance by Lender Not a Waiver.** Borrower or any Successor in Interest of Borrower will not be released from liability under this Security Instrument if Lender extends the time for payment or modifies the amortization of the sums secured by this Security Instrument. Lender will not be required to commence proceedings against any Successor in Interest of Borrower, or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument, by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities, or Successors in Interest of Borrower or in amounts less than the amount then due, will not be a waiver of, or preclude the exercise of, any right or remedy by Lender.

**14. Joint and Several Liability; Signatories; Successors and Assigns Bound.** Borrower's obligations and liability under this Security Instrument will be joint and several. However, any Borrower who signs this Security Instrument but does not sign the Note: (a) signs this Security Instrument to mortgage, grant, and convey such Borrower's interest in the Property under the terms of this Security Instrument; (b) signs this Security Instrument to waive any applicable inchoate rights such as dower and curtesy and any available homestead exemptions; (c) signs this Security Instrument to assign any Miscellaneous Proceeds, Rents, or other earnings from the Property to Lender; (d) is not personally obligated to pay the sums due under the Note or this Security Instrument; and (e) agrees that Lender and any other Borrower can agree to extend, modify, forbear, or make any accommodations with regard to the terms of the Note or this Security Instrument without such Borrower's consent and without affecting such Borrower's obligations under this Security Instrument.

Subject to the provisions of Section 19, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, will obtain all of Borrower's rights,

Copy from re:SearchTX

obligations, and benefits under this Security Instrument. Borrower will not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.

**15. Loan Charges.**

(a) **Tax and Flood Determination Fees.** Lender may require Borrower to pay (i) a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan, and (ii) either (A) a one-time charge for flood zone determination, certification, and tracking services, or (B) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur that reasonably might affect such determination or certification. Borrower will also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency, or any successor agency, at any time during the Loan term, in connection with any flood zone determinations.

(b) **Default Charges.** If permitted under Applicable Law, Lender may charge Borrower fees for services performed in connection with Borrower's Default to protect Lender's interest in the Property and rights under this Security Instrument, including: (i) reasonable attorneys' fees and costs; (ii) property inspection, valuation, mediation, and loss mitigation fees; and (iii) other related fees.

(c) **Permissibility of Fees.** In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower should not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

(d) **Savings Clause.** If Applicable Law sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then (i) any such loan charge will be reduced by the amount necessary to reduce the charge to the permitted limit, and (ii) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). To the extent permitted by Applicable Law, Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**16. Notices; Borrower's Physical Address.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing.

(a) **Notices to Borrower.** Unless Applicable Law requires a different method, any written notice to Borrower in connection with this Security Instrument will be deemed to have been given to Borrower when (i) mailed by first class mail, or (ii) actually delivered to Borrower's Notice Address (as defined in Section 16(c) below) if sent by means other than first class mail or Electronic Communication (as defined in Section 16(b) below). Notice to any one Borrower will constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. If any notice to Borrower required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(b) **Electronic Notice to Borrower.** Unless another delivery method is required by Applicable Law, Lender may provide notice to Borrower by e-mail or other electronic communication ("Electronic Communication") if: (i) agreed to by Lender and Borrower in writing; (ii) Borrower has provided Lender with Borrower's e-mail or other electronic address ("Electronic Address"); (iii) Lender provides Borrower with the option to receive notices by first class mail or by other non-Electronic Communication instead of by Electronic Communication; and (iv) Lender otherwise complies with Applicable Law. Any notice to Borrower sent by Electronic Communication in connection with this Security Instrument will be deemed to have been given to Borrower when sent unless Lender becomes aware that such notice is not delivered. If Lender becomes aware that any notice sent by Electronic Communication is not delivered, Lender will resend such communication to Borrower by first class mail or by other non-Electronic Communication. Borrower may withdraw the agreement to receive Electronic Communications from Lender at any time by providing written notice to Lender of Borrower's withdrawal of such agreement.

Copy from re:SearchTX

(c) **Borrower's Notice Address.** The address to which Lender will send Borrower notice ("Notice Address") will be the Property Address unless Borrower has designated a different address by written notice to Lender. If Lender and Borrower have agreed that notice may be given by Electronic Communication, then Borrower may designate an Electronic Address as Notice Address. Borrower will promptly notify Lender of Borrower's change of Notice Address, including any changes to Borrower's Electronic Address if designated as Notice Address. If Lender specifies a procedure for reporting Borrower's change of Notice Address, then Borrower will report a change of Notice Address only through that specified procedure.

(d) **Notices to Lender.** Any notice to Lender will be given by delivering it or by mailing it by first class mail to Lender's address stated in this Security Instrument unless Lender has designated another address (including an Electronic Address) by notice to Borrower. Any notice in connection with this Security Instrument will be deemed to have been given to Lender only when actually received by Lender at Lender's designated address (which may include an Electronic Address). If any notice to Lender required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

(e) **Borrower's Physical Address.** In addition to the designated Notice Address, Borrower will provide Lender with the address where Borrower physically resides, if different from the Property Address, and notify Lender whenever this address changes.

**17. Governing Law; Severability; Rules of Construction.** This Security Instrument is governed by federal law and the law of the State of Texas. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. If any provision of this Security Instrument or the Note conflicts with Applicable Law (i) such conflict will not affect other provisions of this Security Instrument or the Note that can be given effect without the conflicting provision, and (ii) such conflicting provision, to the extent possible, will be considered modified to comply with Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence should not be construed as a prohibition against agreement by contract. Any action required under this Security Instrument to be made in accordance with Applicable Law is to be made in accordance with the Applicable Law in effect at the time the action is undertaken.

As used in this Security Instrument: (a) words in the singular will mean and include the plural and vice versa; (b) the word "may" gives sole discretion without any obligation to take any action; (c) any reference to "Section" in this document refers to Sections contained in this Security Instrument unless otherwise noted; and (d) the headings and captions are inserted for convenience of reference and do not define, limit, or describe the scope or intent of this Security Instrument or any particular Section, paragraph, or provision.

**18. Borrower's Copy.** One Borrower will be given one copy of the Note and of this Security Instrument.

**19. Transfer of the Property or a Beneficial Interest in Borrower.** For purposes of this Section 19 only, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract, or escrow agreement, the intent of which is the transfer of title by Borrower to a purchaser at a future date.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, Lender will not exercise this option if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender will give Borrower notice of acceleration. The notice will provide a period of not less than 30 days from the date the notice is given in accordance with Section 16 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to, or upon, the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower and will be entitled to collect all expenses incurred in pursuing such remedies, including, but not limited to: (a) reasonable attorneys' fees and costs; (b) property inspection and valuation fees; and (c) other fees incurred to protect Lender's Interest in the Property and/or rights under this Security Instrument.

Copy from re:SearchTX

**20. Borrower's Right to Reinstate the Loan after Acceleration.** If Borrower meets certain conditions, Borrower will have the right to reinstate the Loan and have enforcement of this Security Instrument discontinued at any time up to the later of (a) five days before any foreclosure sale of the Property, or (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate. This right to reinstate will not apply in the case of acceleration under Section 19.

To reinstate the Loan, Borrower must satisfy all of the following conditions: (aa) pay Lender all sums that then would be due under this Security Instrument and the Note as if no acceleration had occurred; (bb) cure any Default of any other covenants or agreements under this Security Instrument or the Note; (cc) pay all expenses incurred in enforcing this Security Instrument or the Note, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument or the Note; and (dd) take such action as Lender may reasonably require to assure that Lender's interest in the Property and/or rights under this Security Instrument or the Note, and Borrower's obligation to pay the sums secured by this Security Instrument or the Note, will continue unchanged.

Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (aaa) cash; (bbb) money order; (ccc) certified check, bank check, treasurer's check, or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a U.S. federal agency, instrumentality, or entity; or (ddd) Electronic Fund Transfer. Upon Borrower's reinstatement of the Loan, this Security Instrument and obligations secured by this Security Instrument will remain fully effective as if no acceleration had occurred.

**21. Sale of Note.** The Note or a partial interest in the Note, together with this Security Instrument, may be sold or otherwise transferred one or more times. Upon such a sale or other transfer, all of Lender's rights and obligations under this Security Instrument will convey to Lender's successors and assigns.

**22. Loan Servicer.** Lender may take any action permitted under this Security Instrument through the Loan Servicer or another authorized representative, such as a sub-servicer. Borrower understands that the Loan Servicer or other authorized representative of Lender has the right and authority to take any such action.

The Loan Servicer may change one or more times during the term of the Note. The Loan Servicer may or may not be the holder of the Note. The Loan Servicer has the right and authority to: (a) collect Periodic Payments and any other amounts due under the Note and this Security Instrument; (b) perform any other mortgage loan servicing obligations; and (c) exercise any rights under the Note, this Security Instrument, and Applicable Law on behalf of Lender. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made, and any other information RESPA requires in connection with a notice of transfer of servicing.

**23. Notice of Grievance.** Until Borrower or Lender has notified the other party (in accordance with Section 16) of an alleged breach and afforded the other party a reasonable period after the giving of such notice to take corrective action, neither Borrower nor Lender may commence, join, or be joined to any judicial action (either as an individual litigant or a member of a class) that (a) arises from the other party's actions pursuant to this Security Instrument or the Note, or (b) alleges that the other party has breached any provision of this Security Instrument or the Note. If Applicable Law provides a time period that must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this Section 23. The notice of Default given to Borrower pursuant to Section 26(a) and the notice of acceleration given to Borrower pursuant to Section 19 will be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 23.

**24. Hazardous Substances.**

(a) **Definitions.** As used in this Section 24: (i) "Environmental Law" means any Applicable Laws where the Property is located that relate to health, safety, or environmental protection; (ii) "Hazardous Substances" include (A) those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law, and (B) the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, corrosive materials or agents, and

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF Document 1-1 Filed 09/27/24 Page 41 of 205

radioactive materials; (iii) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (iv) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

(b) **Restrictions on Use of Hazardous Substances.** Borrower will not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower will not do, nor allow anyone else to do, anything affecting the Property that: (i) violates Environmental Law; (ii) creates an Environmental Condition; or (iii) due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects or could adversely affect the value of the Property. The preceding two sentences will not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

(c) **Notices; Remedial Actions.** Borrower will promptly give Lender written notice of: (i) any investigation, claim, demand, lawsuit, or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge; (ii) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release, or threat of release of any Hazardous Substance; and (iii) any condition caused by the presence, use, or release of a Hazardous Substance that adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower will promptly take all necessary remedial actions in accordance with Environmental Law. Nothing in this Security Instrument will create any obligation on Lender for an Environmental Cleanup.

**25. Electronic Note Signed with Borrower's Electronic Signature.** If the Note evidencing the debt for this Loan is electronic, Borrower acknowledges and represents to Lender that Borrower: (a) expressly consented and intended to sign the electronic Note using an Electronic Signature adopted by Borrower ("Borrower's Electronic Signature") instead of signing a paper Note with Borrower's written pen and ink signature; (b) did not withdraw Borrower's express consent to sign the electronic Note using Borrower's Electronic Signature; (c) understood that by signing the electronic Note using Borrower's Electronic Signature, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms; and (d) signed the electronic Note with Borrower's Electronic Signature with the intent and understanding that by doing so, Borrower promised to pay the debt evidenced by the electronic Note in accordance with its terms.

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**26. Acceleration; Remedies.**

(a) **Notice of Default.** Lender will give a notice of Default to Borrower prior to acceleration following Borrower's Default, except that such notice of Default will not be sent when Lender exercises its right under Section 19 unless Applicable Law provides otherwise. The notice will specify, in addition to any other information required by Applicable Law: (i) the Default; (ii) the action required to cure the Default; (iii) a date, not less than 30 days (or as otherwise specified by Applicable Law) from the date the notice is given to Borrower, by which the Default must be cured; (iv) that failure to cure the Default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property; (v) Borrower's right to reinstate after acceleration; and (vi) Borrower's right to bring a court action to deny the existence of a Default or to assert any other defense of Borrower to acceleration and sale.

(b) **Acceleration; Power of Sale; Expenses.** If the Default is not cured on or before the date specified in the notice, Lender may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender will be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 26, including, but not limited to: (i) reasonable attorneys' fees and costs; (ii) property inspection and valuation fees; and (iii) other fees incurred to protect Lender's interest in the Property and/or rights under this Security Instrument.

---

Copy from re:SearchTX

(c) **Notice of Sale; Sale of Property.** If Lender invokes the power of sale, Lender its designee, or Trustee will give notice of the date, time, place, and terms of sale by posting and filing the notice as provided by Applicable Law. Lender or its designee will mail a copy of the notice to Borrower in the manner prescribed by Applicable Law. Sale will be public, occurring between the hours of 10 a.m. and 4 p.m. on a date and at a location permitted by Applicable Law. The time of sale must begin at the time stated in the notice of sale or not later than three hours after that stated time. Borrower authorizes Trustee to sell the Property to the highest bidder for cash in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

(d) **Trustee's Deed; Proceeds of Sale.** Trustee will deliver to the purchaser a Trustee's deed conveying indefeasible title to the Property with covenants of general warranty from Borrower. Borrower covenants and agrees to defend generally the purchaser's title to the Property against all claims and demands. The recitals in the Trustee's deed will be prima facie evidence of the truth of the statements made in that deed. Trustee will apply the proceeds of the sale in the following order: (i) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs; (ii) to all sums secured by this Security Instrument; and (iii) any excess to the person or persons legally entitled to it.

If the Property is sold pursuant to this Section 26, Borrower or any person holding possession of the Property through Borrower will immediately surrender possession of the Property to the purchaser at that sale. If possession is not surrendered, Borrower or such person will be a Tenant at sufferance and may be removed by writ of possession or other court proceeding.

(e) **Waiver of Deficiency Statute.** To the maximum extent permitted by Applicable Law, Borrower waives all rights, remedies, claims, and defenses based upon or related to Sections 51.003, 51.004, and 51.005 of the Texas Property Code.

**27. Release.** Upon payment of all sums secured by this Security Instrument, Lender will provide a release of this Security Instrument to Borrower or Borrower's designated agent in accordance with Applicable Law. Borrower will pay any recordation costs associated with such release. Lender may charge Borrower a fee for releasing this Security Instrument, only if the fee is paid to a third party for services rendered is permitted under Applicable Law.

**28. Substitute Trustee; Trustee Liability.** All rights, remedies, and duties of Trustee under this Security Instrument may be exercised or performed by one or more trustees acting alone or together. Lender at its option, itself or through the Loan Servicer, and with or without cause, may from time to time, by power of attorney or otherwise, remove or substitute any trustee, add one or more trustees, or appoint a successor trustee to any Trustee without the necessity of any formality other than a designation by Lender in writing. Without any further act or conveyance of the Property the substitute, additional or successor trustee will become vested with the rights, title, remedies, powers, and duties conferred upon Trustee in this Security Instrument and by Applicable Law.

Trustee will not be liable if acting upon any notice, request, consent, demand, statement, or other document believed by Trustee to be correct. Trustee will not be liable for any act or omission unless such act or omission is willful.

**29. Subrogation.** Any of the proceeds of the Note used to take up outstanding liens against all or any part of the Property have been advanced by Lender at Borrower's request and upon Borrower's representation that such amounts are due and are secured by valid liens against the Property. Lender will be subrogated to any and all rights, superior titles, liens, and equities owned or claimed by any owner or holder of any outstanding liens and debts, regardless of whether said liens or debts are acquired by Lender by assignment or are released by the holder of said liens or debts upon payment, or the lien established by this Security Instrument is held to be invalid. Borrower agrees that any statute of limitations related to a cause of action or right to foreclose based on such subrogated rights, superior title, liens, and equities are tolled to the extent necessary until, at the earliest, a final adjudication by a court of last resort that the lien established by this Security Instrument is invalid. Borrower further agrees that Lender will have the same rights and powers provided in Section 26 in connection with any such subrogated rights, superior title, liens, and equities as Lender has in connection with the lien established by this Security Instrument.

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF Document 1-1 Filed 09/27/24 Page 43 of 205

**30. Partial Invalidity.** In the event any portion of the sums intended to be secured by this Security Instrument cannot be lawfully secured, payments in reduction of such sums will be applied first to those portions not secured.

**31. Waiver of Consequential, Punitive, and Speculative Damages.** Lender and Borrower agree that, in connection with any action, suit, or proceeding relating to or arising out of this Security Instrument or any of the other Loan documents, each mutually waives to the fullest extent permitted by Applicable Law any claim for consequential, punitive, or speculative damages.

**32. Purchase Money; Owelty of Partition; Renewal and Extension of Liens Against Homestead Property; Acknowledgment of Cash Advanced Against Non-Homestead Property.**
Check box as applicable:

☐ **Purchase Money.**
The funds advanced to Borrower under the Note were used to pay all or part of the purchase price of the Property. The Note also is primarily secured by the vendor's lien retained in the deed of even date with this Security Instrument conveying the Property to Borrower, which vendor's lien has been assigned to Lender, this Security Instrument being additional security for such vendor's lien.

☐ **Owelty of Partition.**
The Note represents funds advanced by Lender at the special instance and request of Borrower for the purpose of acquiring the entire fee simple title to the Property and the existence of an owelty of partition imposed against the entirety of the Property by a court order or by a written agreement of the parties to the partition to secure the payment of the Note is expressly acknowledged, confessed and granted.

☐ **Renewal and Extension of Liens Against Homestead Property.**
The Note is in renewal and extension, but not in extinguishment, of the indebtedness described on the attached Renewal and Extension Exhibit which is incorporated by reference. Lender is expressly subrogated to all rights, liens, and remedies securing the original holder of a note evidencing Borrower's indebtedness and the original liens securing the indebtedness are renewed and extended to the date of maturity of the Note in renewal and extension of the indebtedness.

☒ **Acknowledgment of Cash Advanced Against Non-Homestead Property.**
The Note represents funds advanced to Borrower on this day at Borrower's request and Borrower acknowledges receipt of such funds. Borrower states that Borrower does not now and does not intend ever to reside on, use in any manner, or claim the Property secured by this Security Instrument as a business or residential homestead. Borrower disclaims all homestead rights, interests and exemptions related to the Property.

**33. Loan Not a Home Equity Loan.** The Loan evidenced by the Note is not an extension of credit as defined by Section 50(a)(6) or Section 50(a)(7), Article XVI, of the Texas Constitution. If the Property is used as Borrower's residence, then Borrower agrees that Borrower will receive no cash from the Loan evidenced by the Note and that any advances not necessary to purchase the Property, extinguish an owelty lien, complete construction, or renew and extend a prior lien against the Property, will be used to reduce the balance evidenced by the Note or such Loan will be modified to evidence the correct Loan balance, at Lender's option. Borrower agrees to execute any documentation necessary to comply with this Section 33.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

Copy from re:SearchTX

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider signed by Borrower and recorded with it.

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By: _____ (Seal)
ANDY PATLAN, MANAGER        -Borrower

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By: _____ (Seal)
MEGAN SCRIMSHIRE,           -Borrower
MANAGER

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By: _____ (Seal)
ELENA RODRIGUEZ,            -Borrower
MANAGER

_____        _____
Witness                        Witness

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)
Form 3044  07/2021                        Page 19 of 20                      ☆DocMagic

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF   Document 1-1   Filed 09/27/24   Page 45 of 205

——————————————— [Space Below This Line For Acknowledgment] ———————————————

The State of __TEXAS__ ,

County of __TRAVIS__ ,

Before me, _Christopher M. Wheeler_ ,

(here insert the name and character of the notarizing officer)

on this day personally appeared __ANDY PATLAN AND MEGAN SCRIMSHIRE AND ELENA RODRIGUEZ__

_____

_____ ,

known to me (or proved to me on the oath of _____

or through _ID to ID_ )

(description of identity card or other document)

to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _22_ day of _AUGUST 2022_ .

CHRISTOPHER M WHEELER
Notary Public, State of Texas
Comm. Expires 08-26-2023
Notary ID 132145551

(Notary Public Signature)

(SEAL)

Loan Originator: DEVANG PATEL, NMLSR ID 1111111
Loan Originator Organization: FUNDING DOOR LLC, NMLSR ID 111111

TEXAS - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT (MERS)
Form 3044 07/2021
Page 20 of 20

☆DocMagic

Copy from re:SearchTX

Loan Number: FD-DSCR-9936

# SFR ENTITY BORROWER RIDER

This Entity Borrower Rider (this "Entity Rider") is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed by the undersigned (the "Borrower") in favor of FUNDING DOOR LLC
("Lender") dated the same date as the date hereof (the "Security Instrument") relating to the propert(ies) located at the address(es) set forth on the signature page hereto (the "Property"). This Entity Rider, together with the Security Instrument and the related the Note and all other riders, certificates and ancillary documents given by Borrower in connection with the Loan and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

1.  **Representations and Warranties.** Borrower represents and warrants to Lender as follows:

(a)  **Organization.** Borrower is validly existing and qualified to transact business and is in good standing in the state in which it is organized and the state in which the Property is located.

(b)  **Authority.** Borrower has all necessary power and authority to (i) own the Property and to carry on its business as now conducted and as contemplated in connection with the performance of its obligations under the Loan Documents and (ii) to execute, deliver and perform its obligations under the Loan Documents to which it is a party. The execution, delivery and performance of the Loan Documents by Borrower will not contravene or conflict with Borrower's organizational documents.

(c)  **Consents.** Any consent, approval, authorization, order, registration or qualification of or with any governmental authority or other person or entity that is required for the execution, delivery and performance of the Loan Documents by Borrower has been obtained and is in full force and effect.

(d)  **Enforceability.** The Loan Documents to which Borrower is a party have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against

Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting the rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(e)  **Certain Regulatory Matters.** Borrower and each Person who owns a 10% or greater direct or indirect beneficial interest in Borrower (each, a "Relevant Party") is in compliance in all material respects with the following (the "Regulatory Requirements"): (i) all applicable United States and other export control laws, including those administered by the United States Department of Commerce and the United States Department of State, (ii) all applicable United States and other laws relating to unsanctioned foreign boycotts; and (iii) all applicable United States and other economic sanctions, anti-terrorism, anti-money laundering and related measures, including those administered by the United States Department of the Treasury, the United States Department of Commerce and the United States Department of State and including the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (USA PATRIOT ACT) of 2001, as the same may be amended from time to time, and corresponding provisions of future laws. In addition, no Relevant Party is a person or entity owned or

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF Document 1-1 Filed 09/27/24 Page 47 of 205

controlled by, or acting for or on behalf of, countries targeted by the United States Department of the Treasury under economic sanctions, or a person or entity designated by the United States Department of the Treasury under sanctions programs that are not country-specific, or otherwise a blocked person identified as such by the United States Department of the Treasury or by officials operating other economic sanctions. Each Relevant Party has obtained all United States and other government approvals, permits or licenses that are required under the Regulatory Requirements to fulfill any of their respective pending commitments or obligations.

**2.** <u>Covenants</u>. Borrower covenants to Lender as follows:

**(a)** <u>Preservation of Entity Existence</u>. Borrower shall (i) comply with its organizational documents, (ii) maintain its existence, rights, franchises and privileges in its state of organization, (iii) qualify and remain in good standing in each other jurisdiction where the same is required under applicable law and (iv) not engage in or consent to any dissolution, liquidation or consolidation or merger with or into any other entity or otherwise terminate its existence.

**(b)** <u>Regulatory Requirements</u>. Borrower shall comply in all material respects with all Regulatory Requirements.

**3.** <u>Meaning of "beneficial interest in Borrower"</u>. For sake of clarity, the phrase "beneficial interest in Borrower" as used in the Security Instrument and the Note includes, without limitation all direct and indirect equity interests in Borrower, regardless of the number of tiers of ownership.

[signature page follows]

Copy from re:SearchTX

BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained in this Entity Rider.

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By: _____ (Seal)
ANDY PATLAN, MANAGER   -Borrower

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By: _____ (Seal)
ELENA RODRIGUEZ,       -Borrower
MANAGER

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By: _____ (Seal)
MEGAN SCRIMSHIRE,      -Borrower
MANAGER

Date: August 22, 2022

Property Address:
2422 W. COMMERCE STREET

SAN ANTONIO, TEXAS 78207

Borrower's Notice Address:

7500 RIALTO BLVD., STE. 250

AUSTIN, TEXAS 78735

_____

Email: _____

SFR ENTITY BORROWER RIDER
SFREBR.CST  03/08/21                    Page 3 of 3                    ☆DocMagic

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF Document 1-1 Filed 09/27/24 Page 49 of 205

MIN: 1016547-1000010070-0          Loan Number: FD-DSCR-9936

# 1-4 FAMILY RIDER

THIS 1-4 FAMILY RIDER is made this 22nd day of August 2022 ,
and is incorporated into and amends and supplements the Mortgage, Mortgage Deed, Deed of Trust, or
Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to
secure Borrower's Note to FUNDING DOOR LLC, A DELAWARE LIMITED LIABILITY
COMPANY                                    (the "Lender") of the same date and covering the Property
described in the Security Instrument and located at:

2422 W. COMMERCE STREET, SAN ANTONIO, TEXAS 78207
[Property Address]

1-4 FAMILY COVENANTS. In addition to the representations, warranties, covenants, and
agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. ADDITIONAL PROPERTY SUBJECT TO THE SECURITY
INSTRUMENT.** In addition to the Property described in the Security Instrument, the
following items now or later attached to the Property, to the extent they are fixtures, are
added to the Property description, and will also constitute the Property covered by the
Security Instrument: building materials, appliances and goods of every nature whatsoever
now or later located in, on, or used, or intended to be used in connection with the Property,
including, but not limited to, those for the purposes of supplying or distributing heating,
cooling, electricity, gas, water, air and light, fire prevention and extinguishing apparatus,
security and access control apparatus, plumbing, bath tubs, water heaters, water closets,
sinks, ranges, stoves, refrigerators, dishwashers, disposals, washers, dryers, awnings, storm
windows, storm doors, screens, blinds, shades, curtains and curtain rods, attached mirrors,
cabinets, paneling, and attached floor coverings, all of which, including replacements and
additions, will be deemed to be and remain a part of the Property covered by the Security
Instrument. All of the foregoing together with the Property described in the Security
Instrument (or the leasehold estate if the Security Instrument is on a leasehold) are referred
to in this 1-4 Family Rider and the Security Instrument as the "Property."

**B. USE OF PROPERTY; COMPLIANCE WITH LAW.** Borrower will
not seek, agree to, or make a change in the use of the Property or its zoning classification,
unless Lender has agreed in writing to the change. Borrower will comply with all laws,
ordinances, regulations, and requirements of any governmental body applicable to the
Property.

**C. BORROWER'S OCCUPANCY.** Unless Lender and Borrower otherwise
agree in writing, Section 6 concerning Borrower's occupancy of the Property is deleted.

**D. ASSIGNMENT OF LEASES.** Upon Lender's request after default,
Borrower will assign to Lender all leases of the Property and all security deposits made in
connection with leases of the Property. Upon the assignment, Lender will have the right to
modify, extend, or terminate the existing leases and to execute new leases, in Lender's sole

Copy from re:SearchTX

discretion. As used in this paragraph D the word "lease" will mean "sublease" if the Security Instrument is on a leasehold.

**E. CROSS-DEFAULT PROVISION.** Borrower's default or breach under any note or agreement related to the Property in which Lender has an interest will be a breach under the Security Instrument and Lender may invoke any of the remedies permitted by the Security Instrument.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this 1-4 Family Rider.

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By:_____ (Seal)
ANDY PATLAN, MANAGER  -Borrower

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By:_____ (Seal)
ELENA RODRIGUEZ  -Borrower
MANAGER

LONESTAR CAPITAL HOLDINGS
LLC, A TEXAS LIMITED
LIABILITY COMPANY

By:_____ (Seal)
MEGAN SCRIMSHIRE,  -Borrower
MANAGER

MULTISTATE 1-4 FAMILY RIDER
Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3170 07/2021                    Page 2 of 2                    ☆DocMagic

Copy from re:SearchTX

Loan Number: FD-DSCR-9936

# VACANT PROPERTY RIDER

This Vacant Property Rider (this "VP Rider") is made on the date set forth on the signature page hereto, and is incorporated into and shall be deemed to amend and supplement the Note by the undersigned (the "Borrower") in favor of FUNDING DOOR LLC

_____ ("Lender"), dated the same date as the date hereof (the "Note"). This VP Rider, together with the Note and the related Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), all other riders, all other certificates and all ancillary documents given by Borrower and any related Guaranty, are collectively referred to herein as the "Loan Documents". All capitalized terms used herein but not defined shall have the meanings ascribed to them in the other Loan Documents.

This VP Rider is an integral part of the Note and the other Loan Documents. In the event of any conflict or inconsistency between this VP Rider and the Note or the other Loan Documents, the terms of this VP Rider shall control.

1. **Acknowledgment Regarding Vacancy.** Borrower hereby represents and acknowledges that, as of the date hereof, the properties set forth on Exhibit A hereto (each a "Vacant Property") are not occupied by an Eligible Tenant pursuant to an Eligible Lease.

2. **Interest Rate Increase.** Borrower agrees that if the Leasing Conditions (as defined below) are not satisfied for all Vacant Properties by the date that is ninety (90) days from date of the Note, then an additional two percent (2.0%) *per annum* shall thereafter be added to the interest rate that would otherwise be in effect under the Note (the "Interest Rate Step Up"). The Interest Rate Step Up will cease when the Leasing Conditions are satisfied for all Vacant Properties.

3. **Leasing Conditions.** The "Leasing Conditions" means the following:

   (a)     Borrower shall have entered into an Eligible Lease for each Vacant Property with an Eligible Tenant and delivered to Lender a fully-executed copy of such Eligible Lease; and

   (b)     Borrower shall have delivered to Lender written evidence of payment of (i) the first month rent under such Eligible Lease or (ii) for an Eligible Lease with an initial term of less than six (6) months, three months of rent under such Eligible Lease. Written evidence of payment must be satisfactory to Lender and may include one or more cancelled checks that have cleared the applicable tenant's bank account or bank records showing receipt by Borrower of an Automated Clearing House (ACH) payment from the applicable tenant.

[Signature Page Follows]

Copy from re:SearchTX

BY SIGNING BELOW, the undersigned accepts and agrees to the terms and covenants contained in this VP Rider.

LONESTAR CAPITAL HOLDINGS LLC, A TEXAS LIMITED LIABILITY COMPANY

By: _____ (Seal)
ANDY PATLAN, MANAGER    -Borrower

LONESTAR CAPITAL HOLDINGS LLC, A TEXAS LIMITED LIABILITY COMPANY

By: _____ (Seal)
MEGAN SCRIMSHIRE,        -Borrower
MANAGER

LONESTAR CAPITAL HOLDINGS LLC, A TEXAS LIMITED LIABILITY COMPANY

By: _____ (Seal)
ELENA RODRIGUEZ,         -Borrower
MANAGER

Date: August 22, 2022

Property Address:
2422 W. COMMERCE STREET, SAN

ANTONIO, TEXAS 78207

Borrower's Notice Address:

7500 RIALTO BLVD., STE. 250,

AUSTIN, TEXAS 78735

_____

Email: _____

VACANT PROPERTY RIDER
VPR2.CST  03/08/21                    Page 2 of 3                    ☆DocMagic

Copy from re:SearchTX

# EXHIBIT A

## VACANT PROPERTY ADDRESS(ES)

_____

_____

_____

_____

_____

_____

Copy from re:SearchTX

**File Information**

**eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY
LUCY ADAME-CLARK, BEXAR COUNTY CLERK**

| | |
|---|---|
| **Document Number:** | 20220208977 |
| **Recorded Date:** | August 26, 2022 |
| **Recorded Time:** | 3:10 PM |
| **Total Pages:** | 29 |
| **Total Fees:** | $134.00 |

**\*\* THIS PAGE IS PART OF THE DOCUMENT \*\***

**\*\* Do Not Remove \*\***

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR

I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on: 8/26/2022 3:10 PM

*Lucy Adame-Clark*
**Lucy Adame-Clark**
**Bexar County Clerk**

Copy from re:SearchTX

Execution Copy

## OPERATING AGREEMENT
## OF REAGENT LONESTAR GROUP, LLC

This Operating Agreement ("**Agreement**") is entered into as of April 27, 2023 (the "**Effective Date**") by and among **REAGENT LONESTAR GROUP, LLC**, a Delaware limited liability company (the "**Company**"), and the Persons identified as the Members on Schedule A (which is attached hereto and expressly made a part hereof, and as may be amended from time to time, "**Schedule A**") and who have additionally executed this Agreement or a joinder agreement (such Persons and their respective successors being hereinafter referred to individually as a "**Member**" and collectively as the "**Members**").

WHEREAS, the Company was formed under the laws of the State of Delaware (as amended from time to time, the "**LLC Law**") by filing of a certificate of formation with the Secretary of State of the State of Delaware on April 27, 2023 (the "**Certificate of Formation**");

WHEREAS, the Members desire to enter into this Agreement to set forth their rights and privileges as Members of the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein made and other good and valuable consideration, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     <u>DEFINITIONS</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

(a)     "**Adjusted Capital Account Deficit**" means with respect to any Member, the deficit balance, if any, in such Member's Capital Account (as hereinafter defined) as of the end of the relevant Fiscal Year (as hereinafter defined), after giving effect to the following adjustments:

   (i)     Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations (as hereinafter defined); and

   (ii)     Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) and 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations. The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations and shall be interpreted consistently therewith.

(b)     "**Affiliate**" means, with respect to any Person (as hereinafter defined), any Person that controls, is controlled by or is under common control with, such Person. A Person shall be deemed to "control" another Person if such first Person possesses, directly or indirectly, the power to direct, or cause the direction of, the management and policies of the second Person, whether through the ownership of voting securities, by contract or otherwise.

**EXHIBIT**
**C**

Copy from re:SearchTX

(c)   **"Articles of Organization"** means the Company's Certificate of Formation filed with the Delaware Secretary of State, as may from time to time be amended.

(d)   **"Capital Account"** means the capital account maintained for a Member pursuant to **Section 6.4**.

(e)   **"Capital Contribution"** means any contribution by a Member to the capital of the Company in cash or property.

(f)   **"Change of Control"** means:

(i)   a Majority Unit Sale;

(ii)   any reorganization, merger or consolidation of the Company, other than a transaction or series of related transactions in which the holders of a majority of its voting securities outstanding immediately prior to such transaction or series of related transactions retain, immediately after such transaction or series of related transactions, at least a majority of the total voting power represented by the outstanding voting securities of the Company or such other surviving or resulting entity; or

(iii)   a sale, lease or other disposition of all or substantially all of the Company's assets.

(g)   **"Code"** means the Internal Revenue Code of 1986, as amended and in effect from time to time, as interpreted by the applicable Treasury Regulations.  Any reference herein to a specific section or sections of the Code shall be deemed to include a reference to any corresponding provision of future law.

(h)   **"Company"** has the meaning assigned to such term in the preamble of this Agreement.

(i)   **"Confidential Information"** has the meaning assigned to such term in **Section 3.10**.

(j)   **"Director"** has the meaning assigned to such term in **Section 4.1**.

(k)   **"Distribution"** means any cash or other property paid to a Member by the Company from Net Cash Available for Distributions (as hereinafter defined).

(l)   **"Expenses"** means all expenses, including attorneys' fees and disbursements, actually and reasonably incurred in defense of a Proceeding (as hereinafter defined) or in seeking indemnification under **ARTICLE V**, and except for Proceedings by or in the right of the Company or alleging that an Indemnified Party (as hereinafter defined) received an improper personal benefit, any judgments, awards, fines, penalties and reasonable amounts paid in settlement of a Proceeding.

(m)   **"Fiscal Year"** has the meaning assigned to such term in **Section 2.4**.

(n)   **"GAAP"** means generally accepted accounting principles as applied in the United States on a consistent basis.

---

Copy from re:SearchTX

(o)    **"Indemnified Party"** includes: (i) a person serving as the Manager and exercising rights and duties delegated by the Members; (ii) a person serving at the request of the Company as a director, officer, employee, attorney or other agent of another Person; (iii) any person who formerly served in any of the foregoing capacities; and (iv) any directors and their Affiliates.

(p)    **"Intellectual Property"** means: (i) all inventions (whether patented or patentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof; (ii) all trademarks, service marks, trade dress, logos, trade names and corporate names, together with all translations, adaptations, derivations and combinations thereof and including all goodwill associated therewith, and all applications, registrations and renewals in connection therewith; (iii) all copyrightable works, all copyrights and all applications, registrations and renewals in connection therewith; (iv) all mask works and all applications, registrations and renewals in connection therewith; (v) all trade secrets (as defined in the Uniform Trade Secrets Act and under corresponding foreign statutory and common law) and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, source code, object code, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (vi) all software (including firmware and other software embedded in hardware devices), software code (including source code and executable or object code), subroutines, interfaces, including application programming interfaces and algorithms (including data and related documentation); (vii) all other proprietary rights; (viii) all rights in domain names; and (ix) all copies and tangible embodiments thereof (in whatever form or medium).

(q)    **"LLC Law"** has the meaning assigned to such term in the recitals of this Agreement.

(r)    **"Majority Interest"** means Members whose aggregate share of Units (as hereinafter defined) constitutes more than one-half (1/2) of the aggregate of the authorized and outstanding Units.

(s)    **"Majority Unit Sale"** means a transaction or series of related transactions in which any "person" or "group" (within the meaning of Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended), becomes the "beneficial owner" (as defined in Rule 13d-3 under the Securities Exchange Act of 1934, as amended), directly or indirectly, of more than fifty percent (50%) of the Company's outstanding voting securities.

(t)    **"Manager"** has the meaning assigned to such term in <u>**Section 4.1**</u>.

(u)    **"Management Agreement"** is the agreement dated as of April 27, 2023 and attached to the Operating Agreement as Exhibit A.

(v)    **"Member"** or **"Members"** has the meaning assigned to such term in the preamble of this Agreement.

(w)    **"Net Cash Available for Distributions"** means, with respect to any period for which such calculation is being made, the net cash proceeds from Company operations *less* the portion thereof used to establish Company reserves as determined by the Manager in its sole discretion.

(x)    **"Net Losses"** means the net losses of the Company, if any, determined in accordance with the Code.

Copy from re:SearchTX

(y) **"Net Profits"** means the net income of the Company, if any, determined in accordance with the Code.

(z) **"Person"** means any natural person, corporation, governmental authority, limited liability company, partnership, trust, unincorporated association or other entity.

(aa) **"Pro Rata Interest"** means, with respect to each Member, the percentage determined from time to time by dividing: (i) the number of all Units held by such Member; by (ii) the aggregate number of all Units held by all Members.

(bb) **"Proceeding"** means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, and any claim which could be the subject of a proceeding.

(cc) **"Securities Act"** means Securities Act of 1933, as amended.

(dd) **"Subsidiary"** means any direct or indirect subsidiary of the Company.

(ee) **"Transfer"** or **"Transferring"** means any direct or indirect transfer, donation, sale, assignment, pledge, hypothecation, grant of a security interest in or other disposal or attempted disposal of all or any portion of a Unit or security, any interest or rights in a Unit or security, or any rights under this Agreement. **"Transferred"** means the accomplishment of a Transfer and **"Transferee"** means the recipient of a Transfer.

(ff) **"Treasury Regulations"** means all proposed, temporary and final regulations promulgated under the Code, as from time to time in effect.

(gg) **"Units"** means the Company's membership interests at any time as further described in <u>Section 3.2</u>.

## ARTICLE II
## ORGANIZATION

**2.1** <u>ORGANIZATION, PURPOSE AND POWERS</u>. One (1) or more Persons have acted as an organizer or organizers to form the Company by preparing, executing and filing with the Delaware Secretary of State the Articles of Organization pursuant to the LLC Law. The purpose of the Company is (i) to purchase, on behalf of the Members, approximately 18 properties owned by Lonestar Capital Holdings, LLC and/or its affiliates, with the ultimate number of properties and specific selection of properties to be determined by the Manager in its sole discretion (the "Lonestar Acquisition"), and (ii) hold and manage such Lonestar Acquisition on behalf of the Members and provide for distributions from such Lonestar Acquisition (if and when received) to the Members as agreed hereunder. The Company may also engage in any lawful business, purpose or activity permitted by the LLC Law, and it shall possess and may exercise all of the powers and privileges granted by the LLC Law or which may be exercised by any Person, together with any powers incidental thereto, so far as such powers or privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

Copy from re:SearchTX

**2.2**    TRANSACTIONS WITH AFFILIATES AND POTENTIAL CONFLICTS.

(a)    Unless entered into in bad faith, no contract or transaction between the Company and one or more of its Managers, Officers, Directors or Members, or between the Company and/or any Affiliate in which one or more of its Managers, Officers, Directors or Members have a financial interest or are directors, partners, managers or officers of such Affiliate shall be voidable for this reason or solely because said Manager, Officer, Director or Member was present or authorized such contract or transaction. No Manager, Officer, Director or Member interested in such contract or transaction, because of such interest, shall be considered to be in breach of this Agreement or liable to the LLC, any Officer, Director or Member, or any other person or organization for any loss or expense incurred by reason of such contract or transaction or shall be accountable for any gain or profit realized from such contract or transaction.

(b)    Any Member or Manager may engage or have an interest in other business ventures which are similar to or competitive with the business of the Company, and the pursuit of such ventures, even if competitive, shall not be deemed wrongful or improper or give the Company, its Officers or other Members any rights with respect thereto. No Member or Manager shall be obligated to present an investment opportunity to the Company even if it is similar to or competitive with the business of the Company, and such Member or Manager shall have a right to take for its own account or recommend to others any such investment opportunity.

**2.3**    PRINCIPAL PLACE OF BUSINESS. The principal office and place of business of the Company shall be as determined by the Manager from time to time. The Manager may change the Company's principal office or place of business at any time and may cause the Company to establish other offices or places of business in various jurisdictions and appoint agents for service of process in such jurisdictions.

**2.4**    FISCAL YEAR. The Company's fiscal year shall be the calendar year or such other fiscal year as may be designated by the Manager or required under the Code (the "**Fiscal Year**").

**2.5**    QUALIFICATION IN OTHER JURISDICTIONS. The Manager shall cause the Company to be qualified or registered under applicable laws of any jurisdiction in which the Company transacts business and shall be authorized to execute, deliver and file any certificates and documents necessary to effect such qualification or registration, including, without limitation, the appointment of agents for service of process in such jurisdictions.

## ARTICLE III
## MEMBERS; UNITS

**3.1**    MEMBERS. The Members and their addresses shall be listed on **Schedule A** and said schedule shall be amended from time to time to reflect the withdrawal of Members and the admission of Members pursuant to this Agreement. Unless otherwise explicitly provided herein or in any amendment hereto, the Members shall constitute a single class or group of members of the Company for all purposes of the LLC Law. The Manager shall notify the Members of changes in **Schedule A**, which shall constitute the record list of the Members for all purposes of this Agreement. In addition, the Manager shall provide a copy of the then current **Schedule A** to any Member upon request, provided that specific identifying details of individual Members may be withheld at the Manager's discretion.

Copy from re:SearchTX

**3.2**    <u>MEMBERSHIP UNITS</u>.

(a)    <u>In General</u>.  The Members shall have no interest in the Company other than the interest conferred by this Agreement represented by, with respect to any Member at any particular time, that Member's Units. Every Member, by virtue of having become a Member, shall be held to have expressly assented and agreed to the terms hereof and to have become a party hereto. Ownership of a Unit shall not entitle a Member to any title in or to the whole or any part of the property of the Company or right to call for a partition or division of the same or for an accounting.

(b)    <u>Authorized Units</u>.  The Company is authorized to have one class of Units and to issue up to 1,500,000 "Common" Units, each having the same rights hereunder.  Subject to the rights of the Members contained in this Agreement, the Manager has the exclusive authority to issue Units and to authorize additional Units for issuance.  The Manager may choose, in its discretion, to create additional classes of Units having different rights as reasonably required for the business of the Company.

(c)    <u>Voting Rights</u>.  The Common Units shall not have the right to vote on certain matters of Company business as specified in **ARTICLE IV**.

(d)    <u>Initial Capital Contribution</u>.  Each Member has made the initial capital contributions set forth opposite his, her or its name and as allocated among Units on **Schedule A** attached hereto (each, an "**Initial Capital Contribution**").

(e)    <u>No Reduction in Member's Units</u>.  Except as otherwise provided in this Agreement, the number of Units held by a Member shall be reduced without such Member's written consent.

(f)    <u>Certificates</u>.  The Company shall have the authority, but shall not be required, to issue certificates, in form and substance satisfactory to the Manager and in compliance with the LLC Law, evidencing the Units. Any such certificate shall bear a legend, in form the same or substantially the same as the legend set forth below:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. THE SALE, PLEDGE, HYPOTHECATION OR TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS AND CONDITIONS OF A SUBSCRIPTION AGREEMENT AND AN OPERATING AGREEMENT BY AND BETWEEN THE HOLDER HEREOF AND REAGENT LONESTAR GROUP, LLC.  NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO REAGENT LONESTAR GROUP, LLC THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.

**3.3**    <u>ADMISSION OF NEW MEMBERS</u>.  The Company, with the consent of the Manager and subject to the rights of Members contained in this Agreement, is authorized to offer and sell, or cause to be offered and sold, additional Units and to exchange or cause to be exchanged additional Units for securities

Copy from re:SearchTX

or other property both in accordance with the provisions hereof and to admit additional Persons to the Company as Members who may participate in the profits, losses, Distributions, allocations and Capital Contributions of the Company upon such terms as are established by the Manager, which may include the authorization and issuance of additional Units or the designation and issuance of new classes of Units or the establishment of classes or groups of one or more Members having different relative rights, powers and duties, including, without limitation, rights and powers that are superior to those of existing Members, or the right to vote as a separate class or group on specified matters, by amendment of this Agreement. The Manager may establish eligibility requirements for admission of a subscriber as a Member and refuse to admit any subscriber that fails to satisfy such eligibility requirements. New Members shall be admitted at the time when all conditions to their admission have been satisfied, as determined by the Manager, and their identity and Units (including their Capital Contribution), as applicable, have been established by amendment of **Schedule A**.

      **3.4**    ACTION BY MEMBERS.  No annual meeting of Members is required to be held.  Any action required or permitted to be taken at any meeting of Members may be taken without a meeting if one or more written consents to such action shall be signed by the Members holding the Majority Interest of Units required to approve the action being taken.  Such written consents may be delivered to the Members upon written request.  The form of the consent, notice provisions and other rules applicable to the taking of action without a meeting, more specifically set forth in the LLC Law, are incorporated herein by reference.

      **3.5**    LIMITATION OF LIABILITY OF MEMBERS.  Except as otherwise provided in the LLC Law, no Member of the Company shall be obligated personally for any debt, obligation or liability of the Company or of any other Member, whether arising in contract, tort or otherwise, solely by reason of being a Member of the Company.  Except as otherwise provided in the LLC Law, by other applicable law or expressly in this Agreement, no Member shall have any fiduciary or other duty to another Member with respect to the business and affairs of the Company, and no Member shall be liable to the Company or any other Member for acting in good faith reliance upon the provisions of this Agreement.  No Member shall have any responsibility to restore any negative balance in its Capital Account or to contribute to or in respect of the liabilities or obligations of the Company or return Distributions made by the Company except as required by the LLC Law or other applicable law; provided, however, that Members are responsible for their failure to make required Capital Contributions.  The Company's failure to observe any formalities or requirements relating to the exercise of its powers or the management of its business or affairs under this Agreement or the LLC Law shall not be grounds for making its Members, Directors or Officers responsible for any Company liability.

      **3.6**    AUTHORITY.  Unless specifically authorized by the Manager, a Member shall not be an agent of the Company or have any right, power or authority to act for or to bind the Company or to undertake or assume any obligation or responsibility of the Company or of any other Member.

      **3.7**    NO RIGHT TO WITHDRAW; NO RIGHT TO DISTRIBUTION OR REPAYMENT.  Except as set forth in **ARTICLE IX** with respect to Transfers of Units, no Member shall have any right to resign or withdraw from the Company without the consent of the Manager.  No Member shall have any right to receive any Distribution or the repayment of its Capital Contribution, except as provided in **ARTICLE VII** and **ARTICLE X**.

Copy from re:SearchTX

**3.8**    INFORMATION RIGHTS; FINANCIAL REPORTS; INSPECTION.

(a)    Information.  Members shall have the right to receive from the Manager, upon request, a copy of the Articles of Organization and of this Agreement, as amended from time to time, and such other information regarding the Company as is required by the LLC Law, subject to reasonable conditions and standards established by the Manager as permitted by the LLC Law, which may include, without limitation, withholding of, or restrictions on, the use of Confidential Information.

(b)    Financial Reports.  The Company shall furnish to each Member, within thirty (30) days after filing with the Internal Revenue Service, copies of the Company's tax return along with each Member's K-1.

(c)    Inspection.  Subject to the restrictions on confidentiality set forth in **Section 3.10** hereof, the Company shall permit and cause each of its Subsidiaries to permit each Member, at such Member's expense, to visit and inspect any of the Company's or Subsidiary's properties, to examine their books, to discuss their affairs, finances and accounts with their officers, employees and public accountants who need to know such information and who have been informed of the confidential nature of such information and of the confidentiality obligations provided herein, and to consult with the management of the Company and/or its Subsidiaries as to their affairs, finances and accounts, all at reasonable times and upon reasonable notice during normal business hours.

**3.9**    COMPLIANCE WITH SECURITIES LAWS AND OTHER LAWS AND OBLIGATIONS. Each Member hereby represents and warrants to the Company and acknowledges that: (a) it is an "accredited investor" within the meaning of Rule 501(a) of Regulation D promulgated under the Securities Act; (b) it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of an investment in the Company and making an informed investment decision with respect thereto; (c) it is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time and understands that it has no right to withdraw and have its interest repurchased by the Company; (d) it is acquiring an interest in the Company for investment only and not with a view to, or for resale in connection with, any distribution to the public or public offering thereof; (e) it understands that the equity interests in the Company have not been registered under the securities laws of any jurisdiction and cannot be disposed of unless they are subsequently registered and/or qualified under applicable securities laws and the provisions of this Agreement have been complied with; (f) no "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act is applicable to it; and (g) if it is an entity, the execution, delivery and performance of this Agreement does not require it to obtain any consent or approval that has not been obtained and does not contravene or result in a default under any provision of any existing law or regulation applicable to it, any provision of its charter, by-laws or other governing documents (if applicable) or any agreement or instrument to which it is a party or by which it is bound.

**3.10**    CONFIDENTIALITY.  As used herein, **"Confidential Information"** means all confidential or proprietary information about the Company, its Subsidiaries or any of their respective Affiliates and businesses, including, without limitation, financial statements, tax returns, revenue and expense information, financial projections, contract terms and conditions, confidential or proprietary Intellectual Property, plans, processes, methods, writings, drawings, samples, photographs, analyses, computations, data, studies, reports, documents, concepts, practices, theories, whether written or oral, and whether or not labeled "confidential", that heretofore have been or hereafter are disclosed by the Company to the Member, as well as this Agreement, and any other confidential or proprietary information about the Company, its

Copy from re:SearchTX

Subsidiaries or any of their respective businesses to which a Member is provided access. Each Member agrees to use such Confidential Information solely for purposes reasonably related to such Member's investment in the Company, and to maintain all Confidential Information in the strictest confidence and not to disclose Confidential Information to any Person other than its fiduciaries, agents or advisors who are subject to obligations of confidentiality at least as restrictive with respect to disclosure and use as the provisions of this **Section 3.10**. Each Member also may disclose Confidential Information to the extent necessary in order to comply with any law, order, regulation, ruling or governmental request applicable to such Member. A Member's obligation hereunder shall not apply to any Confidential Information that becomes publicly available through no fault or act of the Member or the disclosure of which is required by a court or governmental authority or otherwise required by law.

**ARTICLE IV**
**COMPANY MANAGEMENT**

4.1     MANAGEMENT BY MANAGER.

(a)     The operations of the Company shall be managed by a person who shall be chosen unanimously by the Members (hereinafter referred to as the "**Manager**", which term shall include any successor Manager hereinafter named or designated hereunder). Subject to and limited by the provisions of this Agreement, Manager shall:

(i)     have the authority, discretion, obligation and responsibility to manage the affairs of the Company to the best of its ability,

(ii)     use its reasonable efforts to carry out the business of the Company, and

(iii)     oversee the day-to-day affairs of the Company and make all decisions and take all actions with respect thereto.

(b)     Attached hereto as Schedule B is a Unanimous Written Consent of Members to appoint Reagent Capital GP LLC as the Manager and the terms thereof, which shall be executed by all of the Members when they execute this Agreement.

(c)     Majority Approval of the Members shall only be required prior to any action by the Manager with respect to the following:

(i)     amendment, modification, termination or waiver of rights under this Agreement;

(ii)     executing a recourse or a confessed judgment promissory note or otherwise confessing a judgement against the Company in connection with any threatened or pending legal action; or

(iii)     [intentionally left blank]

(iv)     commencement of any litigation or arbitration proceedings involving the Company and settlement of any such proceedings.

Copy from re:SearchTX

(v)    In the event that any Member shall fail to respond within ten (10) days to a request for such consent, such Member shall conclusively be deemed to have acquiesced to the proposed action.

(d)    Subject to the Majority Approval requirement set forth in **<u>Section 4.1(c)</u>**, the Manager may execute, for and on behalf of the Company, deeds absolute, mortgages, (including, without limitation, deeds of trust, financing statements, chattel mortgages, pledges, conditional sales contracts, and similar security instruments), leases, contracts, dedications of or easements on all or any part of the Real Property, promissory notes, or other legal documents, all of which instruments when so executed by the Manager shall be valid and binding upon the Company without any liability or obligation on the part of any purchaser, lender, title company or other third party to see the application of any money or property paid or delivered or the authority of the Manager to so act.

**4.2    <u>AUTHORITY TO BIND THE COMPANY</u>.** Except as otherwise provided by this Agreement or by Majority Approval of the Members, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable pecuniarily for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by Majority Approval of the Members to act as agent of the Company in accordance with the previous sentence.

**4.3    <u>LIMITATIONS ON AUTHORITY</u>.** No Member or Manager shall have any authority to perform:

(a)    any act in violation of any applicable law or regulation thereunder,

(b)    any act in contravention of this Agreement or failing to do any act required by this Agreement,

(c)    any act which would make it impossible to carry on the ordinary business of the Company, or

(d)    any act without any consent or ratification which is required to be consented to or ratified by the Members pursuant to any provisions of this Agreement.

**4.4    <u>LIABILITY FOR ACTS AND OMISSIONS</u>.**

(a)    The Members and Manager shall not be liable, responsible or accountable in damages or otherwise to the Company or any of the other Members for any act or omission performed or omitted in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority granted by this Agreement and in the best interests of the Company, but shall be so liable, responsible or accountable for fraud, intentional bad faith misconduct or any breach of their fiduciary duty with respect to such acts or omissions.

(b)    The Company shall indemnify the Members and Manager (to the extent of available assets, but without the requirement that any Member make additional Capital Contributions for this purpose) against any loss or damage incurred by them by reason of any act or omission performed or omitted by them (or their employees or agents) in good faith on behalf of the Company and in a manner reasonably believed by the Members or Manager to be within the scope of the authority granted to them by this

Copy from re:SearchTX

Agreement and in the best interests of the Company (but not, in any event, any loss or damage incurred by reason of fraud, gross negligence, intentional bad faith misconduct or breach of a Members' fiduciary duty with respect to such act or omission).

## ARTICLE V
## INDEMNIFICATION

**5.1**    MANAGER INDEMNIFICATION.  Except as may be limited by law and subject to the provisions of this **ARTICLE V**, the Company shall indemnify, hold harmless and defend each Indemnified Party against all Expenses incurred by them in connection with any Proceeding in which an Indemnified Party is involved as a result of serving in such capacity, except that no indemnification shall be provided for an Indemnified Party regarding any matter as to which it shall be finally determined: (a) that said Indemnified Party's acts were committed in bad faith or were the result of active and deliberate dishonesty and were material to the cause of action so adjudicated; (b) that said Indemnified Party personally gained in fact a financial profit or other advantage to which he or she was not legally entitled; or (c) with respect to a criminal matter, that said Indemnified Party had reasonable cause to believe that such Indemnified Party's conduct was unlawful.  Subject to the foregoing limitations, such indemnification may be provided by the Company with respect to a Proceeding in which it is claimed that an Indemnified Party received an improper personal benefit by reason of its position, regardless of whether the claim arises out of the Indemnified Party's service in such capacity, except for matters as to which it is finally determined that such Indemnified Party personally gained in fact a financial profit or other advantage to which he or she was not legally entitled.

**5.2**    SUCCESSFUL DEFENSE.  Notwithstanding any contrary provisions of this **ARTICLE V**, if an Indemnified Party has been wholly successful on the merits in the defense of any Proceeding in which it was involved by reason of its position as an Indemnified Party or as a result of serving in such capacity (including termination of investigative or other Proceedings without a finding of fault on the part of the Indemnified Party), the Indemnified Party shall be indemnified by the Company against all Expenses incurred by the Indemnified Party in connection therewith.

**5.3**    ADVANCE PAYMENTS.  Except as may be limited by law or the provisions of this **ARTICLE V**, Expenses incurred by an Indemnified Party in defending any Proceeding, including a Proceeding by or in the right of the Company, shall be paid by the Company to the Indemnified Party as incurred in advance of final disposition of the Proceeding. The Company may require that such Indemnified Party execute a written undertaking to repay the amount of any advance if the Indemnified Party is determined pursuant to this **ARTICLE V** or adjudicated to be ineligible for indemnification.  Any such undertaking by an Indemnified Party shall be an unlimited general obligation of the Indemnified Party, need not be secured and may be accepted without regard to the financial ability of the Indemnified Party to make repayment.

**5.4**    INSURANCE.  The Company shall have power to purchase and maintain insurance on behalf of any Indemnified Party, agent or employee against any liability or cost incurred by such person in any such capacity or arising out of its status as such, whether or not the Company would have power to indemnify against such liability or cost. The Company shall purchase for the Manager appropriate liability insurance in amounts and on terms satisfactory to the Manager.

Copy from re:SearchTX

## ARTICLE VI
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**6.1** <u>CAPITAL CONTRIBUTIONS</u>. Each Member has made, on or prior to the Effective Date, the Capital Contributions and other commitments set forth opposite his, her or its name on **Schedule A** to this Agreement.

**6.2** <u>ADDITIONAL CAPITAL CONTRIBUTIONS</u>. No Member shall be obligated to make any additional Capital Contribution; however, the Company may borrow from its Members as well as from banks or other lending institutions to finance its working capital or the acquisition of assets upon such terms and conditions as shall be approved by the Manager, and any borrowing from Members shall not be considered Capital Contributions or reflected in their Capital Accounts. In the event of additional Capital Contributions, **Schedule A** shall be amended to reflect such additional Capital Contributions.

**6.3** <u>INTEREST ON AND RETURN OF CAPITAL CONTRIBUTIONS</u>. No Member shall be entitled to interest on its Capital Contribution or, except as specifically set forth in this Agreement, to a return of its Capital Contribution.

**6.4** <u>CAPITAL ACCOUNTS</u>. The Company shall establish and maintain a Capital Account for each Member according to Section 704 of the Code and applicable Treasury Regulations. Each Member's Capital Account shall be adjusted as set forth below.

(a) <u>Increase in Capital Accounts</u>. Each Member's Capital Account shall be increased by: (i) the amount of any cash actually contributed by the Member to the capital of the Company; (ii) the fair market value of any property which a Member contributes to the capital of the Company (net of liabilities assumed by the Company or subject to which the Company takes such property within the meaning of Section 752 of the Code); and (iii) the Member's share of Net Profits and of any separately allocated items of income or gain, except adjustments under Section 704(c) of the Code.

(b) <u>Decrease in Capital Accounts</u>. Each Member's Capital Account shall be decreased by: (i) the amount of any cash distributed to the Member by the Company; (ii) the fair market value of any property distributed to the Member (net of liabilities of the Company assumed by the Member or subject to which the Member takes such property within the meaning of Section 752 of the Code) at the time of the distribution; and (iii) the Member's share of Net Losses and of any separately allocated items of deduction or loss, except adjustments under Section 704(c) of the Code.

**6.5** <u>MODIFICATIONS</u>. The manner in which Capital Accounts are to be maintained pursuant to this Agreement shall comply with the requirements of Section 704(b) of the Code. If, in the good faith opinion of the Manager, the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Section 704(b) of the Code, then the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

**6.6** <u>TRANSFERS</u>. Upon a permitted sale or other Transfer of Units, the Capital Account of the Member Transferring his, her or its Units shall become the Capital Account of the Person to which or whom such Units are sold or Transferred in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

Copy from re:SearchTX

      **6.7**   DEFICIT CAPITAL ACCOUNT.  Except as otherwise required in the LLC Law, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

## ARTICLE VII
## ALLOCATIONS AND DISTRIBUTIONS

      **7.1**   ALLOCATIONS OF NET PROFITS AND NET LOSSES.  Except as provided in **Section 7.2**, the Net Profits and Net Losses for each Fiscal Year shall be allocated to the Members in accordance with their Pro Rata Interests.

      **7.2**   SPECIAL ALLOCATIONS.  Except as otherwise provided in this Agreement, the following special allocations will be made in the following order and priority:

      (a)   Company Minimum Gain Chargeback.  Notwithstanding any other provision of this **Section 7.2**, if there is a net decrease in partnership "minimum gain" (as that term is defined in Treasury Regulation 1.704-1(b)(4)(iv)(c)) during any taxable year or other period for which allocations are made, the Members will be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods). The amount allocated to each Member under this **Section 7.2(a)** shall be an amount equal to such Member's share of the net decrease in Company minimum gain during such year or other period determined in accordance with Treasury Regulations Section 1.704-2(g)(2). This **Section 7.2(a)** is intended to comply with the partnership minimum gain chargeback requirements of the Treasury Regulations and the exceptions thereto and will be interpreted consistently therewith.

      (b)   Member Nonrecourse Debt Minimum Chargeback.  Notwithstanding any other provision of this **Section 7.2** (other than **Section 7.2(a)**, which shall be applied first), if there is a net decrease in Member nonrecourse debt minimum gain during any taxable year or other period for which allocations are made, any Member with a share of such Member nonrecourse debt minimum gain attributable to such Member nonrecourse debt (determined under Treasury Regulations Section 1.7042(i)(5)) as of the beginning of the year shall be specially allocated items of Company income and gain for that period (and, if necessary, subsequent periods) in proportion to the portion of such Member's share of the net decrease in the Member nonrecourse debt minimum gain with respect to such Member nonrecourse debt that is allocable to the disposition of Company property subject to such Member nonrecourse debt. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(g). This **Section 7.2(b)** is intended to comply with the partner nonrecourse debt minimum gain chargeback requirements of the Treasury Regulations and the exceptions thereto and shall be interpreted consistently therewith.

      (c)   Qualified Income Offset.  A Member who unexpectedly receives any adjustment, allocation or distribution described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6) will be specially allocated items of Company income and gain in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of the Member as quickly as possible.

      (d)   Gross Income Allocation.  In the event any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the amount such Member is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Treasury Regulations, each such Member shall be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this **Section 7.2(d)**

Copy from re:SearchTX

shall be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this **ARTICLE VII** have been made as if **Section 7.2(c)** and **Section 7.2(d)** were not in this Agreement.

(e) <u>Nonrecourse Deductions</u>. Nonrecourse deductions for any taxable year or other period for which allocations are made will be allocated among the Members in accordance with their Pro Rata Interests.

(f) <u>Member Nonrecourse Deductions</u>. Notwithstanding anything to the contrary in this Agreement, any Member nonrecourse deductions for any taxable year or other period for which allocations are made will be allocated to the Member who bears the economic risk of loss with respect to the Member nonrecourse debt to which the Member nonrecourse deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i).

**7.3** <u>CURATIVE ALLOCATIONS</u>. The allocations set forth in **Section 7.2(a)** through **7.2(f)** (collectively, the **"Regulatory Allocations"**) are intended to comply with certain requirements of Treasury Regulations Section 1.704-1(b) and 1.704-2. The Regulatory Allocations may not be consistent with the manner in which the Company intends to divide Company distributions. Accordingly, the Manager is authorized to further allocate Net Profits, Net Losses and other items among the Members so as to prevent the Regulatory Allocations from distorting the manner in which Company distributions would be divided among the Members under this Agreement but for application of the Regulatory Allocations. In general, the reallocation will be accomplished by specially allocating other Net Profits, Net Losses and items of income, gain, loss and deduction, to the extent they exist, among the Members so that the net amount of the Regulatory Allocations and such allocations to each Member is zero (0). The Manager will have discretion to accomplish this result in any reasonable manner that is consistent with Code Section 704 and the related Treasury Regulations.

**7.4** <u>TAX ALLOCATIONS – CODE SECTION 704(c)</u>. In accordance with Code Section 704(c) and the related Treasury Regulations, income, gain, loss and deduction with respect to any property contributed to the capital of the Company, solely for tax purposes, will be allocated among the Members so as to take account of any variation between the adjusted basis to the Company of the property for federal income tax purposes and the initial book value. If the book value of any Company asset is adjusted, subsequent allocations of income, gain, loss and deduction with respect to that asset will take account of any variation between the adjusted basis of the asset for federal income tax purposes and its book value in the same manner as under Code Section 704(c) and the related Treasury Regulations. Any elections or other decisions relating to allocations under this **Section 7.4** will be made in any manner that the Manager determines reasonably reflects the purpose and intention of this Agreement. Allocations under this **Section 7.4** are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Profits, Net Losses or other items or distributions under any provision of this Agreement.

**7.5** <u>LOSS LIMITATION</u>. Net Losses allocated pursuant to **Section 7.1** hereof shall not exceed the maximum amount of Net Losses that can be allocated without causing any Member to have an Adjusted Capital Account Deficit at the end of any Fiscal Year. In the event some but not all of the Members would have Adjusted Capital Account Deficits as a consequence of an allocation of Net Losses pursuant to **Section 7.1** hereof, the limitation set forth in this **Section 7.5** shall be applied on a Member-by-Member basis and Net Losses not allocable to any Member as a result of such limitation shall be allocated to the other Members in accordance with the positive balances in such Member's Capital Accounts so as to allocate the

Copy from re:SearchTX

maximum permissible Net Losses to each Member under Section 1.7041(b)(2)(ii)(d) of the Treasury Regulations.

**7.6**   OTHER ALLOCATION RULES.  The following rules will apply to the calculation and allocation of Net Profits, Net Losses and other items:

(a)   For purposes of determining the Net Profits, Net Losses or any other item allocable to any period, Net Profits, Net Losses and other items will be determined on a daily, monthly or other basis, as determined by the Manager using any permissible method under Code Section 706 and the related Treasury Regulations.

(b)   Except as otherwise provided in this Agreement, all items of Company income, gain, loss, deduction, credit and other allocations not provided for in this Agreement will be divided among the Members in the same proportions as they share Net Profits and Net Losses.

**7.7**   MEMBER ACKNOWLEDGMENT.  The Members agree to be bound by the provisions of this **ARTICLE VII** in reporting their shares of Company income and loss for income tax purposes.

**7.8**   ALLOCATIONS AND DISTRIBUTIONS WITH RESPECT TO TRANSFERRED UNITS. Profits, gains, losses, deductions and credits allocated to Units Transferred during a Fiscal Year of the Company and distributions with respect thereto shall be allocated or distributed, as the case may be, to the person who was the holder of such Units during such Fiscal Year on the basis of an interim closing or closings of the Company's books or in any other proportion determined by the Manager to be required by the Code or advisable in light of positions (published or unpublished) taken or likely to be taken by the Internal Revenue Service.

**7.9**   DISTRIBUTIONS.

(a)   Except upon the occurrence of a Liquidation Event (as hereinafter defined) as set forth in **Section 10.2**, the Manager, shall cause the Company to distribute to the Members any Net Cash Available for Distributions within a reasonable time after distribution amounts received from the Company.  Such Distributions, if any, shall be made to the Members on a pro rata basis as determined by the Manager at that time.

(b)   At the election of the Manager, and subject to any limitations on Distributions imposed by the LLC Law, for each Fiscal Year, the Company may make one or more cash Distributions (the "**Tax Distributions**") out of the Net Cash Available for Distributions to each Member of the amount necessary for each Member to pay the federal income taxes on the net income allocated to such Member by the Company pursuant to **Section 7.1** for such Fiscal Year; provided, however, that if such net income is allocated to the Members from actual cash distributions made by the Company, no Tax Distributions shall be made.

**7.10**  LIMITATION OF LIABILITY.  Nothing contained herein shall be construed to render any Member liable for any actual Company cash losses.

**7.11**  OFFSET.  The Company may offset all amounts owing to the Company by a Member against any Distribution to be made to such Member.

---

Copy from re:SearchTX

**7.12** <u>LIMITATION UPON DISTRIBUTIONS</u>.  No Distribution shall be declared and paid unless, after such Distribution is made, the assets of the Company are in excess of all liabilities of the Company.

**7.13** <u>LOANS BY MEMBERS</u>.  If the Company does not have sufficient cash to pay its obligations, any Member(s) that may agree to do so with the consent of the Manager may advance all or part of the needed funds to or on the Company's behalf.  An advance described in this **<u>Section 7.13</u>** constitutes a loan from the Member to the Company, bears interest from the date of the advance until the date of repayment at a mutually-agreeable, commercially-reasonable interest rate, and is not a Capital Contribution.

**7.14** <u>ACCOUNTING PERIOD</u>.  The accounting period of the Company shall be the Fiscal Year and may be changed by the Manager at any time.

**7.15** <u>COMPLIANCE WITH CODE</u>.  The foregoing provisions of this **ARTICLE VII** relating to the allocation of Net Profits, Net Losses and other items for federal income tax purposes are intended to comply with Treasury Regulations Sections 1.704-1(b) and 1.704-2 and shall be interpreted and applied in a manner consistent with such Treasury Regulations.

**ARTICLE VIII**
**TAXES**

**8.1** <u>TAX RETURNS</u>.  The Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company.

**8.2** <u>TAX MATTERS PARTNER</u>.  The Manager shall be the "Partnership Representative" of the Company pursuant to Section 6231(a)(7) of the Code.

**8.3** <u>PARTNERSHIP TAXATION</u>.  It is intended by the Members that the Company be taxed as a partnership and neither the Company nor any Member, or the Manager shall make or cause to be made any election for the Company to be excluded from the application of Subchapter K of Chapter I of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

**ARTICLE IX**
**TRANSFERABILITY; OTHER RIGHTS OF MEMBERS**

**9.1** <u>GENERAL RESTRICTIONS ON TRANSFER</u>.  Except as otherwise set forth in this Agreement, no Member may Transfer all or any part of his, hers or its Units without the prior written consent of the Members holding a Majority Interest and the Manager. Such consent may be withheld for any reason in the sole discretion of the Members holding a Majority Interest and the Manager.

**ARTICLE X**
**DISSOLUTION**

**10.1** <u>DISSOLUTION</u>.  Subject to the terms and conditions of this Agreement, the Company shall be dissolved and its affairs shall be wound up upon the first to occur of the following:

Copy from re:SearchTX

(a)     the approval by a Majority of Members and the written consent of the Manager;

(b)     the entry of a judicial decree under the LLC Law;

(c)     the final liquidation of the Lonestar Acquisition and distribution of proceeds; therefrom to the Members as provided below; or

(d)     the sale, consolidation or merger of the Company in which it is not the resulting or surviving entity.

10.2   LIQUIDATION.

(a)     Upon any liquidation, dissolution or winding up, voluntary or involuntary, of the Company, any consolidation or merger of the Company with another entity, any transaction pursuant to or as a result of which a single party (or group of affiliated parties) acquires or holds capital stock or membership interests of the Company representing a majority of the outstanding voting power of the Company, or any sale, license, lease or transfer of all or substantially all of the Company's assets (each such event, a "**Liquidation Event**"), amounts available upon such Liquidation Event, after payment of, or adequate provision for, the debts and obligations of the Company, including the expenses of its liquidation and dissolution, the payment of any liabilities to its Directors, Officers or Members, if any, other than liabilities to Members for Distributions, shall be distributed and applied in the following priorities:

(i)      First, to creditors, including any Member who is a creditor or lender, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate reserves, other than liabilities for Distributions to Members and former Members;

(ii)     Second, to the Members in proportion to their respective total Capital Contributions until each Member has received aggregate distributions pursuant to this **Section 10.2** and **Section 7.9** equal to such Member's total Capital Contributions; and

(iii)    Third, to all Members, in accordance with and pro rata in proportion to their respective percentage of Units in the Company; and to the Manager, in accordance with the Management Agreement.

(b)     If any assets (other than cash) are distributed to the Members, all such assets shall be valued at their then fair market value as determined by the Members and the difference, if any, of the fair market value over (or under) the adjusted basis of such property to the Company shall be credited (or charged) to the Capital Account of the Member in accordance with its applicable Pro Rata Interest. If the Members are unable to mutually agree upon the fair market value of any such asset, the Manager shall in good faith select a qualified appraiser and the fair market value shall be the fair market value determined by such appraiser.

10.3   ARTICLES OF DISSOLUTION.  Within ninety (90) days following the dissolution and the commencement of winding up of the Company, or at any other time there are no Members, articles of dissolution shall be filed with the Delaware Secretary of State pursuant to the LLC Law.

Copy from re:SearchTX

**10.4** <u>NONRECOURSE TO OTHER MEMBERS</u>.  Except as provided by applicable law, upon dissolution, each Member shall receive unpaid Distributions and/or a return of its Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to pay any unpaid Distributions and/or return any Capital Contribution of any Member, such Member shall have no recourse against any other Member.

**10.5** <u>TERMINATION</u>.  Upon completion of the dissolution, winding up, liquidation and distribution of the assets of the Company, the Company shall be deemed terminated.

**ARTICLE XI**
**GENERAL PROVISIONS**

**11.1** <u>AMENDMENT</u>.  Except as otherwise specifically provided herein, an amendment or modification of this Agreement requires the Manager and Majority Interest of Members' approval.

**11.2** <u>NOTICES</u>.

(a)   Except as expressly set forth to the contrary in this Agreement, all notices, requests or consents required or permitted to be given under this Agreement must be in writing and shall be deemed to have been given:

(i)   three (3) days after the date mailed by registered or certified mail, addressed to the recipient, with return receipt requested;

(ii)   upon delivery to the recipient in person or by courier;

(iii)   upon receipt of a facsimile transmission by the recipient; or

(iv)   upon receipt of electronic mail by the recipient.

(b)   Such notices, requests and consents shall be given:

(i)   to Members at their numbers or addresses listed on **<u>Schedule A</u>**, or such other number or address as a Member may specify by notice to the Manager or to all of the other Members; and

(ii)   to the Company or the Manager at the address of the principal office of Company.

(c)   Whenever any notice is required to be given by law, the Articles of Organization or this Agreement, a written waiver thereof, signed by the person entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

**11.3** <u>FURTHER ASSURANCES</u>.  In connection with this Agreement and the transactions contemplated hereby, each Member shall execute and deliver any additional documents and instruments and perform any additional acts that may be necessary or appropriate to effectuate and perform the provisions of this Agreement and those transactions, as requested by the Manager.

Copy from re:SearchTX

**11.4** <u>INTERPRETATION</u>.  For the purposes of this Agreement, terms not defined in this Agreement shall be defined as provided in the LLC Law; and all nouns, pronouns and verbs used in this Agreement shall be construed as masculine, feminine, neuter, singular, or plural, whichever shall be applicable. Titles or captions of Articles and Sections contained in this Agreement are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Agreement or the intent of any provision hereof.

**11.5** <u>WAIVER</u>.  The waiver by a party of a breach of any provision of this Agreement shall not operate as, nor be construed as, a waiver of any subsequent breach thereof.

**11.6** <u>SEVERABILITY</u>.  If any provision of this Agreement is determined by any court of competent jurisdiction or an arbitrator to be illegal or unenforceable, such provision shall be automatically reformed and construed so as to valid, operative and enforceable to the maximum extent permitted by law or equity while preserving its original intent.  The invalidity of any part of this Agreement shall not render invalid the remainder of this Agreement.

**11.7** <u>PARTIES BOUND</u>.  The terms and conditions of this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, executors, administrators, successors and permitted assigns.

**11.8** <u>THIRD PARTY BENEFICIARIES</u>.  The provisions of this Agreement are not intended to be for the benefit of any creditor or other person to whom any debts or obligations are owed by, or who may have any claim against, the Company or any of its Members, Directors or Officers, except for Members, Directors or Officers in their capacities as such.  Notwithstanding any contrary provision of this Agreement, no such creditor or person shall obtain any rights under this Agreement or shall, by reason of this Agreement, be permitted to make any claim against the Company or any Member, or Manager.

**11.9** <u>GOVERNING LAW</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, without reference to principles of conflicts of law.

**11.10** <u>ENTIRE AGREEMENT</u>.  This Agreement constitutes the entire agreement between the parties regarding the subject matter contained herein and supersedes all prior and contemporaneous undertakings and agreements of the parties (including, without limitation, the Original Agreement), whether written or oral, with respect to the subject matter herein.

**11.11** <u>FEDERAL TAXATION</u>.  Notwithstanding anything to the contrary herein, to the extent that any provision herein shall be inconsistent with any provision of the Code, including, without limitation, provisions of the Code with respect to the federal taxation of partnerships, such provision shall be modified and amended such that it is consistent with the Code for federal income tax purposes.

**11.12** <u>DISCLOSURE AND WAIVER OF CONFLICTS</u>.  In connection with the preparation of this Agreement, the Members acknowledge and agree that:

(a)    the Members have been advised that the interests of the Members may be opposed to each other and, accordingly, any legal representation of the Company may not be in the best interests of any one or more Member(s); and

(b)    each of the Members has been advised to retain separate legal counsel prior to signing.

Copy from re:SearchTX

**11.13** <u>COUNTERPARTS</u>.  This Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original, and all of which together shall constitute one (1) and the same instrument, notwithstanding that all parties are not a signatory to the original or the same counterpart.  A facsimile or electronic signature of any party shall be sufficient to constitute the original execution of this Agreement by such party for all purposes.

*[Signature pages follow]*

Copy from re:SearchTX

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written.


**COMPANY:**

**REAGENT LONESTAR GROUP, LLC**


By:     Reagent Capital GP LLC, its Manager

By:     *[signature]*

Name:   Mark J. Daniels

Title:   Chief Executive Officer


**MEMBERS:**

See attached Member Execution Pages


[Company Signature Page to Operating Agreement of REAGENT LONESTAR GROUP, LLC]

Copy from re:SearchTX

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement as of the date first above written.


**COMPANY:**

**REAGENT LONESTAR GROUP, LLC**

By:     Reagent Capital GP LLC, its Manager

By:

Name:  Mark J. Daniels

Title:    Chief Executive Officer


**MEMBER:**


By:     _____

Name:  _____

Date:   _____

Investment Amount: _____


[Member Signature Page to Operating Agreement of REAGENT LONESTAR GROUP, LLC]

Copy from re:SearchTX

## SCHEDULE A

## <u>MEMBERS, CAPITAL CONTRIBUTIONS, SHARES AND PERCENTAGE INTEREST</u>

[This will be finalized based upon final approvals]

Copy from re:SearchTX

**SCHEDULE B**

**UNANIMOUS WRITTEN CONSENT OF
THE MEMBERS OF REAGENT LONESTAR GROUP, LLC**

The undersigned, constituting all of the members (the **"Members"**) of **REAGENT LONESTAR GROUP, LLC**, a Delaware limited liability company (the **"Company"**), pursuant to the provisions of the Limited Liability Act of the State of Delaware, Section 18-101 et. seq. of the Delaware Corporations Code, and the Operating Agreement of the Company dated as of April 27, 2023 (the **"Operating Agreement"**), hereby acknowledge that when the undersigned have executed this Unanimous Written Consent (the **"Consent"**) or a counterpart hereof, the resolutions set forth below shall be deemed to have been adopted to the same extent and to have the same force and effect as if adopted at a formal meeting of the Members, duly called and held for the purpose of acting upon proposals to adopt such resolutions.  This Unanimous Written Consent may be executed by each Member separately in counterparts.

I.       **Appointment of the Manager of The Company.**

**WHEREAS, Section 4.1** of the Operating Agreement requires Members to unanimously approve the appointment of the Manager of the Company to provide the Services as described in the Operating Agreement;

**RESOLVED,** that Members hereby appoint Reagent Capital GP LLC as the Manager of the Company in accordance with **Section 4.1** of the Operating Agreement;

**RESOLVED,** that the Management Agreement is hereby approved in its entirety and that Mark J. Daniels is hereby authorized to execute the Management Agreement on behalf of the Company as well as on behalf of the Manager.

II.      **General.**

**RESOLVED,** that this Unanimous Written Consent may be executed by each Member separately in counterparts. A copy of this Unanimous Written Consent be filed in the minute book of the Company.

**IN WITNESS WHEREOF,** the undersigned have executed this Unanimous Written Consent, as of this 27th day of April, 2023.

**MEMBER:**

By:         _____

Name:      _____

Date:       _____

Investment Amount:      _____

Copy from re:SearchTX

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY "REAGENT LONESTAR GROUP LLC" IS DULY
FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD
STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS
OFFICE SHOW, AS OF THE TWENTY-EIGHTH DAY OF APRIL, A.D. 2023.

Jeffrey W. Bullock, Secretary of State

7433043  8300

SR# 20231685840

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203240245

Date: 04-28-23

Copy from re:SearchTX

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 PM 04/27/2023
FILED 11:33 PM 04/27/2023
SR 20231685840 - File Number 7433043

# STATE OF DELAWARE
## CERTIFICATE OF FORMATION
## OF LIMITED LIABILITY COMPANY

The undersigned authorized person, desiring to form a limited liability company pursuant to the Limited Liability Company Act of the State of Delaware, hereby certifies as follows:

1. The name of the limited liability company is  **Reagent Lonestar Group LLC** .

2. The Registered Office of the limited liability company in the State of Delaware is located at  1209 Orange St  (street), in the City of  Wilmington , Zip Code  19801 . The name of the Registered Agent at such address upon whom process against this limited liability company may be served is  National Registered Agents, Inc. .

By: _____
Authorized Person

Name: **Mark Daniels** _____
Print or Type

Copy from re:SearchTX

# A. Settlement Statement

U.S. Department of Housing and Urban Development — OMB No. 2502-0265

Section 5 of the Real Estate Settlement Procedures Act (RESPA) requires the following:  • HUD must develop a Special Information Booklet to help persons borrowing money to finance the purchase of residential real estate to better understand the nature and costs of real estate settlement services;
• Each lender must provide the booklet to all applicants from whom it receives or for whom it prepares a written application to borrow money to finance the purchase of residential real estate;  • Lenders must prepare and distribute with the Booklet a Good Faith Estimate of the settlement costs that the borrower is likely to incur in connection with the settlement.  These disclosures are mandatory.

Section 4(a) of RESPA mandates that HUD develop and prescribe this standard form to be used at the time of loan settlement to provide full disclosure of all charges imposed upon the borrower and seller.  These are third party disclosures that are designed to provide the borrower with pertinent information during the settlement process in order to be a better shopper.

The Public Reporting Burden for this collection of information is estimated to average one hour per response, including the time for reviewing instructions searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.

This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number.

The information requested does not lend itself to confidentiality.

Copy from re:SearchTX

**L.  Settlement Charges**

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| **700.  Total Sales/Broker's Commission based on price** | $403,864.00   @ % = $0.00 | | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. | to | | | |
| 702. | to | | | |
| 703.  Commission Paid at Settlement | | | $0.00 | $0.00 |
| 704.  The following persons, firms or | to | | | |
| 705.  corporations received a portion of the | to | | | |
| 706.  real estate commission amt. shown above | to | | | |
| **800.  Items Payable in Connection with Loan** | | | | |
| 801.  Loan Origination Fee    % | to | | | |
| 802.  Loan Discount    % | to | | | |
| 803.  Appraisal Fee | to | | | |
| 804.  Credit Report | to | | | |
| 805.  Lender's Inspection Fee | to | | | |
| 806.  Mortgage Insurance Application | to | | | |
| 807.  Assumption Fee | to | | | |
| **900.  Items Required by Lender To Be Paid in Advance** | | | | |
| 901.  Interest from   5/31/2023   to   6/1/2023  @ $0/day | | | | |
| 902.  Mortgage Insurance Premium for  months  to | | | | |
| 903.  Hazard Insurance Premium for  years | to | | | |
| **1000.  Reserves Deposited With Lender** | | | | |
| 1001. Hazard insurance | months @ | per month | | |
| 1002. Mortgage insurance | months @ | per month | | |
| 1003. City property taxes | months @ | per month | | |
| 1004. County property taxes | months @   $3,893.31 | per month | | |
| 1005. Assessment Taxes | months @ | per month | | |
| 1006. School property taxes | months @ | per month | | |
| 1007. MUD taxes | months @ | per month | | |
| 1008. Other taxes | months @ | per month | | |
| 1011. Aggregate Adjustment | | | | |
| **1100.  Title Charges** | | | | |
| 1101. Settlement or closing fee | to | | | |
| 1102. Abstract or title search | to  **Old Republic National Title** | | | |
| 1103. Title examination | to | | | |
| 1104. Title insurance binder | to  **Old Republic National Title** | | | |
| 1105. Document preparation | to | | | |
| 1106. Notary fees | to | | | |
| 1107. Attorney's fees | to | | | |
| (includes above items numbers: | ) | | | |
| 1108. Title insurance | to  **Old Republic National Title** | | | $2,433.00 |
| (includes above items numbers: | ) | | | |
| 1109.  Lender's coverage | $0.00/$0.00 . | | | |
| 1110.  Owner's coverage | $403,864.00/$2,433.00 | | | |
| 1111.  Escrow Fee | to  **Old Republic National Title** | | | |
| 1112.  Restrictions | to  **Old Republic National Title** | | $850.00 | $850.00 |
| 1113.  State of Texas Policy Guaranty Fee | to  **Texas Title Insurance** | | $0.00 | $2.00 |
| 1114.  Electronic Filing Fee | to  **Old Republic National Title** | | | |
| 1115.  State of Texas Policy Guaranty Fee | to  **Texas Title Insurance** | | $0.00 | $0.00 |
| 1116.  Fed Ex Fees | to  **Old Republic National Title** | | $30.00 | $30.00 |
| 1117.  E-Filing Fee | to  **EPN Recording Service** | | | |
| **1200.  Government Recording and Transfer Charges** | | | | |
| 1201.  Recording Fees    Deed  ; Mortgage  ; Rel | to EPN Recording Service | | | |
| 1202.  City/county tax/stamps    Deed  ; Mortgage | to Old Republic National Title | | | |
| 1203.  State tax/stamps    Deed  ; Mortgage | to Old Republic National Title | | | |
| 1204.  Tax certificates | to | | | |
| 1205.  Bexar County Recording Fees for 6 Deeds | to  **Old Republic National Title** | | $250.00 | |
| 1206.  E-file fees 6 deeds | to  **Old Republic National Title** | | $19.20 | |
| **1300.  Additional Settlement Charges** | | | | |
| 1301.  2022 Delinquent Taxes CAD 14944-009-0090 | to  **Albert Uresti, MPA, PCAC** | | | $6,511.28 |
| 1302.  Attorney fees and court cost due | to  **Bexar County District Clerk** | | | $385.00 |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | $1,149.20 | $10,211.28 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.   I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

Copy from re:SearchTX

**REAGENT LONESTAR GROUP LLC,**
a Texas limited liability company

By: _____
    Mark Daniels
    Authorized Representative

**Lonestar Capital Holdings LLC,**
a Texas limited liability company

By: _____
Its:   Andy Patlan
    Authorized Representative

By: _____
Its:   Megan Leigh Scrimshire
    Authorized Representative

**SETTLEMENT AGENT CERTIFICATION**
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused the funds to be disbursed in accordance with this statement.

_____
Andy Patlan

_____   _____
    Settlement Agent                 Date
Warning: It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.   For details see: Title 18 U.S. Code Section 1001 and Section 1010.

**AUSSA RESIDENTIAL LLC,**
a Texas limited liability company

By: _____
Its:   Andy Patlan
    Authorized Representative

By: _____
Its:   Megan Leigh Scrimshire
    Authorized Representative

**AIESP HOLDINGS LLC,**
a Texas limited liability company

By: _____
Its:   Andy Patlan
    Authorized Representative

By: _____
Its:   Megan Leigh Scrimshire
    Authorized Representative

Copy from re:SearchTX

| Addendum to HUD Settlement Statement | |
|---|---|
| **Additional Buyers/Borrowers & Sellers** | |
| I have carefully reviewed the HUD-1 Settlement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.   I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement. | |
| **Section D – Additional Buyers/Borrowers** | **Section E – Additional Sellers** |
| | Andy Pallan |
| | AUSSA Residential LLC, a Texas limited liability company |
| | AIESP Holdings LLC, a Texas limited liability company |

Copy from re:SearchTX

NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

**Warranty Deed**
**Subject to Existing Deed of Trust**

**Date:** May 30, 2023

**Grantor:** Lonestar Capital Holdings, LLC, a Texas limited liability company

**Grantor's Mailing Address:** 2418 W Commerce Street, San Antonio, Texas 78207

**Grantee:** Reagent Lonestar Group, LLC, a Delaware limited liability company

**Grantee's Mailing Address:** 15 S Russell Street, Boston, MA 02114

**Consideration:**

Cash and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

**Property (including any improvements):**

LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF.

Being more commonly known as 2422 Commerce St., San Antonio, TX 78207.

**Reservations from Conveyance:** None.

**Exceptions to Conveyance and Warranty:**

Liens described as part of the Consideration and any other liens described in this deed as being either assumed by Grantee or subject to which title is taken by Grantee; validly existing restrictive covenants common to the platted subdivision in which the Property is located; standby fees, taxes, and assessments by any taxing authority for the year 2023 and subsequent years, and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership; validly existing utility easements created by the dedication deed or plat of the subdivision in which the Property is located; any discrepancies, conflicts, or shortages in area or boundary lines, or any encroachments or protrusions, or any overlapping of improvements; homestead or community property or survivorship rights, if any, of any spouse of Grantee; and any validly existing titles or rights asserted by anyone, including but not limited to persons, the public, corporations, governments, or other entities, to (a) tidelands or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs, or oceans, (b) lands beyond the line of the harbor or bulkhead lines as established or changed by any government, (c) filled-in lands or artificial islands, (d) water rights, including riparian rights, or (e) the area extending from the line of mean low tide to the line of vegetation or the right of access to that area or easement along and across that area.

This conveyance is made subject to any and all indebtedness of Grantor and liens against the Property, including but not limited to that certain indebtedness and liens securing same evidenced by a note in the original principal amount of $380,000.00, dated August 22, 2022, executed by Grantor and payable to the order of Funding Door LLC, which note is secured by a deed of trust of even date, filed August 26, 2022, to Brett M. Shanks, Trustee, recorded at Clerk's File No. 20220208977 in the Official Records of Real Property of Bexar County, Texas. Grantee does not assume payment of this or any other indebtedness of Grantor.



EXHIBIT
E

Copy from re:SearchTX

Case 5:24-cv-01094-FB-RBF   Document 1-1   Filed 09/27/24   Page 87 of 205

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

When the context requires, singular nouns and pronouns include the plural.

LONESTAR CAPITAL HOLDINGS, LLC

By: _____

Printed Name: Andy Patlan
Title: Member and Manager

STATE OF TEXAS

COUNTY OF _Bexar_____

Before me, the undersigned Notary Public, on this day personally appeared Andy Patlan acting as Member and Manager on behalf of Lonestar Capital Holdings, LLC proved to me through _Texas Driver License_ to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he or she executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _31_ day of May, 2023.

MARGARET APOLITA MENDOZA
Notary ID #132309633
My Commission Expires
January 10, 2024

_____
Notary Public, State of Texas

PREPARED IN THE OFFICE OF:
Dorsett Johnson, LLP
407 Throckmorton, Suite 500
Fort Worth, Texas 76102

AFTER RECORDING RETURN TO:
Reagent Lonestar Group, LLC
15 S Russell Street
Boston, MA 02114

Copy from re:SearchTX

**File Information**

**eFILED IN THE OFFICIAL PUBLIC eRECORDS OF BEXAR COUNTY
LUCY ADAME-CLARK, BEXAR COUNTY CLERK**

| | |
|---|---|
| **Document Number:** | 20230099529 |
| **Recorded Date:** | June 02, 2023 |
| **Recorded Time:** | 1:08 PM |
| **Total Pages:** | 3 |
| **Total Fees:** | $30.00 |

**** THIS PAGE IS PART OF THE DOCUMENT ****

**** Do Not Remove ****

Any provision herein which restricts the sale or use of the described real property because of race is invalid and unenforceable under Federal law

STATE OF TEXAS, COUNTY OF BEXAR


I hereby Certify that this instrument was eFILED in File Number Sequence on this date and at the time stamped hereon by me and was duly eRECORDED in the Official Public Record of Bexar County, Texas on:
6/2/2023 1:08 PM


*Lucy Adame-Clark*
**Lucy Adame-Clark**
**Bexar County Clerk**

Copy from re:SearchTX

REAL ESTATE SALES CONTRACT

This Real Estate Sales Contract (the "Contract") to buy and sell real property between **Reagent Lonestar Group LLC, a Delaware limited liability company** (the "Buyer") and **Andy Patlan**, an individual; **Armin Montalvo**, an individual; **Elena Q. Rodriguez**, an individual; **AIESP Holdings, LLC**, a Texas limited liability company; **Lonestar Capital Holdings, LLC,** a Texas limited liability company; and **AUSSA Residential LLC,** a Texas limited liability company; and/or their affiliates as necessary to convey clear title to Buyer (collectively, "Seller", and, together with the Buyer, the "Parties" or each a "Party") is effective on the date of the last of the signatures by Seller and Buyer and by the Title Company as escrow agent as defined below to acknowledge receipt of the Contract and the Earnest Money in good funds ("Effective Date").

**A. Purchase and Sale of Property**

*A.1. Purchase and Sale.* Subject to the terms and provisions of this Contract, Seller agrees to sell and convey to Buyer and Buyer agrees to purchase and pay Seller for the eighteen (18) assets described in Exhibit A (the "Land"), together with improvements to the Land (the "Improvements"), and the leases associated with the Land and Improvements (the "Leases"), all collectively referred to as the "Property."

*A.2. Payment of the Purchase Price.* The purchase price of the Property is $1,210,000.00 (the "Purchase Price"), to be paid by Buyer to Seller for the sale and conveyance of the Property. The Purchase Price will be payable at the Closing (as defined in Section H.1) in cash or certified funds, as required by the Title Company.

*A.3. Repurchase Agreement.* As a material inducement for Buyer's entry into this Contract, Seller and Buyer agree to enter into an agreement for Seller to repurchase from Buyer the Property (the "Repurchase Agreement"). The Repurchase Agreement shall be in a form substantially similar to Exhibit E, attached hereto, and shall be executed by Buyer and Seller at the Closing. Seller's obligation to enter into said Repurchase Agreement shall survive the Closing.

*A.4. Performance.* All deadlines in this Contract expire at 5:00 p.m. Eastern Time. If a deadline falls on a Saturday, Sunday, or holiday, the deadline will be extended to the next day that is not a Saturday, Sunday, or holiday. A holiday is a day, other than a Saturday or Sunday, on which state or local governmental agencies and financial institutions are not generally open for business where the Property is located. Time is of the essence.

**B. Earnest Money**

*B.1. Deposit of Earnest Money.* Upon execution of this Contract, Buyer will deposit Earnest Money in good funds in the amount of $25,000.00, along with this fully executed Contract by Seller and Buyer with Old Republic Title (Attn: Mindy Coover) (the "Title Company"), as escrow agent, located at 8201 Preston Road, Suite 450, Dallas, TX 75225 (with such sum and any interest accrued thereon being hereinafter referred to collectively as the "Earnest Money") and applied according the terms of this Contract. The Title Company shall execute the "Receipt for Earnest Money Deposit" at the end of this Contract and send copies thereof to Seller and Buyer.



REAL ESTATE SALES CONTRACT                                                          PAGE 1 OF 30

Copy from re:SearchTX

The Earnest Money becomes non-refundable in favor of Seller after the expiration of the Inspection Period (as defined in Section D.1), except in the event of default by Seller.

    *B.2. Interest on Earnest Money.* Buyer may direct the Title Company to invest the Earnest Money in an interest-bearing account in a federally insured financial institution by giving notice to the Title Company and satisfying the Title Company's requirements for investing the Earnest Money in an interest-bearing account. Any interest earned on the Earnest Money will become part of the Earnest Money.

    *B.3. Application of Earnest Money.* If the sale of the Property is consummated as contemplated in this Contract, then the Earnest Money will be applied to the Purchase Price at Closing. If this Contract is terminated prior to consummation of the sale of the Property in accordance with this Contract, then the Earnest Money will be applied in accordance with Sections D. and G. below.

## C. Title and Survey

    *C.1. Review of Title.* The following statutory notice is provided to Buyer on behalf of the real estate licensees, if any, involved in this transaction: Buyer is advised that it should either have the abstract covering the Property examined by an attorney of Buyer's own selection or be furnished with or obtain a policy of title insurance.

    *C.2. Title Commitment; Title Policy.* "Title Commitment" means a Commitment for Issuance of an Owner Policy of Title Insurance by the Title Company stating the condition of title to the Land. The "effective date" stated in the Title Commitment must be after the Effective Date of this Contract. "Title Policy" means an Owner Policy of Title Insurance issued by Title Company in conformity with the last Title Commitment delivered to and approved by Buyer.

*C.3. Survey.* To be obtained by Seller at Seller's expense. "Survey" means an on-the-ground, staked plat of survey and metes-and-bounds description of the Land, prepared by a Registered Professional Land Surveyor licensed by the state of Texas and acceptable to Buyer, Seller, and the Title Company. Any existing survey delivered by Seller must be accompanied by an affidavit detailing any changes to the Land and Improvements since the date of the Survey.

    For the purposes of the legal description of the Land to be included in the Title Policy and the Deed and other documents to be delivered at Closing, the field notes prepared by the surveyor will control any conflicts or inconsistencies with the legal description contained on Exhibit A herein or in the Title Commitment and such field notes will be incorporated herein by this reference upon completion and substituted on Exhibit A herein and included as the legal description for the Land in the Deed and the Title Commitment and Owner's and Loan policies.

    *C.4. Delivery of Title Commitment, Survey, and Legible Copies.* Seller must deliver the Title Commitment and legible copies of the instruments referenced in the Title Commitment within five (5) days from the Effective Date. If Seller's existing survey is not satisfactory to Buyer or the Title Company, Seller must obtain a current Survey within ten (10) days from the Effective Date.

REAL ESTATE SALES CONTRACT                                   PAGE 2 OF 30

Copy from re:SearchTX

C.5.    *Title Objections.*  Buyer has fourteen (14) days after delivery of the last of the Title Commitment, legible copies of the instruments referenced in the Title Commitment and the Survey if a new Survey is required by Buyer or Title Company ("Title Objection Deadline") to review the Survey, Title Commitment and legible copies of the title instruments referenced in them and notify Seller of Buyer's objections to any of them ("Title Objections").  Buyer will be deemed to have approved all matters reflected by the Survey, Title Commitment to which Buyer has made no Title Objection by the Title Objection Deadline.  The matters that Buyer either approves or is deemed to have approved are "Permitted Exceptions."  If Buyer notifies Seller of any Title Objections, Seller has five (5) days from receipt of Buyer's notice to notify Buyer whether Seller agrees to cure the Title Objections before Closing ("Cure Notice").  If Seller does not timely give its Cure Notice or timely gives its Cure Notice but does not agree to cure all the Title Objections before Closing, Buyer may, within five (5) days after the deadline for the giving of Seller's Cure Notice, notify Seller that either this Contract is terminated or Buyer will proceed to close, subject to Seller's obligations, at or before Closing, to remove all liquidated liens; remove all exceptions that arise by, through, or under Seller after the Effective Date; and cure any other Title Objections that Seller has agreed to cure in the Cure Notice.

### D.    D.    Inspection Period and Buyer's Right to Terminate

D.1.    *Inspection Period.*  Buyer's inspection of the Property may be conducted commencing on the Effective Date of the Contract and ending at 5:00 p.m. Eastern time, forty-five (45) days after the Effective Date (the "Inspection Period").

D.2.    *Buyer's Right to Terminate.*  Buyer may terminate this Contract for any reason by notifying Seller of the termination in writing before the end of the Inspection Period.  Upon Buyer's delivery of written notice of termination to the Seller, the Title Company is hereby authorized to deliver the Earnest Money to Buyer, less $100.00, which will be paid to Seller as consideration for the right granted by Seller to Buyer to terminate this Contract.  Upon written request by Seller, Buyer will provide Seller copies of the following reports related to the Property in Buyer's possession; environmental reports, physical inspection reports, and surveys.

If Buyer does not deliver written notice to Seller of Buyer's termination of the Contract before the end of the Inspection Period, Buyer waives the right to terminate this Contract pursuant to this provision.

D.3.    *Review of Seller's Records.*  Seller will deliver to Buyer copies of Seller's records specified in Exhibit C ("Seller's Records"), or otherwise make Seller's Records available for Buyer's review (for instance, through an online file sharing service), within five (5) days from the Effective Date of this Contract.

D.4.    *Entry onto the Property.*  Buyer and its duly authorized agents and representatives may enter the Property before Closing, at Buyer's cost and risk, subject to the following:
D.4.b.  Buyer may not interfere in any material manner with existing operations or occupants of the Property.

D.4.c.  Buyer must notify Seller in advance of Buyer's plans to conduct any tests so that

Copy from re:SearchTX

Seller or Seller's representatives may be present during the tests.

D.4.d. If the Property is physically altered because of Buyer's inspections, Buyer must return the Property to its preinspection condition promptly after the alteration occurs.

D.5.   *Environmental Assessment.* During the Inspection Period, Buyer has the right to conduct environmental assessments of the Property. Seller will provide, or will designate a person with knowledge of the use and condition of the Property to provide, information requested by Buyer or Buyer's agents or representatives regarding the use and condition of the Property. Seller will cooperate with Buyer in obtaining and providing to Buyer or its agents or representatives information regarding the use and condition of the Property before Seller's period of ownership to the extent that the information is within Seller's possession or control.

D.6.   *Buyer's Indemnity and Release of Seller*

D.6.a. *Indemnity.* Buyer will indemnify, defend, and hold Seller harmless from any loss, attorney's fees, expenses, or claims arising out of Buyer's inspection of the Property, except those arising out of the acts or omissions of Seller and those for repair or remediation of existing conditions discovered by Buyer's inspection. The obligations of Buyer under this provision will survive termination of this Contract and Closing, notwithstanding any other provision of this Contract to the contrary.

D.6.b. *Release.* Buyer releases Seller and those persons acting on Seller's behalf from all claims and causes of action (including claims for attorney's fees and court and other costs) resulting from Buyer's inspection of the Property.

**E. E.      Representations**

The Parties' representations stated in Section A. of Exhibit B are true and correct as of the Effective Date and must be true and correct on the Closing Date. A Party who becomes aware that any of the representations of either Party are not true and correct will promptly notify the other Party. Unless a Party notifies the other Party to the contrary on or before the Closing Date, or a Party has actual knowledge to the contrary as of the Closing Date, each Party is entitled to presume that the representations of the other Party in Exhibit B are true and correct as of the Closing Date.

**F. F.      Condition of the Property until Closing; Cooperation; No Recording of Contract**

F.1.   *Maintenance and Operation.* Until Closing, Seller will (a) maintain the Property as it existed on the Effective Date, except for reasonable wear and tear and casualty damage; (b) use the Property in the same manner as it was used on the Effective Date; (c) comply with all Leases and other contracts of Seller pertaining to the Property in effect on the Effective Date and all laws and all governmental regulations affecting the Property; and (d) not encumber, transfer or dispose of any of the Property, except to sell inventory, replace equipment, and use supplies in the normal course of operating the Property. Until the end of the Inspection Period, Seller will not

REAL ESTATE SALES CONTRACT                                          PAGE 4 OF 30

Copy from re:SearchTX

enter into, amend, or terminate any Lease or other contract that affects the Property other than in the ordinary course of operating the Property and will promptly give notice to Buyer of each new, amended, or terminated Lease or other contract, including a copy of the Lease or other contract, in sufficient time so that Buyer may consider the new information before the end of the Inspection Period. If Seller's notice is given within three (3) days before the end of the Inspection Period, the Inspection Period will be extended for three (3) days. After the end of the Inspection Period, Seller may not enter into, amend, or terminate any Lease or other contract that affects the Property without first obtaining Buyer's written consent, which Buyer will have no obligation to grant and, if granted, may be conditioned in any manner Buyer in its sole discretion deems appropriate. Seller shall obtain subordinations of any Lease affecting the Property, which subordinates those Leases to the master lease agreement contemplated herein for the management of the Property in the form attached hereto and marked Exhibit F (the "Master Lease Agreement"). This obligation shall survive Closing.

      *F.2.   Casualty Damage.* Seller will notify Buyer promptly after discovery of any casualty damage to the Property. Seller will have no obligation to repair or replace the Property if it is damaged by casualty before Closing. Buyer may terminate this Contract if the casualty damage that occurs before Closing would materially affect Buyer's intended use of the Property, by giving notice to Seller within fifteen (15) days after receipt of Seller's notice of the casualty (or before Closing if Seller's notice of the casualty is received less than fifteen (15) days before Closing). If Buyer does not terminate this Contract, Seller will (a) convey the Property to Buyer in its damaged condition, (b) assign to Buyer all of Seller's rights under any property insurance policies covering the Property, and (c) credit to Buyer the amount of the deductibles and coinsurance provisions under any insurance policies covering the Property, but not in excess of the cost to repair the casualty damage and less any amounts previously paid or incurred by Seller to repair the Property. If Seller has not insured the Property and Buyer does not elect to terminate this Contract in accordance with this Section F.2., the Purchase Price will be reduced by the cost to repair the casualty damage less any amounts previously paid or incurred by Seller to repair the Property.

      *F.3.   Condemnation.* Seller will notify Buyer promptly after Seller receives notice that any part of the Property has been or is threatened to be condemned or otherwise taken by a governmental or quasi-governmental authority. Buyer may terminate this Contract if the condemnation would materially affect Buyer's intended use of the Property by giving notice to Seller within fifteen (15) days after receipt of Seller's notice to Buyer (or before Closing if Seller's notice is received less than fifteen (15) days before Closing). The condemnation will be deemed to materially affect Buyer's intended use if Buyer so determines in Buyer's sole discretion. If Buyer does not terminate this Contract, (a) Buyer and Seller will each have the right to appear and defend their respective interests in the Property in the condemnation proceedings, (b) any award in condemnation will be assigned to Buyer, [and] (c) if the taking occurs before Closing, the description of the Property will be revised to delete the portion taken, and (d) no change in the Purchase Price will be made.

      *F.4.   Claims; Hearings.* Seller will notify Buyer promptly after Seller receives notice of any claim or administrative hearing that is threatened, filed, or initiated before Closing that involves or directly affects the Property.

REAL ESTATE SALES CONTRACT                                                PAGE 5 OF 30

Copy from re:SearchTX

    *F.5.    Cooperation.* Seller will cooperate with Buyer, (a) before and after Closing, to transfer the applications, permits, and licenses held by Seller and used in the operation of the Property and to obtain any consents necessary for Buyer to operate the Property after Closing; and (b) before Closing, with any reasonable evaluation, inspection, audit, or study of the Property prepared by, for, or at the request of Buyer.

    *F.6.    No Recording.* Buyer may not file this Contract or any memorandum or notice of this Contract in the real property records of any county. If Buyer records this Contract or a memorandum or notice, Seller may terminate this Contract and record a notice of termination.

    *F.7.    Cessation of Marketing and Other Activities.* During the term of this Contract, Seller (a) will not contract to sell the Property or grant any easement or other rights to the Property to any other person (whether or not such contract is denominated as a "back-up" contract); (b) will cease all efforts to market the Property to any other prospective buyer thereof; (c) will inform any such prospective buyer inquiring as to the status of the Property that it is under contract of sale; and (d) will not lease any of the buildings in the Property without the express consent of Buyer, which consent may be withheld in Buyer's sole discretion.

## G. Termination

    *G.1.    Disposition of Earnest Money after Termination*

    *G.1.a.  To Buyer.* If Buyer terminates this Contract in accordance with Buyer's rights to terminate, Buyer will send a request for the release of the Earnest Money to Seller, with a copy to the Title Company, to be signed by Seller. If Seller fails to deliver a signed release to the Title Company within ten (10) days after delivery of the request for release, Buyer may make a written demand on the Title Company for the Earnest Money, and the Title Company will promptly deliver a copy of the demand letter to Seller. Unless Seller delivers a written objection to the Title Company, within ten (10) days after the Title Company delivers Buyer's written demand for the Earnest Money, the Title Company will, without further authorization from Seller, deliver the Earnest Money to Buyer, less $100.00, which will be paid to Seller as consideration for the right granted by Seller to Buyer to terminate this Contract.

    *G.1.b.  To Seller.* If Seller terminates this Contract in accordance with any of Seller's rights to terminate, Seller will send a request for the release of the Earnest Money to Buyer, with a copy to the Title Company, to be signed by Buyer. If Buyer fails to deliver a signed release to the Title Company within fifteen (15) days after delivery of the request for release, Seller may make a written demand on the Title Company for the Earnest Money, and the Title Company will promptly deliver a copy of the demand to Buyer. Unless Buyer delivers a written objection to the Title Company, within fifteen (15) days after the Title Company delivers Seller's written demand for the Earnest Money, the Title Company will, without any further authorization from Buyer, deliver the Earnest Money to Seller.

    *G.2.    Duties after Termination.* If this Contract is terminated after the expiration of the Inspection period, Buyer will promptly return to Seller or destroy as directed by Seller all of Seller's Records in Buyer's possession or control. After Seller's Records are returned or destroyed

**REAL ESTATE SALES CONTRACT**                       **PAGE 6 OF 30**

Copy from re:SearchTX

by Buyer, neither Party will have further duties or obligations to the other under this Contract, except for those obligations that cannot be or were not performed before termination of this Contract or that expressly survive termination of this Contract.

## H. Closing

*H.1.    Closing.*  This transaction will close ("Closing") at the Title Company's offices on a date that is no later than ten (10) days following the last day of the Inspection Period (the "Closing Date").  At Buyer's election, Buyer may delay the Closing Date up to ten (10) days.

*H.2.    Conditions of Closing.*  Neither Party will be obligated to close the sale and purchase of the Property unless the other Party has satisfied the following conditions, any of which may be waived by the first Party in its discretion:

*H.2.a. Representations and Warranties.*  All representations and warranties of the other Party, including those stated in Section A. of Exhibit B, must be true and correct at Closing.

*H.2.b. Performance of Covenants and Agreements.*  The other Party must have performed all covenants and agreements required to be performed at or before Closing by that Party.

*H.2.c. No Bankruptcy.*  No voluntary or involuntary proceeding in bankruptcy shall be pending with respect to that Party.

*H.3.    Closing Documents; Title Company Documents.*  The Parties will execute and deliver the following closing documents and any documents required by the Title Company.

*H.3.a.* At Closing, Seller will deliver the following items:

General Warranty Deed

Repurchase Agreement

Master Lease Agreement

Subordination of Leases

Assignment and Assumption of Notes and Deeds of Trust, where applicable (1322 26th St., Lubbock, TX and 170 De Chantle Rd. Units 603, 605, 607, and 610, San Antonio, TX)

Assignment of Net Proceeds of Sale, where applicable (1421 Hopkins St., San Marcos, TX and 1413 Shelburne St., Waco, TX)

*H.3.b.* At Closing, Buyer will deliver the following items:

Balance of Purchase Price

REAL ESTATE SALES CONTRACT                                        PAGE 7 OF 30

Copy from re:SearchTX

Evidence of Buyer's authority to close this transaction

Repurchase Agreement

Master Lease Agreement

Subordination of Leases

Assignment and Assumption of Notes and Deeds of Trust, where applicable

The documents listed in these paragraphs H.3.a. and H.3.b. are collectively known as the "Closing Documents." Unless otherwise agreed by the Parties before Closing, the Closing Documents for which forms exist in the current edition of the *Texas Real Estate Forms Manual* (State Bar of Texas) will be prepared using those forms.

*H.3.c. Payment of Purchase Price.* Buyer will deliver the Purchase Price and other amounts that Buyer is obligated to pay under this Contract to the Title Company in funds acceptable to the Title Company. The Earnest Money will be applied to the Purchase Price.

*H.3.d. Disbursement of Funds; Recording; Copies.* The Title Company will be instructed to disburse the Purchase Price and other funds in accordance with this Contract, record the deed and the other Closing Documents directed to be recorded, and distribute documents and copies in accordance with the Parties' written instructions.

*H.3.e. Delivery of Originals.* Seller will deliver to Buyer the originals of Seller's Records.

*H.3.f. Possession.* Seller will deliver possession of the Property to Buyer, subject to the Permitted Exceptions existing at Closing and any liens and security interests created at Closing to secure financing for the Purchase Price.

*H.4. Transaction Costs*

*H.4.a. Seller's Costs.* Seller will pay the basic charge for the Title Policy; one-half of the escrow fee; the costs to prepare the deed; the costs to obtain, deliver, and record releases of any liens required to be released in connection with the sale; the costs to record documents to cure Title Objections agreed or required to be cured by Seller and to resolve matters shown in Schedule C of the Title Commitment; the Title Company's inspection fee to delete from the Title Policy the customary exception for rights of Parties in possession;  the costs to obtain the Survey and certificates or reports of ad valorem taxes; the costs to deliver copies of the instruments described in paragraph C.4. and Seller's Records; any other costs expressly required to be paid by Seller in this Contract; and Seller's attorney's fees and expenses.

*H.4.b. Buyer's Costs.* Buyer will pay the costs to obtain, deliver, and record all documents other than those to be obtained or recorded at Seller's expense; one-half of the escrow fee; the costs to obtain financing of the Purchase Price, including the incremental premium costs of loan title

REAL ESTATE SALES CONTRACT                                PAGE 8 OF 30

Copy from re:SearchTX

policies and endorsements and deletions required by Buyer's lender; any other costs expressly required to be paid by Buyer in this Contract; and Buyer's attorney's fees and expenses. Provided, however, Seller shall reimburse Buyer, in the form of a reduction to the Purchase Price, up to an aggregate total of $35,000.00 for any actual costs incurred by Buyer with regard to any of the following:

1. Any Buyer's Costs listed above;
2. Legal costs associated with the drafting of the Real Estate Sales Contract and related agreements;
3. Title insurance for the Property;
4. Entity structuring costs and associated legal and accounting costs of any entities of Buyer incurred in connection with Buyer's acquisition of the Property, including estimated annual filing fees and entity wind-down costs;
5. Appraisals or inspections for the Property or any portion thereof;
6. Reasonable travel and travel-related expenses of Buyer or of Buyer's agents or related parties prior to the Closing in connection with Buyer's acquisition of the Property; and
7. Any other reasonable due diligence costs or other expenses incurred in connection with the Buyer's acquisition of the Property.

*H.4.c. Ad Valorem Taxes.* Ad valorem taxes on the Property for all years before the calendar year of Closing must be paid by Seller at or before Closing. Ad valorem taxes for the Property for the calendar year of Closing will be prorated between Buyer and Seller as of the Closing Date. If the ad valorem taxes for the current year are assessed, the Title Company will pay the current year's ad valorem taxes at Closing. If the ad valorem taxes for the current year are not assessed, Seller's portion of the prorated taxes will be paid to Buyer at Closing as a credit to the Purchase Price. Buyer will assume the obligation to pay, and will pay in full, such taxes for the year of Closing before delinquency. If the assessment for the calendar year of Closing is not known at the Closing Date, the proration will be based on tax rates for the previous tax year applied to the most current assessed value, and Buyer and Seller will adjust the prorations in cash within thirty (30) days after the actual assessment and taxes are known. Seller will promptly notify Buyer of all notices of proposed or final tax valuations and assessments that Seller receives after the Effective Date and after Closing.

*H.4.d. Income and Expenses.* Income and expenses, including service contracts assumed by Buyer, general and special assessments, and sewer, water and other utility costs pertaining to the Property will be prorated as of the Closing Date on an accrual basis and paid at Closing as a credit or debit adjustment to the Purchase Price. Invoices that are received after Closing for operating expenses incurred on or before the Closing Date and not adjusted at Closing will be prorated between the Parties as of the Closing Date, and Seller will pay its share within ten (10) days after receipt of Buyer's notice of the deficiency. Notwithstanding, in accordance with the Master Lease Agreement, Seller may be entitled to income from and responsible for expense items of the Property following the Closing as well.

*H.4.e. Post-closing Adjustments.* If errors in the prorations made at Closing are identified within ninety (90) days after Closing, Seller and Buyer will make post-closing adjustments to

Copy from re:SearchTX

correct the errors within fifteen (15) days after receipt of notice of the errors.

 *H.4.f. Brokers' Commissions.* Buyer and Seller represent that there are no third-party real estate agents or brokers involved in this transaction and each indemnify and agree to defend and hold the other Party harmless from any loss, attorney's fees, and court and other costs arising out of a claim by any person or entity claiming by, through, or under the indemnitor for a broker's, finder's fee, or commission because of this transaction or this Contract, whether the claimant is disclosed to the indemnitee or not.

 *H.5. Issuance of Title Policy.* Seller will cause the Title Company to issue the Title Policy to Buyer promptly after Closing.

## I. Default and Remedies

 *I.1. Seller's Default; Remedies before Closing.* If Seller fails to perform its obligations under this Contract or if Seller's representations are not true and correct as of the Closing Date ("Seller's Default"), Buyer may elect either of the following as its sole and exclusive remedy before Closing:

 *I.1.a. Termination; Liquidated Damages.* Buyer may terminate this Contract by giving notice to Seller on or before the Closing Date and have the Earnest Money, less $100.00 as described above, returned to Buyer. Unless Seller's Default relates to the untruth or incorrectness of Seller's representations for reasons not reasonably within Seller's control, if Seller's Default occurs after Buyer has incurred costs to inspect the Property after the Effective Date and Buyer terminates this Contract in accordance with the previous sentence, Seller will also pay to Buyer as liquidated damages the lesser of Buyer's actual out-of-pocket expenses incurred to inspect the Property after the Effective Date ("Buyer's Expenses"), not to exceed the amount of $35,000.00 ("Buyer's Liquidated Damages"), within ten (10) days after Seller's receipt of Buyer's itemization of Buyer's Expenses accompanied by reasonable evidence thereof.

 *I.1.b. Specific Performance.* Buyer may enforce specific performance of Seller's obligations under this Contract, but any such action must be initiated, if at all, within ten (10) days after the breach or alleged breach of this Contract. If such action is not initiated within that period and this Contract has not previously been terminated, Buyer will be deemed to have elected to terminate this Contract as of the expiration of that period. If title to the Property is awarded to Buyer, the conveyance will be subject to the matters stated in the Title Commitment.

 *I.1.c. Actual Damages.* If Seller conveys or encumbers any portion of the Property before Closing so that Buyer's ability to enforce specific performance of Seller's obligations under this Contract is precluded or impaired, Buyer will be entitled to seek recovery from Seller for the actual damages sustained by Buyer by reason of Seller's Default, including, but not limited to, attorney's fees and expenses and court costs. If Buyer is unable to enforce specific performance on all assets of the Property as described in this paragraph I.1.c, Buyer may, at Buyer's sole discretion and in addition to the remedies provided in this paragraph I.1.c, enforce specific performance on all remaining assets of the Property for which it is possible to do so. In such case, the Purchase Price would be decreased by the fair market value of any asset of the Property that was excluded in such

REAL ESTATE SALES CONTRACT       **PAGE 10 OF 30**

Copy from re:SearchTX

DocuSign Envelope ID: 5A75D4DC-2835-3F09-9447-B43EDF91E0B

a manner.

*I.2.     Seller's Default; Remedies after Closing.*  If Seller's representations are not true and correct at Closing due to circumstances reasonably within Seller's control and Buyer does not become aware of the untruth or incorrectness of such representations until after Closing, Buyer will have all the rights and remedies available at law or in equity.  If Seller fails to perform any of its obligations under this Contract that survive Closing, Buyer will have all rights and remedies available at law or in equity unless otherwise provided by the Closing Documents.

*I.3.     Buyer's Default; Remedies before Closing.*  If Buyer fails to perform any of its obligations under this Contract ("Buyer's Default"), Seller may terminate this Contract by giving notice to Buyer on or before Closing and have the Earnest Money paid to Seller.

*I.4.     Buyer's Default; Remedies after Closing.*  If Buyer fails to perform any of its obligations under this Contract that survive Closing, Seller will have all rights and remedies available at law or in equity unless otherwise provided by the Closing Documents.

*I.5.     Liquidated Damages.*  The Parties agree that just compensation for the harm that would be caused by a default by either Party cannot be accurately estimated or would be very difficult to accurately estimate and that Buyer's Liquidated Damages or the Earnest Money are reasonable forecasts of just compensation to the non-defaulting Party for the harm that would be caused by a default.

*I.6.     Attorney's Fees.*  If either Party retains an attorney to enforce this Contract, the Party prevailing in litigation is entitled to recover reasonable attorney's fees and court and other costs.

## J.  Miscellaneous Provisions

*J.1.     Notices.*  Any notice required by or permitted under this Contract must be in writing.  Any notice required by this Contract will be deemed to be delivered (whether received or not) the earlier of receipt or three (3) business days after being deposited with the United States Postal Service, postage prepaid, certified mail, return receipt requested, and addressed to the intended recipient at the address shown in this Contract.  Notice may also be given by regular mail, personal delivery, courier delivery, or e-mail and will be effective when actually received, provided that (a) any notice received on a Saturday, Sunday, or holiday will be deemed to have been received on the next day that is not a Saturday, Sunday, or holiday and (b) any notice received after 5:00 P.M. local time at the place of delivery on a day that is not a Saturday, Sunday, or holiday will be deemed to have been received on the next day that is not a Saturday, Sunday, or holiday.  Any address for notice may be changed by not less than ten (10) days' prior written notice delivered as provided herein.  Copies of each notice must be given by one of these methods to the attorney of the Party to whom notice is given.

> To Buyer:     Reagent Lonestar Group LLC
>                       15 S Russell Street
>                       Boston, MA 02114

REAL ESTATE SALES CONTRACT                                                          PAGE 11 OF 30

Copy from re:SearchTX

DocuSign Envelope ID: E47E04DC-2835-4F40-A47E-94BEE0F91E05

(609) 439-3677
mdaniels@reagentcap.com

With copy to: Kasey Rachel
Dorsett Johnson, LLP
407 Throckmorton Street, Suite 500
Fort Worth, TX 76102
(817) 900-8204
krachel@dorsettjohnson.com

To Seller: Lonestar Capital Holdings, LLC
2418 W Commerce Street
San Antonio, TX 78207

_____
_____

With copy to: Will Echols
D: (832) 303-0228
wechols@we-legal.com

Weatherby Echols Law Group PLLC
20333 SH 249, Ste 200
Houston, TX 77070

J.2.    *Entire Agreement.*  This Contract, its exhibits, and any Closing Documents delivered at Closing are the entire agreement of the Parties concerning the sale of the Property by Seller to Buyer.  There are no representations, warranties, agreements, or promises pertaining to the Property or the sale of the Property by Seller to Buyer, and Buyer is not relying on any statements or representations of Seller or any agent of Seller, other than those in this Contract or any Closing Documents.

J.3.    *Amendment.*  This Contract may be amended only by an instrument in writing signed by the Parties.

J.4.    *Assignment.*  Buyer may assign this Contract and Buyer's rights under it only to an entity in which Buyer possesses, directly or indirectly, the power to direct or cause the direction of its management and policies, whether through the ownership of voting securities or otherwise, and any other assignment is void.  No such assignment releases Buyer of its obligations under this Contract, and Buyer and the assignee will be jointly and severally liable for the performance of such obligations after any such assignment.

J.5.    *Survival.*  The provisions of this Contract that expressly survive termination or Closing and other obligations of this Contract that cannot be performed before termination of this Contract or before Closing survive termination of this Contract or Closing, and the legal doctrine of merger does not apply to these matters.  If there is any conflict between the Closing Documents and this Contract, the Closing Documents will control.  The representations made by the Parties

REAL ESTATE SALES CONTRACT                                    PAGE 12 OF 30

Copy from re:SearchTX

as of Closing survive Closing.

J.6.    *Choice of Law; Venue.*  THIS CONTRACT IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CHOICE-OF-LAW RULES OF ANY JURISDICTION.  VENUE IS IN THE COUNTY WHERE THE PROPERTY IS LOCATED.

J.7.    *Waiver of Default.*  Default is not waived if the non-defaulting Party fails to declare a default immediately or delays taking any action with respect to the default.

J.8.    *No Third-Party Beneficiaries.*    There are no third-party beneficiaries of this Contract.

J.9.    *Severability.*  If a provision in this Contract is unenforceable for any reason, to the extent the unenforceability does not destroy the basis of the bargain among the Parties, the unenforceability does not affect any other provision of this Contract, and this Contract is to be construed as if the unenforceable provision is not a part of the Contract.

J.10.    *Ambiguities Not to Be Construed against Party Who Drafted Contract.*  The rule of construction that ambiguities in a document are construed against the Party that drafted it does not apply in interpreting this Contract.

J.11.    *No Special Relationship.*  The Parties' relationship is an ordinary commercial relationship, and the Parties do not intend to create the relationship of principal and agent, partners, joint venturers, or any other special relationship.

J.12.    *Counterparts.*  If this Contract is executed in multiple counterparts, all counterparts taken together constitute this Contract.  Copies of signatures to this Contract are effective as original signatures.

J.13.    *Confidentiality.*  This Contract, this transaction, and all information learned in the course of this transaction will be kept confidential, except to the extent disclosure is required by law or court order or to enable third-parties to advise or assist Buyer to inspect the Property or either Seller or Buyer to close this transaction. Remedies for violations of this provision are limited to injunctions, and no damages or rescission may be sought or recovered as a result of any such violations.

J.14.    *Exclusivity.* Seller agrees that until the expiration of the Inspection Period, none of the Sellers, their affiliates, or their subsidiaries, nor their respective shareholders, directors, managers, employees, agents, advisors, or representatives, will solicit offers for, or discuss, a possible sale, merger, combination, consolidation, restructuring, refinancing, or other disposition of all or any material part of the Property with any Party other than the Buyer or provide information to any Party other than the Buyer regarding the Property in that connection. The exclusivity granted herein may be terminated by Seller at any time after the later of forty-five (45) days from the Effective Date hereof or the expiration of the Inspection Period. Buyer may terminate the exclusivity granted herein at any time.

Copy from re:SearchTX

*J.14. Binding Effect.* This Contract binds, benefits and may be enforced by the Parties and their respective heirs, successors, and permitted assigns.

*J.15. Additional Agreements.* As a material inducement for Buyer to enter into this Contract, Seller agrees to the following:

       *J.15.1.* At Closing, Seller and Buyer will enter into the Master Lease Agreement. The obligation to enter into said Master Lease Agreement shall survive Closing.

       *J.15.2.* Seller will complete the construction in progress at 1421 Hopkins Street, San Marcos, Texas 78666, which is a part of the Property, within three (3) months of Closing hereof. For avoidance of doubt, the Purchase Price includes approximately $60,000.00 to be used for this purpose, and Seller's obligation to complete such construction shall be independent upon the actual cost of such construction. This provision shall survive Closing.

       J.15.3. The Buyer will be given read-only access to all property management and accounting software tools utilized by the Sellers. This provision shall survive Closing.

       J.15.4  The Sellers will provide monthly comprehensive performance reports to the Buyer in a form that is reasonably agreeable to both the Buyer and Sellers. This provision shall survive Closing.

       J.15.5. The Sellers will host a one-hour weekly phone call with the Buyer to discuss performance and activity of the Property. This provision shall survive Closing.

## K. Exhibits

Exhibit A. – Legal Description of Land
Exhibit B. – Representations; Environmental Matters
Exhibit C. – Seller's Records
Exhibit D. – Notices, Statements, and Certificates
Exhibit E. – Form of Repurchase Agreement
Exhibit F. – Form of Master Lease Agreement

*[Signature pages follow]*

Copy from re:SearchTX

**SELLER:**

DocuSigned by:

*Andy Patlan*

Andy Patlan

Date: 5/24/2023

DocuSigned by:

*[signature]*

Armin Montalvo

Date: 5/24/2023

DocuSigned by:

*Elena Q. Rodriguez*

Elena Q. Rodriguez

Date: 5/24/2023

**AIESP HOLDINGS, LLC,**
**a Texas limited liability company**

DocuSigned by:

*Andy Patlan*

Andy Patlan, Managing Member

Date: 5/24/2023

**LONESTAR CAPITAL HOLDINGS, LLC,**
**a Texas limited liability company**

DocuSigned by:

*Andy Patlan*

Andy Patlan, Managing Member

Date: 5/24/2023

**AUSSA RESIDENTIAL LLC,**
**a Texas limited liability company**

DocuSigned by:

*Andy Patlan*

Andy Patlan, Manager

Date: 5/24/2023

REAL ESTATE SALES CONTRACT                                    PAGE 15 OF 30

Copy from re:SearchTX

DocuSign Envelope ID: E47E04DC-2835-4F40-A47E-943E5DF91E0E

**BUYER:**

**REAGENT LONESTAR GROUP LLC,**
**a Delaware limited liability company,**

Mark J. Daniels, Authorized Representative

Date: 5/24/2023

Copy from re:SearchTX

### Title Company's Acceptance of Contract

Title Company, by its execution and delivery of this Real Estate Sales Contract, acknowledges it is "the person responsible for closing" the transaction that is the subject of this Contract pursuant to section 6045(e) of the Internal Revenue Code and to prepare and file all informational returns, including, without limitation, IRS Form 1099S, and to otherwise comply with the provisions of section 6045(e) of the Internal Revenue Code, and acknowledges receipt of a fully executed counterpart of this Real Estate Sales Contract on this the _____ day of May, 2023.

### OLD REPUBLIC TITLE

By: _____

Name: _____

Title: _____

### Receipt for Earnest Money Deposit

Title Company acknowledges receipt of Earnest Money deposit of TWENTY-FIVE THOUSAND AND NO/100 DOLLARS ($25,000.00) required under this Real Estate Sales Contract on this _____ day of May, 2023.

### OLD REPUBLIC TITLE

By: _____

Name: _____

Title: _____

Copy from re:SearchTX

## EXHIBIT A

### Legal Description of Land
### Identification of the Property
### called the "Land" herein

| Property Address | Type | Units | Title Holder | Max. Debt Encumbrance | Strategy |
|---|---|---|---|---|---|
| 1421 Hopkins Street, San Marcos, TX 78666 | SFR | 1 | Montalvo, Armin | | Assignment of Net Sales Proceeds to Buyer |
| 1413 Shelburne Street, Waco, TX 76711 | SFR | 1 | AUSSA Residential LLC | | Assignment of Net Sales Proceeds to Buyer |
| 1322 26th Street, Lubbock, TX 79411 | SFR | 1 | Barnes, Lisa/Debt Held by Lonestar Capital Holdings, LLC | | Assignment of Note and Deed of Trust to Buyer |
| 170 De Chantle Rd #603, 605, 607 & 610, San Antonio, TX 78201 | 4-condo | 4 | Valdivia, Andres/ Debt Held by Lonestar Capital Holdings, LLC | | Assignment of Note and Deed of Trust to Buyer |
| 1745 15th St, Corpus Christi, TX 78404 | 4-plex | 4 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 2422 Commerce St., San Antonio, TX 78207 | 4-plex | 4 | Lonestar Capital Holdings, LLC | $380,000.00 | Convey Title to Buyer |
| 6207 Rancho Villa Dr., San Antonio, TX 78238 | SFR | 1 | Patlan, Andy | $100,000.00 | Convey Title to Buyer |
| 159 Yuma St., San Antonio, TX 78211 | 2-plex | 2 | Rodriguez, Elena G. & Andy Patlen | $145,000.00 | Convey Title to Buyer |
| 1118 Bailey Ave., San Antonio, TX 78210 | SFR | 1 | AUSSA Residential LLC | $140,000.00 | Convey Title to Buyer |
| 338 Eastley Drive, San Antonio, TX 78217 | SFR | 1 | AUSSA Residential LLC | $170,000.00 | Convey Title to Buyer |
| 1714 39th Street, Lubbock, TX 79412 | SFR | 1 | Lonestar Capital Holdings, LLC | $225,000.00 | Convey Title to Buyer |
| 610 Beech Ave., Lubbock, TX 79403 | SFR | 1 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 1907 48th St., Lubbock, TX 79412 | SFR | 1 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 2015 48th St., Lubbock, TX 79412 | SFR | 1 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 203 Mitchell St. Unit 4, San Marcos, TX 78666 | Condo | 1 | AIESP Holdings, LLC | $520,000.00 | Convey Title to Buyer |
| 1716 Monterey Street, San Antonio, TX 78207 | 6-plex | 6 | AIESP Holdings, LLC | | Convey Title to Buyer |
| 1711 Craig Place, San Antonio, TX 78201 | 5-plex | 5 | AIESP Holdings, LLC | | Convey Title to Buyer |
| Cedano Estates, Lockhart, TX 78644 | Lot | 10 acres | Lonestar Capital Holdings, LLC (deed not executed) | $390,000.00 | Convey Title to Buyer |

1421 Hopkins Street, San Marcos, TX 78666

Lot 4, Block 2, of J.H. Combs Addition to the City of San Marcos, a subdivision in Hays County, Texas, according to the map or plat of record in Volume 53, Page 137, of the Deed Records of Hays County, Texas.

1413 Shelburne Street, Waco, TX 76711

Being Lot Four (4) in Block Seven (7) of the Shelby Addition to the City of Waco, McLennan County, Texas, according to the Plat of said resubdivision in Volume 641, Page 344, Deed Records, McLennan County, Texas.

1322 26th Street, Lubbock, TX 79411
Deed of Trust recorded at Instrument No. 2022022539 on 5/9/22, Deed Records of Lubbock County, TX.

LOT ELEVEN (11), BLOCK ONE (1), MORISON ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 225, Page 24 of the Deed Records of Lubbock County, Texas.

170 De Chantle Rd #603, 605, 607 & 610, San Antonio, TX 78201
Deed of Trust dated 5/5/21, recorded at Document No. 20210122292 on 5/6/21, Deed Records of Bexar County, Texas.

Units 603, 605, 607, 610, Building F, and together with their undivided interest in the appurtenant common elements of the Villa at Bordeaux Condominiums, a Condominium Regine situated in New City Block 8406, Bexar County, Texas, according to the Condominium Declaration recorded in Volume 3111, Page 1783, Condominium Records of Bexar County, Texas

REAL ESTATE SALES CONTRACT                                    PAGE 18 OF 30

Copy from re:SearchTX

1745 15th St, Corpus Christi, TX 78404

Lots Eight (8), Nine (9) and Ten (10), Block One Thousand, Three Hundred Four (1304), MERCHANT'S ADDITION NO. 5, an Addition to the City of Corpus Christi, Texas, as shown by the map or plat thereof recorded in Volume 1, Page 30, Map Records of Nueces County, Texas.

2422 Commerce St., San Antonio, TX 78207

LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF.

6207 Pancho Villa Dr., San Antonio, TX 78238

· Lot 9, Block 9, New City Block 14944, Alamo Hills, Unit 3, a subdivision in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 6800, Page(s) 159, Deed and Plat Records of Bexar County, Texas.

159 Yuma St., San Antonio, TX 78211

<u>AN UNDIVIDED ONE-HALF (1/2) INTEREST ONLY IN</u> Lot 42, Block 5, New City Block 11191, LOMA ALTA ADDITION, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 2222, Page 266, Deed and Plat Records, Bexar County, Texas

1118 Bailey Ave., San Antonio, TX 78210

Lot 5, Block 101, New City Block 3369, HIGHLAND PARK, in the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 105, Page 353, Deed and Plat Records, Bexar County, Texas.

338 Eastley Drive, San Antonio, TX 78217

Lot 13, Block 5, New City Block 12455, NORTHEAST PARK SUBDIVISION UNIT ONE, situated in the City of San Antonio, Texas, according to the map or plat thereof, recorded in Volume 3700, Page 172, Deed and Plat Records, Bexar County, Texas.

1714 39th Street, Lubbock, TX 79412

TRACT III:    LOT ELEVEN (11), BLOCK ONE (1), SOUTHPORT ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 444, Page 247 of the Deed Records of Lubbock County, Texas.

REAL ESTATE SALES CONTRACT                                           PAGE 19 OF 30

Copy from re:SearchTX

610 Beech Ave., Lubbock, TX 79403

TRACT II:  LOT FOUR (4), FLAGG ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 816, Page 55, amended in Volume 847, Page 602 of the Deed Records of Lubbock County, Texas.

1907 48th St., Lubbock, TX 79412

TRACT III:  LOT FOUR (4), BLOCK FIVE (5), RIDGE CREST, an Addition to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 418, Page 84 of the Deed Records of Lubbock County, Texas.

2015 48th St., Lubbock, TX 79412

TRACT IV:  LOT EIGHT (8), BLOCK SIX (6), RIDGE CREST, an Addition to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 418, Page 84 of the Deed Records of Lubbock County, Texas.

203 Mitchell St. Unit 4, San Marcos, TX 78666

**Unit No. 4, together with its undivided interest in the appurtenant common elements of Mitchell Street Condominiums, a Condominium Regime situated in the City of San Marcos, Hays County, Texas, according to the Condominium Declaration, recorded in Volume 2, Page 501, Condominium Records of Hays County, Texas.**

1716 Monterey Street, San Antonio, TX 78207

**The East 72.5 feet of Lots 1, 2 and 3, Block 1, New City Block 2350, of the Town of San Antonio, an Addition to the City of San Antonio, Bexar County, Texas, according to the tax map thereof.**

1711 Craig Place, San Antonio, TX 78201

**Lot 3, Block 32, New City Block 1974, West End Addition, an Addition to the City of San Antonio, Bexar County, Texas, according to the Map or Plat recorded in Volume 54, Page 643, Deed and Plat Records of Bexar County, Texas.**

REAL ESTATE SALES CONTRACT                                          PAGE 20 OF 30

Copy from re:SearchTX

Cedano Estates, Lockhart, TX 78644

**Being all of a certain tract or parcel of land situated in Caldwell County, Texas, and being a part of the James George Survey, A-9, and being also all of a tract of land designated as Tract "A" called 10.000 acres and conveyed to Celso G. Cedano by Deed recorded in Volume 491, Page 904, of the Official Records of Caldwell County, Texas, and being more particularly described by metes and bounds as follows:**

**BEGINNING at a concrete monument found used for basis of bearing in the Northeast corner of the above mentioned Tract "A" and in the West line of F.M. 713 and in the Southeast corner of a tract of land designated as Tract "B" called 10.000 acres and conveyed to Celso G. Cedano and recorded in the said Volume 491, Page 904, for the Northeast corner this tract;**

**THENCE South 12 degrees 05 minutes 21 seconds East, with the East line of the said Tract "A" and the West line of the F.M. 713, 451.28 feet to a yellow capped iron pin found in the Southeast corner of the said Tract "A" and the apparent Northeast corner of a tract of land called 10.000 acres and conveyed to Francisco Recio, et ux, by Deed in Instrument No. 126464, of the said Official Records and described in Volume 506, Page 350, of the said Official Records for the Southeast corner this tract;**

**THENCE South 77 degrees 54 minutes 38 seconds West, with the South line of the said Tract "A" and the apparent North line of the above mentioned Recio 10.000 acre tract, 944.05 feet to a 4"X4" fence corner post found in the Southwest corner of the said Tract "A" and the Northwest corner of the said Recio 10.000 acre tract and the apparent East line of a tract of land called 19.589 acres and conveyed to DMI Enterprises, LLC by Deed recorded in Instrument No. 2017-006082, of the said Official Records for the Southwest corner this tract;**

**THENCE North 19 degrees 28 minutes 28 seconds West, with the West line of the said Tract "A" and the apparent East line of the above mentioned 19.589-acre tract, 447.76 feet to a yellow capped iron pin found used for basis of bearing in the Northwest corner of the said Tract "A" and the Southwest corner of the above mentioned Tract "B" for the Northwest corner this tract;**

**THENCE North 77 degrees 29 minutes 48 seconds East, with the North line of the said Tract "A" and the South line of the said Tract "B", 1001.63 feet to the PLACE OF BEGINNING and containing 10.000 acres of land, more or less.**

all foregoing properties together with

      a.    all of seller's right, title, and interest in and to any alleys, strips, or gores adjoining the Land and all of Seller's rights of ingress and egress to the Land, including, without limitation, any easements, rights-of-way, rights, or other interests in, on, under, or to any land, highway, street, road, right-of-way, or avenue, open or proposed, in, on, under, across, in front of, abutting, or adjoining the Land; and all of Seller's right, title, and interest in and to any awards made, or to be made in lieu thereof, and in and to any unpaid awards for damage to the Land by reason of a change of grad thereof;

      b.    all development or vested rights, utility capacity, governmental approvals licenses, and permits (including all water, sewer, and drainage capacity currently held by or for Seller, if any, for the Land on the Closing Date), to the extent they relate to the ownership, use, leasing, maintenance, service, or operation of the Land;

      c.    all of Seller's right, title, and interest in and to any oil, gas, and other minerals in, under, and that may be produced from the Land, regardless of whether or not the minerals are considered part of the surface estate or part of the mineral estate;

      d.    all of Seller's right, title, and interest in and to all groundwater under the Land and all dedicated or adjudicated surface water on, belonging to or adjacent to the Land;

REAL ESTATE SALES CONTRACT                        PAGE 21 OF 30

Copy from re:SearchTX

       e.      all of Seller's right, title, and interest in and to all site plans, surveys, environmental studies, soil studies, substrata studies, architectural drawings, plans and specifications, engineering plans and studies, floor plans, landscape plans, and other plans or studies of any kind that relate to the Land in the possession of or under the control of Seller; and

       f.      all other rights, privileges, and appurtenances owned by Seller that relate in any way to the above-described properties.

REAL ESTATE SALES CONTRACT                                  PAGE 22 OF 30

Copy from re:SearchTX

DocuSign Envelope ID: E47E09DC-2835-4F40-A4F8-9438FDF91E0F

# EXHIBIT B

## Representations; Environmental Matters

### A.    A.    Seller's Representations to Buyer

Seller represents to Buyer that the following are true and correct as of the Effective Date and will be true and correct on the Closing Date, unless Seller has given Buyer notice of any changes prior to the Closing Date that such circumstances have changed due to causes not reasonably within Seller's control.

*A.1.    Authority of Andy Patlan.* Andy Patlan, as a Seller, has authority to perform its obligations under this Contract. This Contract is binding on Seller. This Contract is, and all documents required by this Contract to be executed and delivered to Buyer at Closing will be, duly authorized, executed, and delivered by Seller.

*A.2.    Authority of Lonestar Capital Holdings, LLC.* Lonestar Capital Holdings, LLC, as a Seller, is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Texas and has authority to perform its obligations under this Contract. This Contract is binding on Seller. This Contract is, and all documents required by this Contract to be executed and delivered to Buyer at Closing will be, duly authorized, executed, and delivered by Seller.

*A.3.    Authority of AUSSA Residential LLC.* AUSSA Residential LLC, as a Seller, is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Texas and has authority to perform its obligations under this Contract. This Contract is binding on Seller. This Contract is, and all documents required by this Contract to be executed and delivered to Buyer at Closing will be, duly authorized, executed, and delivered by Seller.

*A.4.    Litigation.* Seller has not received written notice and has no actual knowledge of any litigation pending or threatened against the Property or Seller that might adversely affect the Property or Seller's ability to perform its obligations under this Contract.

*A.5.    Violation of Governmental Requirements.* Seller has not received written notice and has no actual knowledge of violation of any law, ordinance, regulation, restriction, or legal requirements affecting the Property or Seller's use of the Property.

*A.6.    Licenses, Permits, and Approvals.* Seller has not received written notice and has no actual knowledge that any license, permit, or approval necessary to use the Property in the manner in which it is currently being used has expired or will not be renewed on expiration or that any material condition will be imposed to use or renew the same.

*A.7.    Condemnation; Zoning; Land Use; Hazardous Materials.* Seller has not received written notice and has no actual knowledge of any condemnation, zoning, land-use, hazardous materials, or other proceedings affecting the Property or any written inquiries or notices by any governmental authority or third-party with respect to condemnation, zoning, or other land-use

Copy from re:SearchTX

regulations or the presence of hazardous materials affecting the Property.

  *A.8. Terrorist Organizations List.* Seller is not and Seller has no actual knowledge that any of its partners, members, shareholders, owners, employees, officers, directors, representatives, or agents is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control of the Department of the Treasury or under any statute, executive order, or other governmental action.

  *A.9. No Other Obligation to Sell Property or Restriction against Sale.* Seller is not obligated to sell any of the Property to any person other than Buyer. Seller's performance of this Contract will not cause a breach of any other agreement or obligation to which Seller is a party or by which Seller or the Property is bound.

  *A.10. No Liens.* On the Closing Date, the Property will be free and clear of all mechanic's and materialman's liens and other liens and encumbrances of any nature not arising by, through, or under Buyer except the Permitted Exceptions or liens to which Buyer has given its consent in writing and as outlined on Exhibit A, and no work or materials will have been furnished to the Property by Seller that might give rise to mechanic's, materialman's, or other liens against the Property other than work or materials to which Buyer has given its consent in writing.

  *A.11. Seller's Records.* The records provided by Seller to Buyer for Buyer's inspections will be true, correct, and complete copies of the records in Seller's possession or control. The records that were prepared by or under Seller's supervision and control will be true, correct, and complete in all material respects. Unless Seller notifies Buyer to the contrary at the time of delivery of records provided by Seller to Buyer that were not prepared by or under Seller's supervision and control, Seller has no actual knowledge that such records are not true, correct, and complete in any material respect.

  *A.12. Balances of Debt Obligations Retained by Buyer at the Closing.* Buyer acknowledges that the "Retained Debt" figures in Exhibit A (the "Retained Debt Figures") may change as principal payments are made by the Seller in the ordinary course of business; however, Seller represents and warrants that the actual debt balances retained by the Buyer at the Closing will not exceed the Retained Debt Figures.

  *A.13. No Other Representation.* Except as stated above, Seller makes no representation with respect to the Property.

  *A.14. No Warranty.* Except as set forth in this Contract and in the Closing Documents, Seller has made no warranty in connection with this transaction.

## B. B. Buyer's Representations to Seller

  Buyer represents to Seller that the following are true and correct as of the Effective Date and will be true and correct on the Closing Date, unless Buyer has given Seller notice of any changes prior to the Closing Date that such circumstances have changed due to causes not reasonably within Buyer's control.

REAL ESTATE SALES CONTRACT             PAGE 24 OF 30

Copy from re:SearchTX

*B.1    Authority of Reagent Lonestar Group LLC.*  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the state of Delaware with authority to perform its obligations under this Contract.  This Contract is binding on Buyer.  This Contract is, and all documents required by this Contract to be executed and delivered to Seller at Closing will be, duly authorized, executed, and delivered by Buyer.

*B.2.    Terrorist Organizations List.*  Buyer is not and Buyer has no actual knowledge that any of its partners, members, shareholders, owners, employees, officers, directors, representatives, or agents is a person or entity with whom U.S. persons or entities are restricted from doing business under regulations of the Office of Foreign Asset Control of the Department of the Treasury or under any statute, executive order, or other governmental action.

Copy from re:SearchTX

## EXHIBIT C

### Seller's Records

To the extent that Seller has possession or control of the following items pertaining to the Property, Seller will deliver or make the items or copies of them available to Buyer by the deadline stated in paragraph D.3.:

**Governmental**

> governmental licenses, certificates, permits, and approvals

> tax statements for the current year and the last three (3) years

> notices of appraised value for the current year

> records of any tax exemption, special use, or other valuation or exemption applicable to the Property

> records of regulatory proceedings or violations (for example, condemnation or environmental)

**Financial**

> annual financial statements for the most recent three (3) years of operation

> monthly financial statements since the close of the last fiscal year

> balance sheets as of April 30, 2023

> books and records for the Property

**Leases**

> all Leases currently in effect or previous Leases that were in effect the Property in the past 12 months

> commission and leasing agent agreements

> rent roll setting forth, for each Lease:

>> tenant's name

>> square footage leased

>> date of expiration of current and renewal terms

REAL ESTATE SALES CONTRACT

Copy from re:SearchTX

renewal options

basic rent and formula for any additional rents

amount of additional rent paid during the last 1 year

prepaid rent

delinquent rent

security deposit

current tenant or landlord defaults

options to purchase any portion of the Property

rights of first refusal to lease other space

rights to rent concessions, tenant improvements, or other allowances

unpaid or contingent brokerage commissions (including commission on renewals)

## Licenses, Agreements, and Encumbrances

all licenses, agreements, and encumbrances (including all amendments and exhibits) affecting title to or use of the Property that have not been recorded in the real property records of the county or counties in which the Property is located

copies of all insurance policies, proof of insurance coverage for all real assets in the Property, and demonstration that such coverage is commercially reasonable for the Property and the Seller's management of the Property

**REAL ESTATE SALES CONTRACT**                                   **PAGE 27 OF 30**

Copy from re:SearchTX

# EXHIBIT D

## Notices, Statements, and Certificates

Within five (5) days of the Effective Date, Seller shall provide to Buyer each of the following notices, as applicable, to each of the eighteen (18) properties that collectively comprise the Property:

**A.    Residential Transaction Notices**

A.1.    *Seller's Disclosure of Property Condition.* Seller shall deliver the Seller's disclosure of the condition of residential property, described in section 5.008 of the Texas Property Code.

A.2.    *Notice of Membership in Property Owners Association.* Seller shall deliver the notice concerning the sale of single-family residential property that is subject to membership in a property owners association, described in section 5.012 of the Texas Property Code.

A.3.    *Disclosure of Information on Lead-Based Paint and/or Lead-Based Paint Hazards.* Seller shall deliver the lead-based paint warning statement, described in section 745.100 *et seq.* of title 40 of the Code of Federal Regulations.

A.4.    *Asbestos Disclosure Notice.* Seller shall deliver the notice concerning asbestos, described in sections 1910.1001 and 1926.1101 of title 29 of the Code of Federal Regulations.

A.5.    *Notice Regarding Sale Subject to a Recorded Lien.* Seller shall deliver the notice to the purchaser and each lienholder required under Texas Property Code section 5.016 that property being sold will be conveyed subject to a lien.

**B.    Condominium Transaction Notices**

B.1.    *Delivery of Condominium Documents.* Seller shall deliver any condominium declaration, bylaws, and association rules, described in section 82.156 of the Texas Property Code.

B.1.1. If the documents hereunder reveal that the Property is subject to a right of refusal under which a condominium owners association ("Association") or a member of an Association may purchase the Property, the Inspection Period shall be extended, if it has otherwise expired according to Section D.1. herein, to the date that Buyer receives a copy of the Association's certification that: (i) Seller has complied with the requirements under the right of refusal; and (ii) all persons who may exercise the right of refusal have not exercised or have waived the right to buy the Property. If Buyer does not receive the Association's certification within fourteen (14) days after the Effective Date or if the right of refusal is exercised, Buyer may terminate this Contract and, in such case, the Earnest Money shall be refunded to Buyer.

B.2. *Condominium Resale Certificate.* Seller shall deliver any resale certificate from a condominium owners association or waiver of resale certificate, described in section 82.157 of the Texas Property Code.

Copy from re:SearchTX

# <u>EXHIBIT E</u>

## Form of Repurchase Agreement

Copy from re:SearchTX

# REPURCHASE AGREEMENT

This agreement to repurchase real property ("Agreement") between **Reagent Lonestar Group LLC, a Delaware limited liability company** ("Reagent") and **Andy Patlan**, an individual, **Lonestar Capital Holdings, LLC, a Texas limited liability company**, and **AUSSA Residential LLC, a Texas limited liability company**, and/or their assigns (collectively, "Repurchaser") (Reagent and Repurchaser, each a "Party" and collectively the "Parties") is effective the ____ day of [Month], 2023 ("Effective Date").

## RECITALS

*Real Estate Sales Contract.* On, Reagent and Repurchaser entered into that certain Real Estate Sales Contract dated [Month] [Day], 2023 (the "Real Estate Sales Contract"), wherein Repurchaser agreed to sell and convey to Reagent and Reagent agreed to buy and pay Repurchaser for the eighteen (18) assets described in Exhibit A (the "Land"), together with improvements to the Land (the "Improvements"), and the leases associated with the Land and Improvements (the "Leases"), all collectively referred to as the "Property." The transaction involving the sale of the Property closed and Reagent now owns the Property. As a material inducement of Reagent into said Real Estate Sales Contract, Repurchaser has agreed to repurchase the Property according to the terms and conditions contained herein.

*Master Lease Agreement.* In connection with the Real Estate Sales Contract, Reagent and Repurchaser entered into a master lease agreement dated [Month] [Day], 2023 whereby Repurchaser would manage the day-to-day operations of the Property (the "Master Lease Agreement").

**A.     Repurchase Term.** The term of this Agreement shall be from the Effective Date hereof through the expiration of twenty-four (24) months from the Effective Date ("Repurchase Term").

**B.     Monthly Repurchase Payments.** Beginning on the fifth (5th) day of the month immediately following the Effective Date, and continuing thereafter on the fifth (5th) day of each month for twenty-three (23) additional months, Repurchaser shall pay to Reagent an amount equal to TWENTY-EIGHT THOUSAND TWO HUNDRED THIRTY-THREE AND 33/100 DOLLARS ($28,233.33) (each, a "Monthly Repurchase Payment"). If the fifth (5th) day of the month falls on a weekend or federally-recognized holiday, the Monthly Repurchase Payment shall be due and payable on the business day immediately preceding such date. Notwithstanding, future Monthly Repurchase Payments may be incremented as specified in paragraphs G.4 or H.6 hereto.

**C.     Payment of the Repurchase Price.** The "Repurchase Price" is an amount equal to (a) the Monthly Repurchase Payments due under this Agreement, plus (b) the "Purchase Price" as defined in the Real Estate Sales Contract, less (c) the sum of all Monthly Repurchase Payments actually paid by Repurchaser in advance of Closing, plus (d) the amount of any Reagent Financing as detailed in section G hereto and any proceeds from Property Sales as detailed in Section H hereto. The Repurchase Price will be paid by Repurchaser to Reagent for the sale and conveyance of the Property and will be payable in cash or certified funds at the Closing.

Copy from re:SearchTX

**D.    Closing.** This transaction shall close (with such event, the "Closing") no later than twenty-four (24) months following the Effective Date hereof (the "Closing Date"). Repurchaser may elect to close sooner, with fourteen (14) days' written notice to Reagent, provided that the entire Repurchase Price will be due and payable at Closing. Repurchaser shall bear all costs associated with Closing.

**E.    Restrictions on Reagent Activity.** During the Repurchase Term, Reagent will not, without the prior written consent of Repurchaser, sell, substantially alter, secure liens against, or otherwise take any actions that would materially decrease the value of any of the assets that comprise the Property.

**F.    Termination of this Agreement.** Should any of the following occur, Reagent may, with written notice to Repurchaser and at Reagent's sole discretion, terminate this Agreement, making the Agreement null and void; and all rights and obligations of the Parties hereunder, including the restrictions on Reagent's activities in Section E herein, shall immediately terminate:

F.1.    Repurchaser fails to make any Monthly Repurchase Payment in full to Reagent within five (5) business days of the date such payment was due;

F.2.    Either Reagent or Repurchaser receives notice, whether written or verbal, that any litigation becomes pending or threatened against the Property, or against either the Repurchaser or Reagent in connection to the Property, that might adversely affect the Property or Seller's ability to perform its obligations under this Contract.

F.3.    The market value of the equity of the Property (the "Market Value of the Property") decreases below an amount equal to the Repurchase Price at the time of such calculation of equity value.  For the purposes of this paragraph F.3, the Market Value of the Property shall be calculated as (a) the market value of the Property as estimated by a neutral, third-party real estate broker; less (b) the sum of the balances of any loans, mortgages, or other debt-like instruments or obligations encumbering the Property, including any adjustments to account for Reagent Financing or Property Sales as detailed in paragraphs G.3 or H.3 hereto; or

F.4.    Repurchaser violates any of the terms of the Master Lease Agreement.

F.5.    Repurchaser Defaults on the terms of this agreement as specified in paragraph I.2 or I.3 herein.

**G.    Incremental Future Proceeds from New Debt.** At any time during the Repurchase Term, Reagent and Repurchaser may agree for either party to obtain incremental financing that is secured against the Property or any portion thereof (the "Reagent Financing"), provided that:

G.1.    Any proceeds from such Reagent Financing are used to purchase from Repurchaser additional assets of Reagent's choosing that the Repurchaser has the right to sell (the "Additional Assets from Financing");

REAL ESTATE SALES CONTRACT                                         PAGE 2 OF 11

Copy from re:SearchTX

DocuSign Envelope ID: E47E04DC-2836-4F40-A47F-94986DF91E05

G.2.    The purchase price for such Additional Assets from Financing is equal to the mortgage or other lien amount on such properties at such time;

G.3.    The Reagent Financing results in a decrease of the market value of the equity of the Property, as calculated in Section F.3.;

G.4.    Repurchaser is granted a right to repurchase the Additional Assets From Financing on terms substantially similar to those contained herein, with a term coterminous with Repurchase Term, except that, for the remaining duration of the Repurchase Term, the Monthly Repurchase Payment is increased by an amount equal to one-twelfth of 6% of the purchase price of such Additional Assets from Financing; and

G.5.    Repurchaser is responsible for all costs associated with the Reagent Financing, including ongoing loan payments.

G.6.    Repurchaser enters into a master lease agreement to operate the Additional Assets from Financing in a similar form and on similar terms to the Master Lease Agreement.

G.7    The Additional Assets from Financing are thenceforth included in the definition of Property hereunder.

**H.    Incremental Future Proceeds from Sale of the Property.**    At any time during the Repurchase Term, Reagent and Repurchaser may agree to sell the Property or any portion thereof (the "Property Sales"), provided that:

H.1.    Any proceeds from such Property Sales are used to purchase from Repurchaser additional assets of Reagent's choosing that Repurchaser has the right to sell (the "Additional Assets from Property Sales");

H.2.    The purchase price for such Additional Assets from Property Sales is equal to the mortgage or other lien amount on such properties at such time (the "Property Sales Purchase Prices");

H.3.    The Property Sales result in a decrease of the market value of the equity, as calculated in Section F.3.;

H.4.    The properties sold as part of the Property Sales are removed from the definition of Property hereunder;

H.5.    The Additional Assets from Property Sales are added to the definition of Property hereunder; and

H.6.    For the remainder of the Repurchase Term, the Monthly Repurchase Payment is increased by one-twelfth of 20% of the Property Sales Purchase Prices.

REAL ESTATE SALES CONTRACT                                     PAGE 3 OF 11

Copy from re:SearchTX

H.7.    The Repurchaser enters into a master lease agreement to operate the Additional Assets from Property Sales in a similar form and on similar terms to the Master Lease Agreement.

H.8    The Additional Assets from Property Sales are thenceforth included in the definition of Property hereunder.

## I.    Default and Remedies

*I.1.    Reagent's Default.*  If Reagent fails to perform its obligations under this Agreement ("Reagent's Default"), Repurchaser will have all rights and remedies available at law or in equity, including the right to specific performance, unless otherwise provided herein.

*I.2.    Repurchaser's Default.*  If Repurchaser fails to perform any of its obligations under this Agreement ("Repurchaser's Default"), Reagent will have all rights and remedies available at law or in equity, including the right to specific performance, unless otherwise provided herein.

*I.3.    Repurchaser's Default in Other Agreements.*  If Repurchaser fails to perform any of its obligations under agreements with other parties relating to the Property, including, but not limited to Repurchaser's failure to pay when due, any principal or interest on all claims of the Repurchaser's secured creditors, Reagent will have all rights and remedies available at law or in equity, including the right to specific performance, unless otherwise provided herein. Further and without limiting the foregoing, in the event of acceleration or threatened acceleration by a holder of secured indebtedness concerning the Property, Reagent will have all rights and remedies available at law or in equity, including the right to specific performance and the right, to be exercised in Reagent's sole discretion, to step in and make payments toward said indebtedness on behalf of Repurchaser, for which Repurchaser shall become obligated to reimburse Reagent on demand for any amount paid, including attorneys' fees, plus interest on those amounts from the date of payment at the rate of 18% per annum.

*I.4.    Attorney's Fees.*  If either party retains an attorney to enforce this Agreement, the party prevailing in litigation is entitled to recover reasonable attorney's fees and court and other costs.

## J.    Miscellaneous Provisions

*J.1.    Notices.*  Any notice required by or permitted under this Agreement must be in writing. Any notice required by this Agreement will be deemed to be delivered (whether received or not) the earlier of receipt or three (3) business days after being deposited with the United States Postal Service, postage prepaid, certified mail, return receipt requested, and addressed to the intended recipient at the address shown in this Agreement. Notice may also be given by regular mail, personal delivery, courier delivery, or e-mail and will be effective when actually received, provided that (a) any notice received on a Saturday, Sunday, or holiday will be deemed to have been received on the next day that is not a Saturday, Sunday, or holiday and (b) any notice received after 5:00 P.M. local time at the place of delivery on a day that is not a Saturday, Sunday, or holiday will be deemed to have been received on the next day that is not a Saturday, Sunday, or holiday.

Copy from re:SearchTX

Any address for notice may be changed by not less than ten (10) days' prior written notice delivered as provided herein. Copies of each notice must be given by one of these methods to the attorney of the party to whom notice is given.

| | |
|---|---|
| To Reagent: | Reagent Lonestar Group LLC |
| | 15 S Russell Street |
| | Boston, MA 02114 |
| | 609.439.3677 |
| | mdaniels@reagentcap.com |
| | |
| With copy to: | Kasey Rachel |
| | Dorsett Johnson, LLP |
| | 407 Throckmorton Street, Suite 500 |
| | Fort Worth, TX 76102 |
| | (817) 900-8204 |
| | krachel@dorsettjohnson.com |
| | |
| To Repurchaser: | Lonestar Capital Holdings, LLC |
| | 2418 W Commerce Street |
| | San Antonio, TX 78207 |
| | _____ |
| | _____ |
| | |
| With copy to: | Will Echols |
| | D: (832) 303-0228 |
| | wechols@we-legal.com |
| | |
| | Weatherby Echols Law Group PLLC |
| | 20333 SH 249, Ste 200 |
| | Houston, TX 77070 |

    *J.2.    Entire Agreement.* This Agreement and its exhibits are the entire agreement of the Parties concerning the sale of the Property by Reagent to Repurchaser. There are no representations, warranties, agreements, or promises pertaining to the Property or the sale of the Property by Reagent to Repurchaser, and Repurchaser is not relying on any statements or representations of Reagent or any agent of Reagent, other than those in this Agreement.

    *J.3.    Performance.* All deadlines in this Agreement expire at 5:00 p.m. local time where the Property is located. If a deadline falls on a Saturday, Sunday, or holiday, the deadline will be extended to the next day that is not a Saturday, Sunday, holiday. A holiday is a day, other than a Saturday or Sunday, on which state or local governmental agencies and financial institutions are not generally open for business where the Property is located. Time is of the essence.

    *J.4.    Amendment.* This Agreement may be amended only by an instrument in writing signed by the Parties.

REAL ESTATE SALES CONTRACT                                              PAGE 5 OF 11

Copy from re:SearchTX

*J.5.    Assignment.*  Repurchaser may assign this Agreement and Repurchaser's rights under it only to an entity in which Repurchaser possesses, directly or indirectly, the power to direct or cause the direction of its management and policies, whether through the ownership of voting securities or otherwise, and any other assignment is void.  No such assignment releases Repurchaser of its obligations under this Agreement, and Repurchaser and the assignee will be jointly and severally liable for the performance of such obligations after any such assignment.

*J.6.    Survival.*  The provisions of this Agreement that expressly survive termination or Closing and other obligations of this Agreement that cannot be performed before termination of this Agreement or before Closing survive termination of this Agreement or Closing, and the legal doctrine of merger does not apply to these matters.

*J.6.    Choice of Law; Venue.*  THIS AGREEMENT IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF DELAWARE, WITHOUT REGARD TO CHOICE-OF-LAW RULES OF ANY JURISDICTION.  VENUE IS SUFFOLK COUNTY, MA.

*J.7.    Waiver of Default.*  Default is not waived if the non-defaulting Party fails to declare a default immediately or delays taking any action with respect to the default.

*J.8.    No Third-Party Beneficiaries.*  There are no third-party beneficiaries of this Agreement.

*J.9.    Severability.*  If a provision in this Agreement is unenforceable for any reason, to the extent the unenforceability does not destroy the basis of the bargain among the Parties, the unenforceability does not affect any other provision of this Agreement, and this Agreement is to be construed as if the unenforceable provision is not a part of the Agreement.

*J.10.    Ambiguities Not to Be Construed against Party Who Drafted Agreement.*  The rule of construction that ambiguities in a document are construed against the Party that drafted it does not apply in interpreting this Agreement.

*J.11.    No Special Relationship.*  The Parties' relationship is an ordinary commercial relationship, and the Parties do not intend to create the relationship of principal and agent, partners, joint venturers, or any other special relationship.

*J.12.    Counterparts.*  If this Agreement is executed in multiple counterparts, all counterparts taken together constitute this Agreement.  Copies of signatures to this Agreement are effective as original signatures.

*J.13.    Confidentiality.*  This Agreement, this transaction, and all information learned in the course of this transaction will be kept confidential, except to the extent disclosure is required by law or court order or to enable third parties to advise or assist Reagent or Repurchaser to close this transaction.  Remedies for violations of this provision are limited to injunctions, and no damages or rescission may be sought or recovered as a result of any such violations.

*J.14.    Binding Effect.*  This Agreement binds, benefits and may be enforced by the Parties

REAL ESTATE SALES CONTRACT                                                        PAGE 6 OF 11

Copy from re:SearchTX

and their respective heirs, successors, and permitted assigns.

**K.    Exhibits**

Exhibit A. – Legal Description of Land

**<u>REPURCHASER:</u>**

_____

**Andy Patlan**

Date: _____

**LONESTAR CAPITAL HOLDINGS, LLC**
**a Texas limited liability company**

_____

Andy Patlan, Managing Member

Date: _____

**AUSSA RESIDENTIAL LLC**
**a Texas limited liability company**

_____

Andy Patlan, Manager

Date: _____

**<u>REAGENT:</u>**
**REAGENT LONESTAR GROUP LLC**
**a Delaware limited liability company**

_____

Mark J. Daniels, Authorized Representative

Date: _____

**REAL ESTATE SALES CONTRACT**                                    **PAGE 7 OF 11**

Copy from re:SearchTX

## EXHIBIT A

### Identification of the Property
### called the "Land" herein

| Property Address | Type | Units | Title Holder | Max. Debt Encumbrance | Strategy |
|---|---|---|---|---|---|
| 1421 Hopkins Street, San Marcos, TX 78666 | SFR | 1 | Montalvo, Armin | | Assignment of Net Sales Proceeds to Buyer |
| 1413 Shelburne Street, Waco, TX 76711 | SFR | 1 | AUSSA Residential LLC | | Assignment of Net Sales Proceeds to Buyer |
| 1322 26th Street, Lubbock, TX 79411 | SFR | 1 | Barnes, Lisa/Debt Held by Lonestar Capital Holdings, LLC | | Assignment of Note and Deed of Trust to Buyer |
| 170 De Chantle Rd #603, 605, 607 & 610, San Antonio, TX 78201 | 4-condo | 4 | Valdivia, Andres/ Debt Held by Lonestar Capital Holdings, LLC | | Assignment of Note and Deed of Trust to Buyer |
| 1745 15th St, Corpus Christi, TX 78404 | 4-plex | 4 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 2422 Commerce St., San Antonio, TX 78207 | 4-plex | 4 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 6207 Pancho Villa Dr., San Antonio, TX 78238 | SFR | 1 | Patlan, Andy | $380,000.00 | Convey Title to Buyer |
| 159 Yuma St., San Antonio, TX 78211 | 2-plex | 2 | Rodriguez, Elena O. & Andy Patlan | $100,000.00 | Convey Title to Buyer |
| 1118 Bailey Ave., San Antonio, TX 78210 | SFR | 1 | AUSSA Residential LLC | $145,000.00 | Convey Title to Buyer |
| 318 Eastley Drive, San Antonio, TX 78217 | SFR | 1 | AUSSA Residential LLC | $140,000.00 | Convey Title to Buyer |
| 1714 39th Street, Lubbock, TX 79412 | SFR | 1 | Lonestar Capital Holdings, LLC | $170,000.00 | Convey Title to Buyer |
| 610 Beech Ave., Lubbock, TX 79403 | SFR | 1 | Lonestar Capital Holdings, LLC | $225,000.00 | Convey Title to Buyer |
| 1907 48th St., Lubbock, TX 79412 | SFR | 1 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 2015 48th St., Lubbock, TX 79412 | SFR | 1 | Lonestar Capital Holdings, LLC | | Convey Title to Buyer |
| 203 Mitchell St. Unit 4, San Antonio, TX 78666 | Condo | 1 | Lonestar Capital Holdings, LLC | $520,000.00 | Convey Title to Buyer |
| 1716 Monterey Street, San Antonio, TX 78207 | 6-plex | 6 | AIESP Holdings, LLC | | Convey Title to Buyer |
| 1711 Craig Place, San Antonio, TX 78201 | 5-plex | 5 | AIESP Holdings, LLC | | Convey Title to Buyer |
| Cedano Estates, Lockhart, TX 78644 | Lot | 10 acres | Lonestar Capital Holdings, LLC (deed not executed) | $390,000.00 | Convey Title to Buyer |

1421 Hopkins Street, San Marcos, TX 78666

Lot 4, Block 2, of J.H. Combs Addition to the City of San Marcos, a subdivision in Hays County, Texas, according to the map or plat of record in Volume 53, Page 137, of the Deed Records of Hays County, Texas.

1413 Shelburne Street, Waco, TX 76711

Being Lot Four (4) in Block Seven (7) of the Shelby Addition to the City of Waco, McLennan County, Texas, according to the Plat of said resubdivision in Volume 641, Page 344, Deed Records, McLennan County, Texas.

1322 26th Street, Lubbock, TX 79411
Deed of Trust recorded at Instrument No. 2022022539 on 5/9/22, Deed Records of Lubbock County, TX.

LOT ELEVEN (11), BLOCK ONE (1), MORISON ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 225, Page 24 of the Deed Records of Lubbock County, Texas.

170 De Chantle Rd #603, 605, 607 & 610, San Antonio, TX 78201
Deed of Trust dated 5/5/21, recorded at Document No. 20210122292 on 5/6/21, Deed Records of Bexar County, Texas.

Units 603, 605, 607, 610, Building F, and together with their undivided interest in the appurtenant common elements of the Villa at Bordeaux Condominiums, a Condominium Regine situated in New City Block 8406, Bexar County, Texas, according to the Condominium Declaration recorded in Volume 3111, Page 1783, Condominium Records of Bexar County, Texas

REAL ESTATE SALES CONTRACT                                    PAGE 8 OF 11

Copy from re:SearchTX

1745 15th St, Corpus Christi, TX 78404

Lots Eight (8), Nine (9) and Ten (10), Block One Thousand, Three Hundred Four (1304), MERCHANT'S ADDITION NO. 5, an Addition to the City of Corpus Christi, Texas, as shown by the map or plat thereof recorded in Volume 1, Page 30, Map Records of Nueces County, Texas.

2422 Commerce St., San Antonio, TX 78207

**LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF.**

6207 Pancho Villa Dr., San Antonio, TX 78238

**Lot 9, Block 9, New City Block 14944, Alamo Hills, Unit 3, a subdivision in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 6800, Page(s) 159, Deed and Plat Records of Bexar County, Texas.**

159 Yuma St., San Antonio, TX 78211

**AN UNDIVIDED ONE-HALF (1/2) INTEREST ONLY IN** Lot 42, Block 5, New City Block 11191, LOMA ALTA ADDITION, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 2222, Page 266, Deed and Plat Records, Bexar County, Texas

1118 Bailey Ave., San Antonio, TX 78210

Lot 5, Block 101, New City Block 3369, HIGHLAND PARK, in the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 105, Page 353, Deed and Plat Records, Bexar County, Texas.

338 Eastley Drive, San Antonio, TX 78217

**Lot 13, Block 5, New City Block 12455, NORTHEAST PARK SUBDIVISION UNIT ONE, situated in the City of San Antonio, Texas, according to the map or plat thereof, recorded in Volume 3700, Page 172, Deed and Plat Records, Bexar County, Texas.**

1714 39th Street, Lubbock, TX 79412

TRACT III:    LOT ELEVEN (11), BLOCK ONE (1), SOUTHPORT ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 444, Page 247 of the Deed Records of Lubbock County, Texas.

REAL ESTATE SALES CONTRACT                          PAGE 9 OF 11

Copy from re:SearchTX

610 Beech Ave., Lubbock, TX 79403

TRACT II:    LOT FOUR (4), FLAGG ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 816, Page 55, amended in Volume 847, Page 602 of the Deed Records of Lubbock County, Texas.

1907 48th St., Lubbock, TX 79412

TRACT III:    LOT FOUR (4), BLOCK FIVE (5), RIDGE CREST, an Addition to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 418, Page 84 of the Deed Records of Lubbock County, Texas.

2015 48th St., Lubbock, TX 79412

TRACT IV:    LOT EIGHT (8), BLOCK SIX (6), RIDGE CREST, an Addition to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 418, Page 84 of the Deed Records of Lubbock County, Texas.

203 Mitchell St. Unit 4, San Marcos, TX 78666

**Unit No. 4, together with its undivided interest in the appurtenant common elements of Mitchell Street Condominiums, a Condominium Regime situated in the City of San Marcos, Hays County, Texas, according to the Condominium Declaration, recorded in Volume 2, Page 501, Condominium Records of Hays County, Texas.**

1716 Monterey Street, San Antonio, TX 78207

**The East 72.5 feet of Lots 1, 2 and 3, Block 1, New City Block 2350, of the Town of San Antonio, an Addition to the City of San Antonio, Bexar County, Texas, according to the tax map thereof.**

1711 Craig Place, San Antonio, TX 78201

**Lot 3, Block 32, New City Block 1974, West End Addition, an Addition to the City of San Antonio, Bexar County, Texas, according to the Map or Plat recorded in Volume 54, Page 643, Deed and Plat Records of Bexar County, Texas.**

REAL ESTATE SALES CONTRACT                                    PAGE 10 OF 11

Copy from re:SearchTX

Cedano Estates, Lockhart, TX 78644

Being all of a certain tract or parcel of land situated in Caldwell County, Texas, and being a part of the James George Survey, A-9, and being also all of a tract of land designated as Tract "A" called 10.000 acres and conveyed to Celso G. Cedano by Deed recorded in Volume 491, Page 904, of the Official Records of Caldwell County, Texas, and being more particularly described by metes and bounds as follows:

BEGINNING at a concrete monument found used for basis of bearing in the Northeast corner of the above mentioned Tract "A" and in the West line of F.M. 713 and in the Southeast corner of a tract of land designated as Tract "B" called 10.000 acres and conveyed to Celso G. Cedano and recorded in the said Volume 491, Page 904, for the Northeast corner this tract;

THENCE South 12 degrees 05 minutes 21 seconds East, with the East line of the said Tract "A" and the West line of the F.M. 713, 451.28 feet to a yellow capped iron pin found in the Southeast corner of the said Tract "A" and the apparent Northeast corner of a tract of land called 10.000 acres and conveyed to Francisco Recio, et ux, by Deed in Instrument No. 126464, of the said Official Records and described in Volume 506, Page 350, of the said Official Records for the Southeast corner this tract;

THENCE South 77 degrees 54 minutes 38 seconds West, with the South line of the said Tract "A" and the apparent North line of the above mentioned Recio 10.000 acre tract, 944.05 feet to a 4"X4" fence corner post found in the Southwest corner of the said Tract "A" and the Northwest corner of the said Recio 10.000 acre tract and the apparent East line of a tract of land called 19.589 acres and conveyed to DMI Enterprises, LLC by Deed recorded in Instrument No. 2017-006082, of the said Official Records for the Southwest corner this tract;

THENCE North 19 degrees 28 minutes 28 seconds West, with the West line of the said Tract "A" and the apparent East line of the above mentioned 19.589-acre tract, 447.76 feet to a yellow capped iron pin found used for basis of bearing in the Northwest corner of the said Tract "A" and the Southwest corner of the above mentioned Tract "B" for the Northwest corner this tract;

THENCE North 77 degrees 29 minutes 48 seconds East, with the North line of the said Tract "A" and the South line of the said Tract "B", 1001.63 feet to the PLACE OF BEGINNING and containing 10.000 acres of land, more or less.

REAL ESTATE SALES CONTRACT                                                                 PAGE 11 OF 11

Copy from re:SearchTX

## EXHIBIT E

### Form of Master Lease Agreement

Copy from re:SearchTX

# MASTER LEASE AGREEMENT

THIS MASTER LEASE AGREEMENT (the "Master **Lease**") is made and entered into effective as of the _____ day of _____, 2023 (the "**Effective Date**") by and between **Reagent Lonestar Group, LLC**, a Delaware limited liability company (the "**Landlord**"), and **Andy Patlan**, an individual; **Lonestar Capital Holdings, LLC**, a Texas limited liability company; and **AUSSA Residential LLC**, a Texas limited liability company (collectively the "**Tenant,**" and, together with the Landlord, the "**Parties**").

W I T N E S S E T H:

WHEREAS, Landlord acquired and owns title to sixteen (16) certain parcels of real property as more particularly described in **Exhibit "A"** attached hereto (each, a "**Real Property,**" and collectively, the "**Real Properties**") upon which are located buildings and real property improvements acquired by Landlord from Tenant, and all appurtenances thereto, including all related site improvements such as pavement, access ways, curb cuts, parking, drainage systems and facilities, landscaping, and utility facilities and connections for sanitary sewer, potable water, irrigation, electricity, telephone and natural gas, if applicable (the "**Improvements**"), and the leases associated with the Land and Improvements, including, but not limited to, those leases more particularly described on **Exhibit "B"** (the "Other **Leases**"), all collectively referred to as the "**Property**."

WHEREAS, Tenant desires to lease from Landlord, and Landlord has agreed to lease to Tenant, the Real Properties and all related Improvements (each Real Property and its related Improvements are referred to herein individually as a "**Demised Property**" and collectively as the "**Demised Properties**") upon the terms and conditions as more particularly hereinafter provided and described; and

WHEREAS, this Master Lease constitutes a single and indivisible lease of the Demised Property, and is not an aggregation of leases for each separate Demised Property. Neither Landlord nor Tenant would have entered into this Master Lease except as a single and indivisible lease;

NOW, THEREFORE, for and in consideration of the premises hereof, the sums of money to be paid hereunder, and the mutual and reciprocal obligations undertaken herein, the Parties hereto do hereby covenant, stipulate, and agree as follows:

## ARTICLE I.
## AGREEMENT TO LEASE

1.1 <u>Demise</u>. Landlord does hereby demise, let, and lease unto Tenant, and Tenant does hereby hire, lease, and take as tenant from Landlord, the entire Demised Property upon those terms and conditions hereinafter set forth. This Master Lease may be relied upon by third parties who enter into transactions with the Tenant.

1.2 <u>Condition</u>. Landlord leases to Tenant and Tenant leases from Landlord the Demised Property in its "**AS-IS, WHERE-IS, WITH ALL FAULTS**" condition, and Landlord makes

Copy from re:SearchTX

absolutely no representations or warranties whatsoever with respect to the Demised Property or the condition thereof. Tenant is the immediate past owner of the Demised Property, and Tenant acknowledges that Tenant has both inspected and operated the Demised Property prior to the commencement of this Master Lease and that Tenant's familiarity and knowledge of the condition of the Demised Property is vastly superior to that of Landlord. Landlord has not investigated and does not warrant or represent to Tenant that the Demised Property are fit for the purposes intended by Tenant or for any other purpose or purposes whatsoever. Except as provided herein, Tenant acknowledges that Tenant shall be solely responsible for any and all actions, repairs, permits, approvals, or costs required for the rehabilitation, renovation, use, occupancy, or operation of the Demised Property in accordance with the terms of this Master Lease. By leasing the Demised Property, Tenant warrants and represents that Tenant has examined and approved all things concerning the Demised Property which Tenant deems material to Tenant's leasing and use of the Demised Property. Tenant further acknowledges and agrees that (a) neither Landlord nor any agent of Landlord has made any representation or warranty, express or implied, concerning the Demised Property which have induced Tenant to execute this Master Lease except as contained in this Master Lease; and (b) any other representations and warranties are expressly disclaimed by Landlord. The provisions of this Section 1.2 have been negotiated, and are intended to be a complete exclusion and negation of any warranties, by Landlord, express or implied, with respect to the Demised Property, arising pursuant to the Uniform Commercial Code or any other law now or hereafter in effect or arising otherwise.

1.3 <u>Quiet Enjoyment</u>. Landlord covenants and agrees that so long as Tenant shall pay all rents due to Landlord from Tenant pursuant to the terms of this Master Lease and keep, observe and perform all covenants, promises, and agreements on Tenant's part to be kept, observed, and performed pursuant to the terms of this Master Lease (including applicable notice and cure periods for Tenant's benefit), Tenant shall and may peacefully and quietly have, hold, and occupy the Demised Property free of any interference from Landlord or anyone claiming by, through, or under Landlord; subject, however, to the terms, provisions, and conditions of this Master Lease.

**ARTICLE II.**
**TERM**

2.1 <u>Term</u>. The initial term of this Master Lease shall, unless sooner terminated as elsewhere provided in this Master Lease, commence on _____, 2023 at 12:01 a.m. Central Time and shall terminate and expire at 11:59 p.m. Central Time on _____, 2025 (this duration of time referred to herein as the **"Term"**).

2.2 <u>Termination</u>. Notwithstanding any present or future law to the contrary, this Master Lease shall not be terminated by Tenant for any failure of Landlord to perform pursuant to the terms and conditions of this Master Lease.

**ARTICLE III.**
**OPERATING EXPENSES OF AND RENT FROM THE DEMISED PROPERTIES**

3.1 Operating Expenses and <u>Rent</u>. Tenant shall pay directly all operating costs of the Property, including without limitation, any loan or mortgage payments encumbering the Demised

Copy from re:SearchTX

Property, ad valorem property taxes, insurance costs, landscaping costs, repairs and maintenance costs, property management costs, Appfolio license costs, accounting costs, and property leasing costs incurred in the ordinary course of business ("Operating Expenses"). If Landlord shall make any expenditure for which Tenant is responsible or liable under this Master Lease, including **all debt serviced on all mortgages encumbering Landlord's fee simple interest in the Demised Property**, or if Tenant shall become obligated to Landlord under this Master Lease for any sum, the amount thereof shall be deemed to constitute rent ("**Rent**") and shall be due and payable by Tenant within ten (10) days of receipt by Tenant of Landlord's written notice of the amount of such Rent and demand for payment of same, which notice shall include copies of third-party invoices, if applicable, and an explanation of such Rent.

3.2 <u>Past Due Rent</u>. If Tenant fails to make any payment of Rent to Landlord on or before the date such payment is due and payable, and such failure continues for ten (10) days after the due date of such payment, Tenant shall pay to Landlord an administrative late charge of ten percent (10%) of the amount of the delinquent part of such payment. In addition, and not in lieu of late charges, any payment of Rent not made on the due date shall bear interest from the date such payment became due to the date of payment thereof by Tenant at a rate which is equal to the lesser of (i) twenty-eight percent (28%) per annum, or (ii) the maximum interest rate then allowable under applicable laws (the "**Default Rate**"). Such late charge and interest shall constitute Additional Rent ("**Additional Rent**") and shall be due and payable as provided in Section 3.2.

## ARTICLE IV.
## USE AND OPERATION OF PREMISES

4.1 <u>Operations</u>. Throughout the Term of this Master Lease, during such time as Tenant is operating a Demised Property, Tenant shall operate its business in a commercially reasonable manner and in a fashion that is consistent with past practices of Tenant and then-existing market conditions; provided, however, that nothing in this Master Lease shall be construed as requiring Tenant to operate any of the Demised Property. Tenant shall manage the day-to-day operations of the Property and meet the obligations under the Other Leases. Tenant shall be the beneficiary of any rental or other income derived from the Other Leases, excluding any proceeds from Reagent Financings or Property Sales as defined in that Repurchase Agreement between the Parties dated _____, 2023 ("Repurchase Agreement"). Tenant shall assume legal liability for all management-related items of the Property.

4.2 <u>Compliance with Laws</u>. Tenant shall at all times keep and maintain the Demised Property in compliance with all applicable (taking into account any grandfathered rights of Tenant) laws, ordinances, statutes, rules, regulations, orders, and lawful requirements of all federal, state, county, and municipal governments currently in existence or hereafter enacted or rendered, and of all other governmental entities having jurisdiction over the Demised Property or the business activities conducted thereon or therein (collectively, the "**Legal Requirements**").

4.3 <u>Compliance with Restrictions, etc.</u> Tenant, at its expense, shall comply with all restrictive covenants and all title restrictions affecting and enforceable against the Demised Property (including declarations and easement agreements) existing as of the Effective Date or entered into after the Effective Date with the consent of Tenant (collectively, the "**Restrictions**")

Copy from re:SearchTX

and comply with and perform all of the obligations set forth therein, whether performable prior to or during the Term, including, without limitation, all insurance requirements.

## ARTICLE V.
## TAXES AND ASSESSMENTS

5.1 <u>Real Estate Taxes and Assessments</u>. Tenant shall pay all Real Estate Taxes (as hereinafter defined) that (i) are imposed or assessed either before or during the Term that relate to the Term, (ii) are imposed or assessed after the Term that relate to the Term, and (iii) are imposed or assessed either before or during the Term that relate to periods prior to the Term.

(a) As used herein, **"Real Estate Taxes"** shall mean all taxes, assessments, and other governmental impositions or charges of every kind and nature whatsoever, extraordinary as well as ordinary, and each and every installment thereof which are charged, laid, levied, assessed, or imposed upon, or arise in connection with, the use, occupancy, or possession of the Demised Property or any part thereof before or during the Term, including, without limitation, ad valorem real and personal property taxes, and all taxes charged, laid, levied, assessed, or imposed in lieu of or in addition to any of the foregoing by virtue of all present or future laws, ordinances, requirements, orders, directions, rules, or regulations of federal, state, county, and municipal governments and of all other governmental authorities whatsoever.

(b) Tenant shall pay the Real Estate Taxes directly to the appropriate taxing authorities in accordance with applicable Legal Requirements. Tenant shall have the right (i) to participate directly in all negotiations regarding the Real Estate Taxes and the proposed valuation of any of the Demised Property, or any portion thereof, (ii) to contest or protest directly the amount or validity of any assessed or proposed valuation of any of the Demised Property, or any portion thereof; (iii) to contest directly the validity or the amount of any Real Estate Taxes or any other tax, fee, charge or other imposition with respect to any of the Demised Property, or any portion thereof, by such appellate or other proceedings as may be appropriate in the jurisdiction; (iv) to defer payment of such obligations if payment would operate as a bar to such contest; and (v) to pay same under protest, if applicable, or take such other steps as Tenant may deem appropriate; provided, however, that Tenant indemnifies Landlord from any expense (including reasonable attorney's fees) or liability arising out of such contest, pursues such contest in good faith and with due diligence, posts any bond or security required by law in connection with such contest, and takes such action as is necessary to prevent the institution of any foreclosure proceedings or similar action against the Demised Property. Landlord shall cooperate in the institution and prosecution of any such proceedings initiated by Tenant, shall execute any documents which Landlord may reasonably be required by Tenant to execute, and shall make any appearances which Landlord may reasonably be required by Tenant to make in connection with such proceedings, provided that Tenant will reimburse Landlord for any reasonable expenses incurred by Landlord in connection therewith.

(c) Landlord's failure to deliver any tax bill or invoice in any time required herein shall not relieve Tenant of the ultimate responsibility for Tenant to pay any and all said Real Estate Taxes.

Copy from re:SearchTX

## ARTICLE VI.
## UTILITIES

6.1 <u>Utilities</u>. Tenant shall be liable for and shall pay directly all charges, rents, and fees (together with any applicable taxes or assessments thereon) when due for water, gas, electricity, air conditioning, heat, septic, sewer, refuse collection, telephone, and any other utility charges or similar items in connection with the use or occupancy of the Demised Property during the Term or prior to the Term of this Master Lease. Landlord shall not be responsible or liable in any way whatsoever for the impairment, interruption, stoppage, or other interference with any utility services to the Demised Property not caused by Landlord, its agents, employees, contractors, invitees, or licensees. In any event, no interruption, termination, or cessation of utility services to the Demised Property shall relieve Tenant of its duties and obligations pursuant to this Master Lease, including, without limitation, its obligation to pay all Rent as and when the same shall be due hereunder.

## ARTICLE VII.
## INSURANCE

7.1 <u>Insurance by Tenant</u>. From and after the Effective Date and continuing throughout the Term of this Master Lease, Tenant shall, at its sole cost and expense, maintain in full force and effect the following types and amounts of insurance coverage:

(a) Commercial general liability insurance providing coverage against liability for property damage, bodily injury, and personal injury having limits of not less than ONE MILLION DOLLARS ($1,000,000.00) per occurrence with a general aggregate of not less than TWO MILLION DOLLARS ($2,000,000.00), and if more than one location is insured under such policy, a per location aggregate is required. Such insurance shall cover the following hazards: (i) premises and operations; (ii) products and completed operations; (iii) independent contractors; (iv) contractual liability for all written and oral contracts, to the extent the same is then commonly available on commercially reasonable terms; and (v) contractual liability covering the indemnities contained in this Master Lease, to the extent the same is available on commercially reasonable terms. Such insurance, and any and all other liability insurance maintained by Tenant in excess of or in addition to that required hereunder, shall name Landlord as an additional insured.

(b) Umbrella or excess liability insurance with follow form general liability insurance, automobile liability insurance, and employer liability insurance, each with limits in a minimum amount of not less than TEN MILLION DOLLARS ($10,000,000.00) per occurrence/aggregate.

(c) Flood hazard insurance if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area" and in which flood insurance has been made available under the National Flood Insurance Act of 1968 (and any successor thereto) in an amount which reasonably assures that there will be sufficient proceeds to replace the Improvements in the event of a loss against which such insurance is issued, to the extent coverage in such amount is readily available on commercially reasonable terms.

Copy from re:SearchTX

(d) Within ten (10) days after the policy goes into effect, Tenant will provide to Landlord a copy of the policy or policies required by this Section 7.1. Tenant shall within five (5) days prior to the expiration of each insurance policy furnish Landlord with renewal certificates or binders of insurance.

7.2 <u>Failure to Procure Insurance</u>. Should Tenant fail to provide to Landlord the renewal or renewal certificates or binders in the time period set forth in Section 7.1 above, or in the event of a lapse or deficiency of any insurance coverage specified herein for any reason, Landlord may, upon three (3) days prior written notice to Tenant, replace the deficient insurance coverage with a policy of insurance covering the Demised Property of the type and in the limits set forth above. Upon written notice from Landlord of the placement of insurance, Tenant shall pay to Landlord, as Additional Rent, an amount equal to the total cost of premiums and expense of such insurance placement. Tenant shall not take any actions that shall cause the termination or cancellation of the insurance policies required of Tenant under this Master Lease, without replacing such policies with the required insurance.

7.3 <u>Waiver of Subrogation</u>. Tenant agrees that, if any property owned by it and located in the Demised Property shall be stolen, damaged, or destroyed by an insured peril, Landlord shall not have any liability to Tenant, nor to any insurer of Tenant, for or in respect of such theft, damage, or destruction (except that Landlord will be liable to Tenant for the insurance deductible amount of any loss caused by the negligence, recklessness or intentional acts of Landlord, but the term "negligence" as used in this sentence shall not include negligence imputed as a matter of law to Landlord solely by reason of Landlord's interest in the Demised Property or Landlord's failure to act in respect of matters which are or were the obligation of Tenant under this Master Lease), and Tenant shall require all policies of risk insurance carried by it on its property in the Demised Property to contain or be endorsed with a provision in and by which the insurer designated therein shall waive its right of subrogation against Landlord. Notwithstanding that Landlord has no obligation under this Master Lease to carry any insurance on the Demised Property, should Landlord carry a standalone policy of insurance on the Demised Property (which policy shall be an excess policy with Tenant's policy being the primary policy), then Landlord shall have such insurance endorsed with a provision in and by which the insurer designated therein shall waive its right of subrogation against Tenant, unless Landlord is obtaining such insurance due to Tenant's failure to carry such insurance that Tenant is required to carry under this Article.

## ARTICLE VIII.
## ADDITIONS, ALTERATIONS, AND REMOVALS

8.1 <u>Prohibition</u>. No portion of the Demised Property shall be demolished, removed, or altered by Tenant in any manner whatsoever without the prior written consent of Landlord. Notwithstanding, Tenant will complete the construction in progress at 1421 Hopkins Street, San Marcos, TX 78666, which is a Property in the Portfolio, within three months of the Effective Date hereof.

(i) Tenant represents and warrants to Landlord that all such alterations or renovations will be performed in a good and workmanlike manner, in accordance with the terms, provisions, and conditions of this Master Lease; substantially in accordance with the plans and specifications or

Copy from re:SearchTX

itemization thereof approved by Landlord, if any approval is required or given; and substantially in compliance with all applicable Legal Requirements.

(ii) Landlord shall have the right, at Landlord's expense, and with prior notice, to inspect any such work at all times during normal working hours as it may deem necessary so long as such inspections do not interfere with Tenant's work (but Landlord shall not thereby assume any responsibility for the proper completion of the alterations in accordance with the terms of this Master Lease, nor any liability arising from the improper performance thereof).

(iii) All such demolitions, alterations, or renovations shall be performed at Tenant's cost and expense, and shall be free of any expense to Landlord and free of any liens on Landlord's title to or Tenant's leasehold interest in the Demised Property.

(iv) Tenant shall, and hereby agrees to, indemnify and save and hold Landlord harmless from and against and reimburse Landlord for any and all loss, damage, cost, and expense (including, without limitation, reasonable attorneys' fees) incurred by or asserted against Landlord which results, directly or indirectly, from any construction or renovation activities conducted upon the Demised Property by Tenant; whether or not the same is caused by or is the fault of Tenant or any contractor, subcontractor, laborer, supplier, materialman, or any other third party (other than Landlord). Tenant shall select and retain counsel to defend Landlord in the event of such actions, subject to Landlord's right to approve the selection of counsel, which approval Landlord shall not unreasonably withhold or delay.

## ARTICLE IX.
## MAINTENANCE AND REPAIRS

9.1 <u>Repairs by Tenant</u>. Throughout the Term of this Master Lease, Tenant shall, at its sole cost and expense, keep, replace, and maintain the Demised Property (including, without limitation, the roof, plumbing systems, electric systems, HVAC systems, and paving) in good repair and condition, and shall make all necessary repairs and replacements thereto, both inside and outside, structural and non-structural, howsoever the necessity for repairs or replacements may occur, and whether or not necessitated by wear, tear, obsolescence or defects, latent or otherwise, and shall use commercially reasonable efforts consistent with past practices to prevent waste, damage, or injury. Tenant may perform its obligations under this Section in the ordinary course of its business without Landlord's prior consent.

9.2 <u>Landlord's Obligation</u>. Landlord shall not be required to make any alterations, reconstructions, replacements, changes, additions, improvements, repairs, or replacements of any kind or nature whatsoever to the Demised Property or any portion thereof (including, without limitation, any portion of the Improvements) at any time during the Term of this Master Lease.

## ARTICLE X.
## DAMAGE OR DESTRUCTION

Copy from re:SearchTX

10.1 <u>Restoration and Repair</u>. If, during the Term of this Master Lease, any Improvements on any of the Demised Properties shall be destroyed or damaged in whole or in part by fire, windstorm, or any other cause whatsoever, Tenant shall:

(i) give Landlord reasonably prompt notice thereof with respect to any casualty resulting in a loss payment for the Improvements on a Demised Property; and

(ii) repair, reconstruct, or replace the Improvements, or the portion thereof so destroyed or damaged (whichever is reasonably required), pursuant to the terms of this Master Lease. All work shall be started and completed as soon as reasonably practicable, at Tenant's sole cost and expense. Tenant shall promptly take such action as is necessary to assure that the Demised Property (or any portion thereof) does not constitute a nuisance or otherwise present a health or safety hazard. If Tenant intends to repair, reconstruct, or replace the Improvements or portion thereof destroyed such that at the completion of Tenant's work, the Improvements will be substantially similar in all material respects to the Improvements before they were destroyed or damaged, and the square footage of the Demised Property shall not be reduced and the value of the Improvements shall not be reduced, then Tenant may perform its obligations under this Section in the ordinary course of its business without Landlord's prior consent.

10.3 <u>Uninsured Losses</u>. Nothing contained herein shall relieve Tenant of its obligations under this Article if the destruction or damage is not covered, either in whole or in part, by insurance.

## ARTICLE XI.
## CONDEMNATION

11.1 <u>Eminent Domain - Generally</u>. Landlord and Tenant hereby agree that in no event shall any taking of any Demised Property for any public or quasi-public use under any statute or by right of eminent domain, or by purchase in lieu thereof, in any way relieve Landlord or Tenant of any obligations under this Master Lease (as to the applicable Demised Property or otherwise) except as explicitly provided in this Article. The parties hereto agree to cooperate in applying for and in prosecuting any claim for any taking regarding any Demised Property and further agree that the proceeds from any such taking or purchase in lieu thereof for the condemned Demised Property shall be distributed to Landlord. Without limiting the foregoing, Landlord will promptly notify Tenant when and if Landlord receives any written notice from a condemning authority that such authority intends to condemn all or any part of any of the Demised Properties subject to this Master Lease, and will promptly provide Tenant with copies of any offers or any other correspondence with such condemning authority. Tenant shall have the right to select and engage legal counsel for the condemnation proceeding on behalf of Tenant and Landlord, subject to Landlord's approval of such counsel, which will not be unreasonably withheld or delayed, in which event Tenant shall pay directly for such legal fees and expenses, and will be entitled to recover such costs from the condemnation award.

## ARTICLE XII.
## LANDLORD'S RIGHT OF ENTRY

Copy from re:SearchTX

DocuSign Envelope ID: E47E04DC-2835-4F40-A47E-94355DF91E9E

12.1 <u>Inspections by Landlord</u>. Upon reasonable advance notice to Tenant, Landlord and its agents shall have the right to enter upon the Demised Property or any portion thereof at any reasonable time during normal business hours to inspect the operation, sanitation, safety, maintenance, or use of the same, or any portions of the same, and to assure itself that Tenant is in full compliance with its obligations under this Master Lease (but Landlord shall not thereby assume any responsibility for the performance of any of Tenant's obligations hereunder, nor any liability arising from the improper performance thereof). In making any such inspections, Landlord shall not unduly interrupt or interfere with the conduct of Tenant's business. In connection with any entry by Landlord upon any of the Demised Property, Landlord shall defend, indemnify, and save and hold Tenant harmless from and against any and all liabilities, obligations, losses, damages, injunctions, suits, actions, fines, penalties, claims, demands, costs, and expenses of every kind or nature, including reasonable attorneys' fees and court costs, incurred by Landlord and arising directly or indirectly from or out of the recklessness or intentional acts of Landlord or its employees, agents, invitees (including purchasers or prospective lenders), licensees, inspectors, or contractors, and the obligations of Landlord hereunder shall survive the termination of this Master Lease with respect to all or any of the Demised Property.

**ARTICLE XIII.**
**ASSIGNMENT AND SUBLETTING BY TENANT**

13.1 <u>Assignment and Subletting</u>. Except as otherwise specifically allowed for in this Article, Tenant shall not assign, sublet, or otherwise transfer any interest in this Master Lease or the Demised Property without Landlord's written consent, which consent may not be unreasonably withheld.

13.2 <u>No Release</u>. No assignment or sublease shall affect or reduce any of the obligations of Tenant hereunder, and all such obligations shall continue in full force and effect as obligations of a principal and not as obligations of a guarantor, as if no assignment or sublease had been made. Landlord's consent to any assignment or sublease and/or Landlord's acceptance of rent from an assignee or sublessee shall in no event: (i) release Tenant from any liability under this Master Lease, or (ii) be construed as Landlord's agreement to recognize any subtenant or sublease. Furthermore, should Landlord and any subsequent assignee of Tenant's interest in the Master Lease enter into any amendments, modifications, or supplements to the Lease, the original Tenant shall remain liable for all obligations of the assignee under the Master Lease as amended, modified, or supplemented irrespective of whether the original Tenant receives notice of or consents to any such amendment, modification or supplement to the Master Lease, except to the extent that Landlord and original Tenant otherwise agree in writing at the time of the assignment or thereafter. Except to the extent that Landlord and original Tenant otherwise agree in writing at the time of the assignment or thereafter, Tenant acknowledges, understands and agrees that Tenant shall remain liable on the Master Lease whether or not Tenant consents to or has notice of any subsequent amendment, modification, or supplement and Landlord has specifically bargained for the right to so amend, modify, or supplement the Master Lease subsequent to an assignment without obtaining said consent or giving said approval. Tenant may only be released upon any assignment or sublease if Landlord releases Tenant in writing by separate instrument, which release Landlord shall have no obligation to give.

Copy from re:SearchTX

## ARTICLE XIV.
## SUBORDINATION, ATTORNMENT, AND NON-DISTURBANCE

14.1 <u>Subordination</u>. Subject to the condition hereinafter stated, this Master Lease, Tenant's interest hereunder and Tenant's leasehold interest in and to the Demised Property are hereby agreed by Tenant to be and are hereby made junior, inferior, subordinate and subject in right, title, interest, lien, encumbrance, priority, and all other respects to any voluntary mortgage or mortgages now or hereafter in force and effect upon or encumbering Landlord's interest in the Demised Property, or any portion thereof, and to all voluntary collateral assignments by Landlord to any third party or parties of any of Landlord's rights under this Master Lease or the rents, issues, and profits thereof or therefrom as security for any liability or indebtedness, direct, indirect or contingent, of Landlord to such third party or parties, and to all future modifications, extensions, renewals, consolidations and replacements of, and all amendments and supplements to any such mortgage, mortgages or assignments. Upon recording of any such mortgage, mortgages, or assignments, the same shall be deemed to be prior in dignity, lien, and encumbrance to this Master Lease, Tenant's interest hereunder and Tenant's leasehold interest in and to the Demised Property irrespective of the dates of execution, delivery, or recordation of any such mortgage, mortgages, or assignments; provided, however, such subordination shall be upon the express condition that the holder or holders of such voluntary mortgages and/or collateral assignments execute and deliver to Tenant a Subordination, Attornment and Non-Disturbance Agreement ("SNDA") to evidence that the validity of this Master Lease. All of Tenant's rights and options hereunder shall be recognized in the SNDA by the holder of any such mortgage or assignment, and, notwithstanding any default by Landlord with respect to such mortgage or assignment, Tenant's possession and right of use under this Master Lease in and to the Demised Property, and all other rights of Tenant under this Master Lease, shall not be disturbed by such mortgagee, unless until and to the extent that an Event of Default has occurred and this Master Lease and Tenant's right to possession hereunder shall have been terminated in accordance with the provisions of this Master Lease for a Material Event of Default. Further, Seller shall obtain subordinations of any Other Lease affecting the Property, which subordinates those Other Leases to this Master Lease Agreement.

14.2 <u>Attornment.</u> Subject to the rights and remedies of Tenant under this Master Lease, including those described in the last sentence of this paragraph, Tenant shall and hereby agrees to attorn, and be bound under all of the terms, provisions, covenants and conditions of this Master Lease, to any successor of the interest of Landlord under this Master Lease for the balance of the Term of this Master Lease remaining at the time of the succession of such interest to such successor. In particular, in the event that any proceedings are brought for the foreclosure of any voluntary mortgage or security interest encumbering or collateral assignment of Landlord's interest in the Demised Property, or any portion thereof, Tenant shall attorn to the purchaser at any such foreclosure sale and recognize such purchaser as Landlord under this Master Lease, subject, however, to all of the terms and conditions of this Master Lease, including the foregoing conditions and the terms of any applicable SNDA.

Copy from re:SearchTX

## ARTICLE XV.
## END OF TERM

15.1 <u>Surrender of Demised Property</u>. Tenant shall, on or before the last day of the Term of this Master Lease or upon the sooner termination thereof, peaceably and quietly surrender and deliver to Landlord the Demised Property (including, without limitation, all Improvements and all additions thereto and replacements thereof made from time to time over the Term of this Master Lease), in good order, condition, and repair, subject to reasonable wear and tear, and free and clear of all liens and encumbrances other than those which exist on the Effective Date or are otherwise specifically approved and acknowledged by Landlord in writing or are created by, through, or under Landlord.

## ARTICLE XVI.
## LIABILITY OF LANDLORD; INDEMNIFICATION

16.1 <u>Liability of Landlord</u>. Landlord shall not be liable to Tenant, its employees, agents, invitees, licensees, assignees, sublessees, customers, clients, contractors, or guests for any damage, injury, loss, compensation or claim, including, but not limited to, claims for the interruption of or loss to Tenant's business, based on, arising out of or resulting from any cause whatsoever (except the recklessness or intentional acts of Landlord or its employees, agents, invitees, licensees, or contractors, or the breach of this Master Lease by Landlord, including a misuse of or failure to release escrowed funds held for Tenant's benefit and use) including, but not limited to: (i) repairs to any portion of the Demised Property; (ii) interruption in Tenant's use of the Demised Property; (iii) any accident or damage resulting from the use or operation of any equipment within the Demised Property, including without limitation, heating, cooling, electrical or plumbing equipment or apparatus; (iv) any fire, robbery, theft, mysterious disappearance or other casualty; and (v) any leakage or seepage in or from any part or portion of the Demised Property, whether from water, rain or other precipitation that may leak into, or flow from, any part of the Demised Property, or from drains, pipes or plumbing fixtures in the Improvements. Landlord shall be liable to Tenant for failure to disburse insurance proceeds or condemnation proceeds to Tenant as required by this Master Lease. Landlord shall defend, indemnify, and save and hold Tenant harmless from and against any and all liabilities, obligations, losses, damages, injunctions, suits, actions, fines, penalties, claims, demands, costs, and expenses of every kind or nature, including reasonable attorneys' fees and court costs, incurred by Tenant and arising directly or indirectly from or out of the recklessness or intentional acts of Landlord or its employees, agents, invitees (including purchasers or prospective lenders), licensees, inspectors, or contractors, and the obligations of Landlord hereunder shall survive the termination of this Master Lease with respect to all or any of the Demised Property.

16.2 <u>Indemnification of Landlord</u>. Tenant shall pay, protect, defend, indemnify, and save and hold Landlord harmless from and against any and all liabilities, obligations, losses, damages, injunctions, suits, actions, fines, penalties, claims, demands, costs, and expenses of every kind or nature (except as may arise directly or indirectly from or out of the recklessness or intentional acts of Landlord or its employees, agents, invitees (including purchasers or prospective lenders), licensees, or contractors, or the breach of this Master Lease by Landlord), including reasonable attorneys' fees and court costs incurred by Landlord, arising directly or indirectly from or out of:

Copy from re:SearchTX

(i) any failure by Tenant to perform any of the terms, provisions, covenants, or conditions of this Master Lease on Tenant's part to be performed; (ii) any accident, injury, or damage which shall happen at, in, or upon the Demised Property prior to the expiration or earlier termination of the Master Lease with respect to such Demised Property, however occurring; (iii) any matter or thing growing out of the condition, occupation, maintenance, alteration, repair, use, or operation by any person of the Improvements or the Demised Property or any part thereof prior to the expiration or earlier termination of the Master Lease with respect to such Demised Property, or the operation of the business contemplated by this Master Lease to be conducted thereon, thereat, therein, or therefrom prior to the expiration or earlier termination of the Master Lease with respect to such Demised Property; (iv) any failure of Tenant to comply with any Legal Requirements, including, without limitation, the Accessibility Laws with respect to the Demised Property, prior to the expiration or earlier termination of the Master Lease with respect to such Demised Property; (v) any discharge of Hazardous Materials, sewage or waste materials from the Demised Property prior to the expiration or earlier termination of the Master Lease in violation of applicable Legal Requirements with respect to such Demised Property; or (vi) any other act or omission of Tenant, its employees, agents, invitees, licensees, assignees, sublessees, contractors, or customers with respect to Demised Property prior to the expiration or earlier termination of the Master Lease with respect to such Demised Property. TO THE EXTENT THAT ANY MATTER FOR WHICH TENANT HAS INDEMNIFIED LANDLORD PURSUANT TO THIS SECTION 16.2 RESULTS IN WHOLE OR IN PART FROM THE ALLEGED NEGLIGENCE OF LANDLORD OR LANDLORD'S OFFICERS, DIRECTORS, PARTNERS, SHAREHOLDERS, OR EMPLOYEES, AND SUCH MATTER IS COVERED BY TENANT'S INSURANCE AND ONLY TO THE EXTENT OF RECEIPT OF INSURANCE PROCEEDS OF TENANT, THEN TENANT'S INDEMNIFICATION OF LANDLORD SHALL BE EFFECTIVE WITHOUT REGARD TO WHETHER SUCH DAMAGE OR INJURY RESULTS IN WHOLE OR IN PART FROM THE ALLEGED NEGLIGENCE OF LANDLORD OR LANDLORD'S OFFICERS, DIRECTORS, PARTNERS, SHAREHOLDERS, OR EMPLOYEES. Notwithstanding the foregoing, there shall be excluded from Tenant's indemnity obligations under this Section 16.2 any and all liabilities, obligations, losses, damages, injunctions, suits, actions, fines, penalties, claims, demands, costs, and expenses of every kind or nature arising directly or indirectly from or out of the recklessness or willful misconduct of Landlord or its employees, agents, invitees, licensees, inspectors, representatives, or contractors prior to or after the Effective Date. Tenant's indemnity obligations under this Article and elsewhere in this Master Lease arising prior to the expiration or earlier termination of this Master Lease shall survive any such expiration or termination of this Master Lease.

16.3 <u>Notice of Claim or Suit</u>. Tenant shall promptly notify Landlord of: (i) any claim, action, proceeding, or suit involving the Demised Property which is instituted against Landlord of which Tenant receives written notice; and (ii) any suit involving the Demised Property which is instituted against Tenant of which Tenant receives written notice (either of which (i) or (ii), a "Claim or Suit"). In the event Landlord is made a party to any action for damages or other relief against which Tenant has indemnified Landlord, as aforesaid, Tenant shall defend Landlord, pay all costs, and shall provide legal counsel to Landlord in such litigation. Tenant shall have the right to select and engage legal counsel on behalf of Tenant and Landlord, subject to Landlord's approval of such counsel, which will not be unreasonably withheld or delayed. To the extent reasonably necessary to protect the interests of Landlord, taking into account the nature of the

Copy from re:SearchTX

claim and the availability of insurance for such litigation, Landlord may, at its option, engage its own legal counsel, in which event Tenant shall pay all reasonable attorneys' fees and costs incurred by Landlord in connection with its own defense or settlement of said litigation.

16.4 <u>Limitation on Liability of Landlord</u>. In the event Tenant is awarded a money judgment against Landlord, Tenant's sole recourse for satisfaction of such judgment shall be limited to execution against the Demised Property and setting off the amount of said judgment against the Rent and Additional Rent under this Master Lease.

**ARTICLE XVII.**
**DEFAULT**

17.1 <u>Events of Default</u>. Each of the following events shall be an event of default hereunder by Tenant and shall constitute a breach of this Master Lease (individually an **"Event of Default"**):

(a) If Tenant shall fail to pay, when due, any Rent, or portion thereof, or any other sum due to Landlord from Tenant hereunder, and such failure shall continue for a period of ten (10) days after written notice from Landlord that such amount is past due.

(b) If Tenant shall violate or fail to comply with or perform any other term, provision, covenant, agreement, or condition to be performed or observed by Tenant under this Master Lease, and such violation or failure shall continue for a period of thirty (30) days after written notice thereof from Landlord (the **"Default Notice"**); provided, however, Tenant shall have more than thirty (30) days to cure the non-monetary default as is necessary provided Tenant commences to cure said default within thirty (30) days of receipt of Landlord's Default Notice, and Tenant diligently pursues said cure to completion. If Landlord reasonably believes that Tenant's failure to cure such default will give rise to a Material Event of Default, as defined herein (either because such failure will cost more than $250,000.00 to cure, or such failure cannot be adequately cured monetarily by Landlord and would result in forfeiture or material impairment of Landlord's title to a Demised Property) then, before said Material Event of Default shall have occurred, after expiration of the original cure period set forth in the first sentence of this paragraph, Landlord shall give Tenant a second notice of default (**"Second Default Notice"**) and Tenant shall have thirty (30) days after receipt of the Second Default Notice to cure such default. As used in this Master Lease, a **"Material Event of Default"** shall be limited to any of the following Events of Default: (i) the first monetary Event of Default in any calendar year which remains uncured after the expiration of the cure period under the Second Monetary Default Notice; (ii) the second or any successive monetary Event of Default in any calendar year without any need to send a Second Monetary Default Notice for such second or any successive monetary Event of Default; (iii) an Event of Default under Section 17.1(c) – (h); or (iv) a Material Event of Default under the Other Leases;

(c) If, at any time during the Term of this Master Lease, Tenant shall file in any court, pursuant to any statute of either the United States or of any State, a petition in bankruptcy or insolvency, or for reorganization or arrangement, or for the appointment of a receiver or trustee of all or substantially all of Tenant's property, including, without limitation, its leasehold interest in

Copy from re:SearchTX

the Demised Property, or if Tenant shall make an assignment for the benefit of its creditors or petitions for or enters into an arrangement with its creditors.

(d) If, at any time during the Term of this Master Lease, there shall be filed against Tenant in any courts pursuant to any statute of the United States or of any State, a petition in bankruptcy or insolvency, or for reorganization, or for the appointment of a receiver or trustee of all or substantially all of Tenant's property, including, without limitation, its leasehold interest in the Demised Property, and any such proceeding against Tenant shall not be dismissed within one hundred twenty (120) days following the commencement thereof.

(e) If Tenant's leasehold interest in the Demised Property shall be seized under any levy, execution, attachment, or other process of court where the same shall not be vacated or stayed on appeal or otherwise within ninety (90) days thereafter, or if Tenant's leasehold interest in the Demised Property is sold by judicial sale (other than a judicial foreclosure sale requested by a Leasehold Mortgagee) and such sale is not vacated, set aside, or stayed on appeal or otherwise within ninety (90) days thereafter.

(f) An Event of Default (as defined in the Other Leases) by the tenant under any of the Other Leases, as defined herein occurs. The fact that Tenant assigns its interest as a tenant under any Other Lease shall not change the character of such lease as an Other Lease as defined herein. Should Landlord or Landlord's Affiliate assign this Master Lease or assign any of the Other Leases pursuant to rights thereunder (i) in connection with a merger or consolidation of Landlord or Landlord's Affiliate, (ii) to any entity acquiring all or substantially all of the assets of Landlord or Landlord's Affiliate, (iii) to another Landlord's Affiliate, or (iv) to an entity acquiring all of the Demised Property and all of the other premises subject to all of the Other Leases, this Master Lease and the Other Leases shall continue to be cross-defaulted, notwithstanding any other provision of this Master Lease. In addition to complying with the requirements of this Master Lease and the Other Leases for such assignment, upon such merger, consolidation, asset sale, or assignment of this Master Lease, upon Tenant's request, Landlord shall provide such documentation as reasonably necessary to evidence the same. Should Landlord or Landlord's Affiliate assign its rights under this Master Lease to a successor landlord that is not an Affiliate of Landlord in connection with the sale of any or all the Demised Property unrelated to an asset sale or merger, then upon such sale and assignment to said non-Affiliate: (A) an Event of Default of the tenant under any Other Lease so assigned or sold shall no longer be an Event of Default of Tenant under this Master Lease; and (B) an Event of Default of Tenant under this Master Lease shall no longer be an Event of Default under any Other Lease so assigned or sold. Should Landlord or Landlord's Affiliate assign its rights under any Other Lease to a successor landlord that is not an Affiliate of Landlord in connection with the sale of that property unrelated to an asset sale or merger, then upon such sale and assignment to said non-Affiliate: (1) an Event of Default of the tenant under that particular Other Lease shall no longer be an Event of Default of Tenant under this Master Lease; and (2) an Event of Default of Tenant under this Master Lease shall no longer be an Event of Default under that particular Other Lease. Should Landlord or Landlord's Affiliate assign its rights under this Master Lease with one or more of the Other Leases (the "**Assigned Leases**") to a successor landlord that is not an Affiliate of Landlord in connection with the sale of the Demised Property unrelated to an asset sale or merger, then upon such sale and assignment of those Assigned Lease to said non-Affiliate, the Assigned Leases shall no longer be cross-defaulted with

Copy from re:SearchTX

the remaining Other Leases, but the Assigned Leases shall remain cross-defaulted with each other. This section shall be self-operative without the need for Landlord or Tenant to execute any documentation in connection with the assignment and sale of the Demised Property or any property subject to any Other Lease.

(g) Tenant becomes party to a Claim or Suit as described in Paragraph 16.3 hereto.

(h) A default by Tenant under the Repurchase Agreement.

As used in this Master Lease, the term "**Affiliate**" shall mean (i) any Person directly or indirectly through one or more subsidiaries controlling, controlled by, or under common control with another Person; (ii) any Person owning or controlling ten percent (10%) or more of the outstanding voting securities of another Person; (iii) any officer, director, partner, or trustee of such Person; and (iv) if such other Person is an officer, director, partner, or trustee of a Person, the Person for which such Person acts in any such capacity. "**Person**" shall mean any natural person or Entity. "**Entity**" shall mean any corporation, partnership (general, limited, or other), limited liability company, trust, business trust, cooperative, or association.

17.2 <u>Remedies on Default.</u>

(a) If any of the Events of Default hereinabove specified shall occur and be continuing, Landlord, at any time thereafter, shall have and may exercise any of the following rights and remedies:

(i) Exercise self-help and cure rights under the Texas Property Code.

(ii) Bring suit against Tenant to enforce Tenant's obligations under this Master Lease and to collect any and all damages incurred by Landlord as a result of said Event of Default (subject to the limitations otherwise provided in this Master Lease) including all costs and expenses incurred in enforcing the Master Lease, inclusive of legal fees and expenses, and court fees and expenses, without terminating the Master Lease or retaking possession of the Demised Property.

(b) If any of the Events of Default hereinabove specified shall occur and be continuing, and said Event of Default is a Material Event of Default, Landlord, at any time thereafter, in addition to and not in limitation to the rights and remedies set forth herein above, shall have and may exercise any of the following additional rights and remedies:

(i) Landlord may, pursuant to written notice thereof to Tenant, terminate this Master Lease as to all or some of the Demised Properties and, peaceably or pursuant to appropriate legal proceedings, re-enter, retake and resume possession of some of the Demised Properties or all of the Demised Property for Landlord's own account and, for Tenant's breach of and default under this Master Lease, recover immediately from Tenant any and all rents and other sums and damages due or in existence at the time of such termination, including, without limitation, (i) all Rent and other sums, charges, payments, costs and expenses agreed and/or required to be paid by Tenant to Landlord hereunder with respect

Copy from re:SearchTX

to such terminated Demised Properties (subject to the limitations on accelerated sums as provided below); (ii) all costs and expenses of Landlord in connection with the recovery of possession of the Demised Property, including reasonable attorneys' fees and court costs; and (iii) all costs and expenses of Landlord in connection with any reletting or attempted reletting of the Demised Property or any Demised Property, including, without limitation, brokerage fees, attorneys' fees and the cost of any alterations or repairs which may be reasonably required to so relet the Demised Property, or any Demised Property.

(ii) Landlord may, pursuant to any prior notice required by law, and without terminating this Master Lease, peaceably or pursuant to appropriate legal proceedings, re-enter, retake, and resume possession of some but less than all of the Demised Properties or of the entire Demised Property for the account of Tenant, make such alterations of and repairs to the Demised Property as may be reasonably necessary in order to relet the same or any part or parts thereof and relet or attempt to relet the Demised Property or any part or parts thereof for such term or terms (which may be for a term or terms extending beyond the Term of this Master Lease, at such rents and upon such other terms and provisions as Landlord, in its sole, but reasonable, discretion, may deem advisable. If Landlord relets or attempts to relet the Demised Property or any Demised cannot be adequately cured monetarily and which would result in forfeiture or material impairment of Landlord's title to the Demised Property (e.g., enforcing party would have the right to purchase the Demised Property should such failure not be cured).

17.3 <u>Landlord Default</u>. Each of the following events shall be a default hereunder by Landlord and shall constitute a breach of this Master Lease by Landlord (individually a "**Landlord Default**"):

(a) If Landlord shall violate or fail to comply with or perform any term, provision, covenant, agreement, or condition to be performed or observed by Landlord under this Master Lease, and such violation or failure shall continue for a period of thirty (30) days after written notice thereof from Tenant; provided, however, Landlord shall have more than thirty (30) days to cure the non-monetary default as is necessary provided Landlord commences to cure said default within thirty (30) days of receipt of Tenant's notice, and Landlord diligently pursues said cure to completion. Upon the occurrence of a Landlord Default, the sole and exclusive remedies of Tenant shall be the following: (i) bring suit against Landlord for said Landlord Default (including a suit for declaratory judgment or injunction) and obtain a final non-appealable judgment against Landlord for actual damages incurred as a result of said Landlord Default; (ii) upon obtaining said judgment against Landlord Tenant may offset against Rent the amount of the judgment, even if the judgment is not against the then current Landlord under this Master Lease; and (iii) seek specific performance of any Landlord obligation under this Master Lease. In no event shall Tenant have the right to terminate in whole or in part this Master Lease as a result of any Landlord Default nor shall Tenant have any right to offset or withhold Rent except as specifically provided in this paragraph above. Upon the occurrence of a Landlord Default regarding Landlord's obligation to pay (or credit) money to Tenant or to release or disburse moneys held in escrow for the benefit of Tenant's use under this Master Lease, said amount shall bear interest at the Default Rate beginning ten (10) days after the date the money was due to be paid, released, or disbursed to Tenant. NOTWITHSTANDING THE FOREGOING OR ANY OTHER PROVISIONS OF THIS

Copy from re:SearchTX

MASTER LEASE, IN NO EVENT SHALL TENANT BE ENTITLED TO RECOVER CONSEQUENTIAL OR PUNITIVE DAMAGES AGAINST LANDLORD FOR AN EVENT OF DEFAULT OR ANY OTHER BREACH OF LANDLORD'S OBLIGATIONS UNDER THIS MASTER LEASE.

## ARTICLE XVIII.
## NOTICES

18.1 <u>Notices</u>. Any notice required by or permitted under this Contract must be in writing. Any notice required by this Contract will be deemed to be delivered (whether received or not) the earlier of receipt or three business days after being deposited with the United States Postal Service, postage prepaid, certified mail, return receipt requested, and addressed to the intended recipient at the address shown in this Contract. Notice may also be given by regular mail, personal delivery, courier delivery, or e-mail, and will be effective when actually received, provided that (a) any notice received on a Saturday, Sunday, or holiday will be deemed to have been received on the next day that is not a Saturday, Sunday, or holiday and (b) any notice received after 5:00 P.M. local time at the place of delivery on a day that is not a Saturday, Sunday, or holiday will be deemed to have been received on the next day that is not a Saturday, Sunday, or holiday. Any address for notice may be changed by not less than ten days' prior written notice delivered as provided herein. Copies of each notice must be given by one of these methods to the attorney of the party to whom notice is given.

| | |
|---|---|
| To Landlord: | Reagent Lonestar Group LLC, a Delaware limited liability company<br>15 S Russell St.<br>Boston, MA 02114<br>(609) 439-3677<br>mdaniels@reagentcap.com |
| With copy to: | Kasey Rachel<br>Dorsett Johnson, LLP<br>407 Throckmorton Street, Suite 500, Fort Worth, Texas 76102<br>(817) 900-8204<br>krachel@dorsettjohnson.com |
| To Tenant: | Lonestar Capital Holdings, LLC, a Texas limited liability company<br>2418 W. Commerce St.<br>San Antonio, Texas 78207<br>_____<br>_____ |
| With copy to: | _____<br>_____<br>_____<br>_____ |

Copy from re:SearchTX

## ARTICLE XIX.
## MISCELLANEOUS

19.1 <u>Characterization of Master Lease</u>. Landlord and Tenant acknowledge and agree that both parties intend that:

(a) This Master Lease shall be and constitute what is generally referred to in the real estate industry as a "triple net" or "absolute net" lease, such that Tenant shall be obligated hereunder to pay all costs and expenses incurred with respect to, and associated with, the Demised Property and the business operated thereon and therein, including, without limitation, all taxes and assessments, utility charges, insurance costs, maintenance costs and repair, replacement and restoration expenses (all as more particularly herein provided) together with any and all other assessments, charges, costs and expenses of any kind or nature whatsoever related to, or associated with, the Demised Property and the business operated thereon and therein; **in addition, Tenant is responsible for and Tenant shall be obligated to pay all debt serviced on all mortgages encumbering Landlord's fee simple interest in the Demised Property**; except as provided in this Master Lease, Landlord shall bear no cost or expense of any type or nature with respect to, or associated with, the Demised Property;

(b) This Master Lease is a "true lease" and not a financing lease, capital lease, mortgage, equitable mortgage, deed of trust, trust agreement, security agreement or other financing or trust arrangement, and the economic realities of this Master Lease are those of a true lease;

(c) The business relationship created by this Master Lease and any related documents is solely that of a long-term commercial lease between landlord and tenant and has been entered into by both parties in reliance upon the economic and legal bargains contained herein;

(d) Tenant and Landlord each waive any claim or defense based upon the characterization of this Master Lease as anything other than as a "true lease."

(e) Except as may be required by applicable laws or a governmental authority (it being understood that Tenant and Landlord each agree that under current U.S. federal income tax law, this Master Lease for the Initial Term is a "true lease" and not part of a loan or financing), not to assert or take, or omit to take, any action if such action or omission (including, without limitation, reporting positions in its income tax return) would be inconsistent with the agreements and understandings set forth in this Section 19.1; and

(f) In the event that its separate existence from another individual, partnership, corporation, limited liability company, trust or other form of entity ("**Person**") is disregarded for U.S. federal income tax purposes, it shall not permit such Person to assert or take any action, or omit to take any action if such omission would be, inconsistent with the agreements and understandings set forth in this Section.

Landlord and Tenant each stipulate and agree not to challenge the validity, enforceability, or characterization of the Master Lease of the Demised Properties as a true lease. Landlord will claim all depreciation with respect to the Demised Properties.

Copy from re:SearchTX

19.2 <u>Brokerage</u>. Landlord and Tenant hereby represent and warrant to each other that they have not engaged, employed, or utilized the services of any business or real estate brokers, salesmen, agents, or finders in the initiation, negotiation, or consummation of the business and real estate transaction reflected in this Master Lease. On the basis of such representation and warranty, each party shall and hereby agrees to indemnify and save and hold the other party harmless from and against the payment of any commissions or fees or claims for commissions or fees by any real estate or business broker, salesman, agent, or finder resulting from or arising out of any actions taken or agreements made by them with respect to the business and real estate transaction reflected in this Master Lease.

19.3 <u>No Partnership or Joint Venture</u>. Landlord shall not, by virtue of this Master Lease, in any way or for any purpose, be deemed to be a partner of Tenant in the conduct of Tenant's business upon, within, or from the Demised Property or otherwise, or a joint venturer or a member of a joint enterprise with Tenant.

19.4 <u>Entire Agreement</u>. This Master Lease contains the entire agreement between the parties with respect to the Demised Property, and, except as otherwise provided herein, can only be changed, modified, amended, or terminated by an instrument in writing executed by the parties. It is mutually acknowledged and agreed by Landlord and Tenant that there are no verbal agreements, representations, warranties, or other understandings affecting the same; and that Tenant hereby waives, as a material part of the consideration hereof, all claims against Landlord for rescission, damages, or any other form of relief by reason of any alleged covenant, warranty, representation, agreement, or understanding not contained in this Master Lease. This Master Lease shall not be changed, amended, or modified except by a written instrument executed by Landlord and Tenant.

19.5 <u>Waiver</u>. No release, discharge, or waiver of any provision hereof shall be enforceable against or binding upon Landlord or Tenant unless in writing and executed by Landlord or Tenant, as the case may be. Neither the failure of Landlord or Tenant to insist upon a strict performance of any of the terms, provisions, covenants, agreements and conditions hereof, nor the acceptance of any Rent by Landlord with knowledge of a breach of this Master Lease by Tenant in the performance of its obligations hereunder, shall be deemed a waiver of any rights or remedies that Landlord or Tenant may have or a waiver of any subsequent breach or default in any of such terms, provisions, covenants, agreements, and conditions.

19.6 <u>Time</u>. Time is of the essence in every particular of this Master Lease, including, without limitation, obligations for the payment of money.

19.7.<u>Amendment</u>. This Master Lease may be amended only by an instrument in writing signed by the parties.

19.8. <u>Choice of Law; Venue</u>. THIS MASTER LEASE IS TO BE CONSTRUED UNDER THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO CHOICE-OF-LAW RULES OF ANY JURISDICTION. VENUE IS IN THE COUNTY WHERE THE PROPERTY IS LOCATED.

Copy from re:SearchTX

19.9. <u>No Third-Party Beneficiaries</u>. There are no third-party beneficiaries of this Master Lease.

19.20 <u>Severability</u>. If a provision in this Master Lease is unenforceable for any reason, to the extent the unenforceability does not destroy the basis of the bargain among the parties, the unenforceability does not affect any other provision of this Master Lease, and this Master Lease is to be construed as if the unenforceable provision is not a part of the Contract.

19.21 <u>Ambiguities Not to Be Construed against Party Who Drafted Master Lease</u>. The rule of construction that ambiguities in a document are construed against the party who drafted it does not apply in interpreting this Master Lease.

19.22. <u>Counterparts</u>. If this Master Lease is executed in multiple counterparts, all counterparts taken together constitute this Master Lease. Copies of signatures to this Master Lease are effective as original signatures.

19.23. <u>Binding Effect</u>. This Master Lease binds, benefits and may be enforced by the parties and their respective heirs, successors, and permitted assigns.

*[Signature pages follow]*

Copy from re:SearchTX

**TENANT:**

_____

Andy Patlan

Date: _____

LONESTAR CAPITAL HOLDINGS, LLC,
a Texas limited liability company

_____

Andy Patlan, Managing Member

Date: _____

AUSSA RESIDENTIAL LLC,
a Texas limited liability company

_____

Andy Patlan, Manager

Date: _____

**LANDLORD:**

REAGENT LONESTAR GROUP LLC,
a Delaware limited liability company

_____

Mark J. Daniels, Authorized Representative

Date: _____

Copy from re:SearchTX

# EXHIBIT A

## Identification of the Demised Property

| Property Address | Type | Units |
|---|---|---|
| 1421 Hopkins Street, San Marcos, TX 78666 | SFR | 1 |
| 1413 Shelburne Street, Waco, TX 76711 | SFR | 1 |
| 1745 15th St, Corpus Christi, TX 78404 | 4-plex | 4 |
| 2422 Commerce St., San Antonio, TX 78207 | 4-plex | 4 |
| 6207 Pancho Villa Dr., San Antonio, TX 78238 | SFR | 1 |
| 159 Yuma St., San Antonio, TX 78211 | 2-plex | 2 |
| 1118 Bailey Ave., San Antonio, TX 78210 | SFR | 1 |
| 338 Eastley Drive, San Antonio, TX 78217 | SFR | 1 |
| 1714 39th Street, Lubbock, TX 79412 | SFR | 1 |
| 610 Beech Ave., Lubbock, TX 79403 | SFR | 1 |
| 1907 48th St., Lubbock, TX 79412 | SFR | 1 |
| 2015 48th St., Lubbock, TX 79412 | SFR | 1 |
| 203 Mitchell St. Unit 4, San Marcos, TX 78666 | Condo | 1 |
| 1716 Monterey Street, San Antonio, TX 78207 | 6-plex | 6 |
| 1711 Craig Place, San Antonio, TX 78201 | 5-plex | 5 |
| Cedano Estates, Lockhart, TX 78644 | Lot | 10 acres |

1421 Hopkins Street, San Marcos, TX 78666

Lot 4, Block 2, of J.H. Combs Addition to the City of San Marcos, a subdivision in Hays County, Texas, according to the map or plat of record in Volume 53, Page 137, of the Deed Records of Hays County, Texas.

1413 Shelburne Street, Waco, TX 76711

Being Lot Four (4) in Block Seven (7) of the Shelby Addition to the City of Waco, McLennan County, Texas, according to the Plat of said resubdivision in Volume 641, Page 344, Deed Records, McLennan County, Texas.

1745 15th St, Corpus Christi, TX 78404

Lots Eight (8), Nine (9) and Ten (10), Block One Thousand, Three Hundred Four (1304), MERCHANT'S ADDITION NO. 5, an Addition to the City of Corpus Christi, Texas, as shown by the map or plat thereof recorded in Volume 1, Page 30, Map Records of Nueces County, Texas.

**MASTER LEASE AGREEMENT**                                        **PAGE 22 OF 26**

Copy from re:SearchTX

2422 Commerce St., San Antonio, TX 78207

**LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEREOF.**

6207 Pancho Villa Dr., San Antonio, TX 78238

Lot 9, Block 9, New City Block 14944, Alamo Hills, Unit 3, a subdivision in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 6800, Page(s) 159, Deed and Plat Records of Bexar County, Texas.

159 Yuma St., San Antonio, TX 78211

<u>AN UNDIVIDED ONE-HALF (1/2) INTEREST ONLY IN</u> Lot 42, Block 5, New City Block 11191, LOMA ALTA ADDITION, in the City of San Antonio, Bexar County, Texas, according to plat thereof recorded in Volume 2222, Page 266, Deed and Plat Records, Bexar County, Texas

1118 Bailey Ave., San Antonio, TX 78210

Lot 5, Block 101, New City Block 3369, HIGHLAND PARK, in the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 105, Page 353, Deed and Plat Records, Bexar County, Texas.

338 Eastley Drive, San Antonio, TX 78217

Lot 13, Block 5, New City Block 12455, NORTHEAST PARK SUBDIVISION UNIT ONE, situated in the City of San Antonio, Texas, according to the map or plat thereof, recorded in Volume 3700, Page 172, Deed and Plat Records, Bexar County, Texas.

Copy from re:SearchTX

1714 39th Street, Lubbock, TX 79412

TRACT III:    LOT ELEVEN (11), BLOCK ONE (1), SOUTHPORT ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 444, Page 247 of the Deed Records of Lubbock County, Texas.

610 Beech Ave., Lubbock, TX 79403

TRACT II:    LOT FOUR (4), FLAGG ADDITION to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 816, Page 55, amended in Volume 847, Page 602 of the Deed Records of Lubbock County, Texas.

1907 48th St., Lubbock, TX 79412

TRACT III:    LOT FOUR (4), BLOCK FIVE (5), RIDGE CREST, an Addition to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 418, Page 84 of the Deed Records of Lubbock County, Texas.

2015 48th St., Lubbock, TX 79412

TRACT IV:    LOT EIGHT (8), BLOCK SIX (6), RIDGE CREST, an Addition to the City of Lubbock, Lubbock County, Texas, according to the Map, Plat and/or Dedication Deed thereof recorded in Volume 418, Page 84 of the Deed Records of Lubbock County, Texas.

203 Mitchell St. Unit 4, San Marcos, TX 78666

**Unit No. 4, together with its undivided interest in the appurtenant common elements of Mitchell Street Condominiums, a Condominium Regime situated in the City of San Marcos, Hays County, Texas, according to the Condominium Declaration, recorded in Volume 2, Page 501, Condominium Records of Hays County, Texas.**

MASTER LEASE AGREEMENT                                                PAGE 24 OF 26

Copy from re:SearchTX

1716 Monterey Street, San Antonio, TX 78207

**The East 72.5 feet of Lots 1, 2 and 3, Block 1, New City Block 2350, of the Town of San Antonio, an Addition to the City of San Antonio, Bexar County, Texas, according to the tax map thereof.**

1711 Craig Place, San Antonio, TX 78201

**Lot 3, Block 32, New City Block 1974, West End Addition, an Addition to the City of San Antonio, Bexar County, Texas, according to the Map or Plat recorded in Volume 54, Page 643, Deed and Plat Records of Bexar County, Texas.**

Cedano Estates, Lockhart, TX 78644

**Being all of a certain tract or parcel of land situated in Caldwell County, Texas, and being a part of the James George Survey, A-9, and being also all of a tract of land designated as Tract "A" called 10.000 acres and conveyed to Celso G. Cedano by Deed recorded in Volume 491, Page 904, of the Official Records of Caldwell County, Texas, and being more particularly described by metes and bounds as follows:**

**BEGINNING at a concrete monument found used for basis of bearing in the Northeast corner of the above mentioned Tract "A" and in the West line of F.M. 713 and in the Southeast corner of a tract of land designated as Tract "B" called 10.000 acres and conveyed to Celso G. Cedano and recorded in the said Volume 491, Page 904, for the Northeast corner this tract;**
**THENCE South 12 degrees 05 minutes 21 seconds East, with the East line of the said Tract "A" and the West line of the F.M. 713, 451.28 feet to a yellow capped iron pin found in the Southeast corner of the said Tract "A" and the apparent Northeast corner of a tract of land called 10.000 acres and conveyed to Francisco Recio, et ux, by Deed in Instrument No. 126464, of the said Official Records and described in Volume 506, Page 350, of the said Official Records for the Southeast corner this tract;**
**THENCE South 77 degrees 54 minutes 38 seconds West, with the South line of the said Tract "A" and the apparent North line of the above mentioned Recio 10.000 acre tract, 944.05 feet to a 4"X4" fence corner post found in the Southwest corner of the said Tract "A" and the Northwest corner of the said Recio 10.000 acre tract and the apparent East line of a tract of land called 19.589 acres and conveyed to DMI Enterprises, LLC by Deed recorded in Instrument No. 2017-006082, of the said Official Records for the Southwest corner this tract;**
**THENCE North 19 degrees 28 minutes 28 seconds West, with the West line of the said Tract "A" and the apparent East line of the above mentioned 19.589-acre tract, 447.76 feet to a yellow capped iron pin found used for basis of bearing in the Northwest corner of the said Tract "A" and the Southwest corner of the above mentioned Tract "B" for the Northwest corner this tract;**
**THENCE North 77 degrees 29 minutes 48 seconds East, with the North line of the said Tract "A" and the South line of the said Tract "B", 1001.63 feet to the PLACE OF BEGINNING and containing 10.000 acres of land, more or less.**

Copy from re:SearchTX

## EXHIBIT B

### Other Leases

[Insert all existing leases here.]

Copy from re:SearchTX

| From: | Mark J. Daniels |
|---|---|
| | Managing Partner, Reagent Lonestar Group, LLC |
| To: | Alicia Vitovsky |
| | Newrez LLC DBA Shellpoint Mortgage Servicing, NMLS #3013 |
| Date: | June 5, 2024 |
| Re: | **Letter of Hardship and Settlement Proposal, 2422 W Commerce St. and 1716 Monterey St.** |

To whom it may concern,

On May 31, 2023, my company, Reagent Lonestar Group ("I" or "Reagent") acquired six properties from Andy Patlan and his companies, AUSSA Residential, Lonestar Capital Holdings, and AIESP (collectively, "Lonestar"). These included, among others, the properties located at 2422 W Commerce Street, San Antonio, TX 78207 (the "Commerce Property") and 1716 Monterey Street, San Antonio, TX 78207 (the "Monterey Property" and, together with Commerce, the "Properties"). Attached are the HUD form for the transaction and official tax records showing Reagent as the titleholder and owner of record.

I purchased the Commerce Property from Lonestar for the sum of $83,359 and the Monterey Property for $96,639. Both of these figures were well below the market value for similar properties due to the considerable issues at each Property and the immediate liquidity needs of Lonestar. For example, the Commerce Property needs four new water heaters, as the previous ones were physically destroyed by an unknown assailant, which has made it impossible to secure long-term tenants at the Property.

I acquired these Properties with the intention of making necessary improvements, leasing to new tenants at higher rates, and, ultimately selling the property for a higher value. In connection with the acquisition of the portfolio including the Properties, I engaged an affiliate of Lonestar to act as property manager and construction manager. Per my agreement with Lonestar, and given that I live outside of Texas, I would pay for any necessary capital work needed, Lonestar would collect any rent generated, and Lonestar would manage and pay all ongoing expenses of the property.

In the approximately 10 months that followed, Lonestar took the capital investment amounts I sent to them, did not make any of the required capital improvements, and neglected the day-to-day needs of the Properties, including utility and tax bills, ongoing repairs and maintenance, and new leasing activity. As I am located out of state, I had little ability to verify any of Lonestar's activity.

To make things much worse, I was notified, after several months, that not only were there mortgages against the Properties that were not discharged in connection with my purchase (you can see this in the HUD), but Lonestar had not been making the required monthly payments on the mortgages, which, in turn, had begun to accrue nearly $100,000 in late fees, default and deferred interest, and other penalties on the Properties (which is in addition to similar figures at several of the other properties I acquired from Lonestar). They further took the security deposits from the tenants and used them to pay for expenses associated with other properties in their portfolio.

**EXHIBIT**

**G**

This is not the only instance of Lonestar conducting seemingly fraudulent behavior. The managers of and companies associated with Lonestar are currently subject to dozens of ongoing legal claims from its investors, partners, and tenants and are being threatened with having their real estate licenses revoked and with jailtime for criminal violations.

In April, upon determining the extent of the issues at the Properties, I terminated my management agreement with Lonestar and engaged another property manager. The new property manager has identified a completely new set of issues at the properties, and I have already paid them tens of thousands of dollars to make immediately necessary repairs on some of the other properties I acquired from Lonestar, including new electrical work, considerable repairs, the demolition of a structurally-unstable garage, and a new roof.

While the loans with Shellpoint remain in Lonestar's name and with personal and corporate guarantees from Andy Patlan and his companies, they are not at all legally related to Reagent. However, the Properties still serve as collateral against the loans, which poses a major legal and financial issue for me. I hold title to the properties, but someone else is on the hook for a mortgage and is refusing to pay any mortgage payments. It took weeks of negotiating with Lonestar even to be able to communicate directly with Shellpoint regarding the loans.

As part of our evaluation with Shellpoint of the situation, Shellpoint commissioned BPOs for each of the Properties, and the full appraisal reports are included separately. Most unfortunately, due to the challenges at the Properties referenced above, the BPOs for each Property came in substantially below the current mortgage values; that is, even if Shellpoint were to short-sell or foreclose upon the properties, they would not generate nearly enough proceeds to pay down the loans in full.

The BPO for the Commerce Property was $360,000, with anticipated net proceeds upon short sale of $331,200, which is approximately 11.9% below the current principal balance on the loan of $375,887. The BPO for the Monterey Property was $240,000, with anticipated net proceeds upon short sale of $220,800, which is approximately 54.0% below the current principal balance on the loan of $479,437.

I am at a position now where the Properties are generating minimal income, which is not nearly sufficient to cover the operating costs of each Property, let alone the mortgage payments to Shellpoint. The Properties are at risk of foreclosure, and, unfortunately, I will be forced to commence legal action to stop any foreclosure activity, given the disconnect between the titles and loans of the Properties.

After speaking at length over the past several weeks with the Shellpoint teams overseeing the loan default, settlement, and short sale teams, we concluded that the most attractive way forward for all parties will be to reach a settlement between me and Shellpoint's investors to eliminate the loans, excluding Lonestar from that process as they do not have any cash available or interest in repaying the loans.

To this end, I am willing to invest additional personal funds in order to negotiate the elimination of the loans on the Properties, but this would need to be conducted in the context of the fact that these are not my mortgages, and I'm trying to come up with a financial solution that any negotiated amount would have to be substantially less than the current principal balance of the loans. I'm still the one getting hurt the most, here, as I was expecting to hold these properties free and clear, but I believe in trying to find a middle-ground solution for all parties. Following in this document is my settlement offer.

Copy from re:SearchTX

As I referenced above, the alternative to this is not pretty – the situation is sufficiently messy that the legal route will likely prevent any foreclosure or short sale of the Properties for many months, during which point no mortgage payments would be made and all parties would incur very substantial legal fees.

In conclusion, I recognize that this is an unusual and complicated situation for all parties. Alicia has been incredibly helpful throughout this process, I am willing to work with you in good faith to try to find a reasonable solution.

<u>**Settlement Offers**</u>

Shellpoint commissioned BPOs for each of the Properties, the values from which are included below. As referenced above, due to the challenges of the Properties, the BPOs came in substantially below the current principal balances of the loans.

As you know, the recourse for Shellpoint in instances like this is to foreclose on the Properties and conduct a short sale process, selling the Properties as-is in an attempting to return as much money to its investors as possible. The BPOs were commissioned to provide an estimate of the resulting value that would be generated upon a short sale to Shellpoint's investors. According to the Shellpoint short sale team, this calculation of net proceeds to investors is the BPO value, minus a 5% brokerage fee to a third-party to marketing and sell the asset, minus 3% in closing costs and other title fees.

For the Commerce Property, the BPO of $360,000, less a brokerage fee of 5% = $18,000, less title costs of 3% = $10,800, would generate an estimated $331,200 in net proceeds to investors.

For the Monterey Property, the BPO of $240,000, less a brokerage fee of 5% = $12,000, less title costs of 3% = $7,200, would generate an estimated $220,800 in net proceeds to investors.

Further, even if the properties were to go to a short sale following the legal proceedings, the appraisals further qualify that a sale process to generate the BPO values is expected to take four additional months.

In order to come up with an equitable solution, I am proposing that I immediately pay to Shellpoint the same net proceed amounts for each property. In addition to matching, dollar-for-dollar, the amounts that Shellpoint's investors would receive upon a short sale, we would be providing these proceeds four to six months sooner than via a short sale process.

As referenced above, the alternative to a settlement is to go engage legal teams to stop any short sale of the property or foreclosure, which would result in substantial legal fees and missed mortgage payments for all parties, and this is why I am willing to make a substantial settlement offer. As such, this proposal is strictly better for Shellpoint's investors than the lengthy and legally challenging alternative route.

In all cases, a settlement would result in: the payment of the settlement offer amount by Reagent within 15 business days; the complete termination of the loans and release of all collateral properties; and the indemnification of Reagent and Lonestar from legal action regarding the loans and collateral properties.

**In conclusion: for the Commerce Property, I am offering a settlement offer of $331,200; and, for the Monterey Property, I am offering a settlement offer of $220,800; with both such amounts matching the anticipated net proceeds to Shellpoint's investors in case of a short sale process.**

Sincerely,

Mark J. Daniels

Copy from re:SearchTX

## NOTICE OF FORECLOSURE SALE

State of Texas     §
                      §

County of Bexar    §

Notice is hereby given of a public non-judicial foreclosure sale.

1.    <u>Property To Be Sold</u>. The property to be sold is described as follows:

    LOT 6, BLOCK 12, NEW CITY BLOCK 2317, IN THE CITY OF SAN ANTONIO, BEXAR COUNTY, TEXAS, SAVE AND EXCEPT, THE WEST 29.3 FEET OF THE NORTH 100.0 FEET THEROF.

2.    <u>Date, Time, and Place of Sale</u>. The sale is scheduled to be held at the following date, time, and place:

    Date:     August 6, 2024
    Time:     The sale shall begin no earlier than 12:00 PM or no later than three hours thereafter.
    Place:    Bexar County Courthouse in San Antonio, Texas, at the following location: the area designated by the Commissioners Court of San Antonio, Bexar County, Texas, pursuant to § 51.002 of the Texas Property Code as the place where foreclosure sales are to take place (if no such place is so designated, the sale will take place in the area where this Notice of Substitute Trustee's Sale is posted).

The deed of trust permits the Mortgagee of Record to postpone, withdraw, or reschedule the sale for another day. In that case, the trustee or substitute trustee under the deed of trust need not appear at the date, time, and place of a scheduled sale to announce the postponement, withdrawal, or rescheduling. Notice of the date of any rescheduled foreclosure sale will be reposted and refiled in accordance with the posting and filing requirements of the Texas Property Code. The reposting or refiling may be after the date originally scheduled for this sale.

Pursuant to section 51.009 of the Texas Property Code, the property will be sold in "as is, where is" condition, without any express or implied warranties, except as to the warranties of title (if any) provided for under the deed of trust. Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the property.

Pursuant to section 51.0075 of the Texas Property Code, the trustee reserves the right to set further reasonable conditions for conducting the sale. Any such further conditions shall be announced before bidding is opened for the first sale of the day held by the trustee or any substitute trustee.

3.    <u>Terms of Sale</u>. The sale will be conducted as a public auction to the highest bidder for cash, subject to the provisions of the deed of trust permitting the Mortgagee of Record thereunder to have the bid credited to the note up to the amount of the unpaid debt secured by the deed of trust at the time of sale.

Those desiring to purchase the property will need to demonstrate their ability to pay their bid immediately in cash if their bid is accepted.

The sale will be made expressly subject to any title matters set forth in the deed of trust, but prospective bidders are reminded that by law the sale will necessarily be made subject to all prior matters of record affecting the property, if any, to the extent that they remain in force and effect and have not been subordinated to the deed of trust. The sale shall not cover any part of the property that has been released of public record from the lien of the deed of trust. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the deposit paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee or the Mortgagee's attorney.

1007696-1



Copy from re:SearchTX

4.  <u>Type of Sale.</u> The sale is a non-judicial deed of trust lien and security interest foreclosure sale being conducted pursuant to the power of sale granted by the Deed of Trust executed by Lonestar Capital Holdings LLC, Elena Rodriguez, Andy Patlan, Megan Scrimshire.

5.  <u>Obligations Secured.</u> The Deed of Trust is dated August 22, 2022, and is recorded in the office of the County Clerk of Bexar County, Texas, in/under 20220208977, Official Public Records of Bexar County, Texas. The deed of trust provides that it secures the payment of the indebtedness and obligations therein described (collectively the "Obligations") including but not limited to the promissory note in the original principal amount of $380,000.00, executed by Lonestar Capital Holdings LLC, Elena Rodriguez, Andy Patlan, Megan Scrimshire, and payable to the order of Mortgage Electronic Registration Systems, Inc., as beneficiary as nominee for Funding Door LLC.

    Original Mortgagee: Mortgage Electronic Registration Systems, Inc., as beneficiary as nominee for Funding Door LLC.

    Current Mortgagee of Record: Massachusetts Mutual Life Insurance Company whose address is 55 Beattie Place Suite 100, Greenville, SC 29601.

6.  <u>Default and Request To Act.</u> Default has occurred under the deed of trust, and the beneficiary has requested me, as Substitute Trustee, to conduct this public sale. Notice is given that before the sale the beneficiary may appoint another person substitute trustee to conduct the sale.

7.  **ASSERT AND PROTECT YOUR RIGHTS AS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES. IF YOU ARE OR YOUR SPOUSE IS SERVING ON ACTIVE MILITARY DUTY, INCLUDING ACTIVE MILITARY DUTY AS A MEMBER OF THE TEXAS NATIONAL GUARD OR THE NATIONAL GUARD OF ANOTHER STATE OR AS A MEMBER OF A RESERVE COMPONENT OF THE ARMED FORCES OF THE UNITED STATES, PLEASE SEND WRITTEN NOTICE OF THE ACTIVE DUTY MILITARY SERVICE TO THE SENDER OF THIS NOTICE IMMEDIATELY.**

Sent by: Clare V. Cougill
Robertson Anschutz Vetters, LLC
10375 Richmond Avenue, Suite 200
Houston, TX 77042

DATED July 15, 2024.

Mark Cummings, Jason West, Dick Vetters, Matthew Johnson, David Garvin, Nicole Correra , Substitute Trustee
c/o Robertson Anschutz Vetters, LLC
10375 Richmond Avenue, Suite 200
Houston, TX 77042
Phone: 713-244-1360

THIS INSTRUMENT APPOINTS THE SUBSTITUTE TRUSTEE(S) IDENTIFIED TO SELL THE PROPERTY DESCRIBED IN THE SECURITY INSTRUMENT INDENTIFIED IN THIS NOTICE OF SALE THE PERSON SIGNING THIS NOTICE IS THE ATTORNEY OR AUTHORIZED AGENT OF THE MORTGAGEE OR MORTGAGE SERVICER.

1007696-1

**FILE INFORMATION**
**Document Number: 20240800259**
Date/Time: 7/15/2024 11:42:10 AM
Total Pages: 2
FILED IN THE OFFICIAL PUBLIC RECORDS OF BEXAR COUNTY
LUCY ADAME-CLARK
BEXAR COUNTY CLERK
Total Fees: $2.00

Copy from re:SearchTX

FILED
8/19/2024 11:43 AM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Monica Hernandez
Bexar County - 57th District Court

**CAUSE NO. 2024CI16604**

| | | |
|---|---|---|
| **REAGENT LONESTAR GROUP, LLC and MARK DANIELS,** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **57th JUDICIAL DISTRICT** |
| | § | |
| **MASSACHUSETTS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY, SHELLPOINT** | § | |
| **MORTGAGE SERVICING, and LONESTAR** | § | |
| **CAPITAL HOLDINGS, LLC, its/their** | § | |
| **successors and/or assigns,** | § | |
| | § | |
| **Defendant.** | § | **OF BEXAR COUNTY, TEXAS** |

## TEMPORARY RESTRAINING ORDER

On this date the Application for a Temporary Restraining Order of Plaintiffs, Reagent Lonestar Group LLC, and Mark Daniels that was incorporated into the Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Petition") filed in this cause, was heard and considered before this court.

Based upon the pleadings, exhibits, records, and documents filed and presented to the Court, as well as the arguments of counsel at the hearing, IT CLEARLY APPEARS:

A.  That unless Defendant, Massachusetts Mutual Life Insurance Company and Shellpoint Mortgage Servicing, and each of its respective agents, employees, attorneys, trustees, substitute trustees, successors and/or assigns, is immediately restrained and enjoined, the Defendants will proceed with foreclosure and foreclose on Plaintiffs' property described in their Petition, and Plaintiffs will suffer an immediate and irreparable harm and will have no adequate remedies under the law, and the Defendants will commit the foregoing before

Temporary Restraining Order – Reagent Lonestar Group LLC, et al.                    Page 1

Copy from re:SearchTX

notice and a hearing on Plaintiffs' Application for Temporary Injunction.

B.   Plaintiffs will suffer an irreparable harm if the Defendants, and/or any of its/their agents, employees, attorneys, trustees, substitute trustees, successors and/or assigns are not restrained immediately, because Plaintiffs will lose fee simple title, ownership and possession of their property, which is unique and irreplaceable, and there is no adequate remedy at law to grant Plaintiff complete, final and equitable relief.

C.   Plaintiffs has provided notice to the Defendants, through its local foreclosure attorney and/or trustee, Robertson Anschutz Vetters, LLC, of the filing of Plaintiffs' Petition at least two (2) hours before this Court conducted this hearing and has provided the Court with a Certificate of Conference to evidence the same as required by the Local Rules of the Bexar County District Courts.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED** that Defendants, Massachusetts Mutual Life Insurance Company and Shellpoint Mortgage Servicing, and any of its agents, employees, attorneys, trustees, substitute trustees, successors and/or assigns is/are each hereby ORDERED to immediately cease and desist from proceeding with any and all efforts to foreclose upon Plaintiffs' property described in the Plaintiff's Petition, which is commonly known as 2422 West Commerce Street, San Antonio, Texas 78207, and that the Defendant, and any of its agents, employees, attorneys, trustees, substitute trustees, successors and/or assigns is/are each hereby immediately enjoined and restrained from the date of entry of this order until fourteen (14) days hereafter, or until further order of this Court.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that Plaintiffs' Application for Temporary Injunction be heard on **August 30, 2024 at 9:00 A. M.** in the courtroom    MH
of the Presiding Court Judicial District Court of Bexar County located in Room 109, 100 Dolorosa

---

Copy from re:SearchTX

Street, San Antonio, Texas 78205, and that the Defendants are commanded to appear at that time and provide reasons, if any, why a temporary injunction should not be issued against said Defendants.

The clerk of the above-entitled court shall issue a notice of entry of a temporary restraining order in conformity with the law and the terms of this order, to include a copy of this order, upon the posting by Plaintiff of the bond hereinafter set forth.

This order shall not be effective until Plaintiff deposits with the Bexar County District Clerk a cash bond in the amount of $1,000.00, or in the form of a check drawn from the Plaintiff's counsel's business checking account, in due conformity with applicable law.

**SIGNED and ENTERED** on this _____ day of August, 2024, at _____ o'clock, __. M.
8/19/2024 4:38:22 pm

_____
**DISTRICT JUDGE**

**APPROVED AND AGREED AS TO FORM:**

**/s/ John G. Helstowski**
John G. Helstowski
Texas Bar No. 24078653
5209 Heritage Ave., Suite 510
Colleyville, TX 76034
Telephone: (817) 382-3125
Facsimile: (817) 382-1799
Email: jgh@jghfirm.com
Attorney for Plaintiffs

Temporary Restraining Order – Reagent Lonestar Group LLC, et al.                    Page 3

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 91049467
Filing Code Description: ORIGINAL
Filing Description: TEMPORARY RESTRAINING ORDER
Status as of 8/20/2024 4:53 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 8/19/2024 11:43:16 AM | SENT |

Copy from re:SearchTX

FILED
8/5/2024 4:12 PM Case 5:24-cv-01094-FB-RBF    Document 1-1    Filed 09/27/24    Page 165 of 205
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Rosa Lynn Aguilera-Rodriguez
Bexar County - 57th District Court

CAUSE NO. <u>2024-CI16604</u>

| | | |
|---|---|---|
| **REAGENT LONESTAR GROUP, LLC and MARK DANIELS,** | § | **IN THE DISTRICT COURT** |
| | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | <u>57th</u>  **JUDICIAL DISTRICT** |
| | § | |
| **MASSACHUSETTS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY, SHELLPOINT** | § | |
| **MORTGAGE SERVICING, and LONESTAR** | § | |
| **CAPITAL HOLDINGS, LLC, its/their** | § | |
| **successors and/or assigns,** | § | **OF BEXAR COUNTY, TEXAS** |
| | | |
| **Defendants.** | | |

## <u>CERTIFICATE OF CONFERENCE</u>

Pursuant to the Bexar County Local Rules, the undersigned counsel for the Plaintiffs named in the above styled and numbered cause, hereby certifies that on August 5, 2024 at 9:10 a.m., I personally called William Attmore at 817-873-3080 and left a message informing counsel that I intend to seek a TRO today and informed counsel that I would be filing a petition and application for TRO and Temporary Injunction and at 3:59 p.m. my legal assistant, Hannah Kube, sent an email to attorney William Attmore, attorney for Robertson Anschutz Vetters, LLC at **wattmore@rasgl.com**, who is the local attorney who represents the Defendants, its/their successors and/or assigns, in the processing of a foreclosure sale, to notify counsel of the filing of the Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction ("Petition"), and provided copies of the filed Petition and proposed temporary restraining order ("TRO") and the envelope filing receipt for the same, and advised foreclosure counsel that I would be seeking entry of the TRO at last two hours later.

Copy from re:SearchTX

Respectfully submitted,

**J. GANNON HELSTOWSKI LAW FIRM**

*/s/ John G. Helstowski*
John G. Helstowski
Texas Bar No. 24078653
5209 Heritage Avenue, Suite 510
Colleyville, Texas 76034
Telephone: (817) 382-3125
Facsimile: (817) 382-1799
Email: jgh@jghfirm.com
Attorney for Plaintiffs

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 90551667
Filing Code Description: CERTIFICATE OF
Filing Description: Conference
Status as of 8/8/2024 9:25 AM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 8/5/2024 4:12:23 PM | SENT |

Copy from re:SearchTX

FILED
8/12/2024 11:24 AM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Christina Carreon
Bexar County - 57th District Court

# J. GANNON HELSTOWSKI LAW FIRM
## 5209 HERITAGE AVENUE, SUITE 510
## COLLEYVILLE, TEXAS 76034
## (817) 382-3125 - Telephone
## (817) 382-1799 – Facsimile

August 12, 2024

Honorable Judge Antonia Arteaga
Bexar County Courthouse
100 Dolorosa, 2nd Floor
San Antonio, TX 78205
Attn: Clerk of the Court/District Clerk

RE:  **Request for Copy of Signed Temporary Restraining Order**
*Reagent Lonestar Group, et al., Plaintiffs v. Massachusetts Mutual Life Insurance Company, et al., Defendants*
**Cause No. 2024CI16604, 57th Judicial District Court, Bexar County**

Dear Clerk of the Court and/or District Clerk:

We are formally requesting a copy of the signed Temporary Restraining Order entered in the above referenced cause on August 5, 2024 at 4:52 p.m.

Once issued, please upload the same and email to jgh@jghfirm.com.

Thank you for your assistance in this matter, and please feel free to contact me should you have any questions.

Respectfully submitted,

*/s/ John G. Helstowski*
John G. Helstowski
State Bar No. 24078653
J. GANNON HELSTOWSKI LAW FIRM
5209 Heritage Avenue, Suite 510
Colleyville, Texas 76034
(817) 382-3125 – Telephone
(817) 382-1799 – Facsimile
Email: jgh@jghfirm.com
Attorney for Plaintiff

1

### Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 90778649
Filing Code Description: LETTER TO DISTRICT CLERK
Filing Description: Requesting Copies
Status as of 8/13/2024 11:08 AM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 8/12/2024 11:24:28 AM | SENT |

Copy from re:SearchTX

FILED
8/14/2024 9:33 AM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Kirstin Herrera
Bexar County - 57th District Court

Case 5:24-cv-01094-FB-RBF     Document 1-1     Filed 09/27/24     Page 170 of 205

CAUSE NO. <u>2024CI16604</u>

| | | |
|---|---|---|
| REAGENT LONESTAR GROUP, LLC and MARK DANIELS, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, SHELLPOINT MORTGAGE SERVICING, and LONESTAR CAPITAL HOLDINGS, LLC, its successors and/or assigns, | § § § § § § § | 57th JUDICIAL DISTRICT |
| Defendants. | § § | OF BEXAR COUNTY, TEXAS |

## <u>PLAINTIFFS' UNOPPOSED MOTION TO EXTEND TEMPORARY RESTRAINING ORDER AND RESCHEDULE TEMPORARY INJUNCTION HEARING</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

**NOW COMES** Reagent Lonestar Group LLC and Mark Daniels, hereinafter called Plaintiffs ("Plaintiffs"), Plaintiffs in the above styled and numbered cause, and pursuant to TRCP 680 hereby moves this Court to extend the Temporary Restraining Order previously entered in this cause and to reschedule the current hearing setting for the Temporary Injunction hearing, and in support thereof would respectfully show unto the Court as follows:

### I.

### <u>PROCEDURAL HISTORY</u>

1.     On August 5, 2024, Plaintiff filed his *Plaintiffs' Original Verified Petition and Application for Temporary Restraining Order and Temporary Injunction* ("Petition") in the above styled and numbered cause.

Copy from re:SearchTX

2.      On August 5, 2024, the Court signed and entered a Temporary Restraining Order ("TRO"), wherein Defendants Massachusetts Mutual Life Insurance Company and Shellpoint Mortgage Servicing , ("Defendants"), were prevented from taking certain actions against Plaintiffs, namely the Defendants were ordered to cease and desist from all efforts to foreclose on Plaintiffs' property made the subject of this suit. The TRO further provided that the Plaintiffs must post a cash bond in the amount of $1,000.00 before the TRO could take effect.

3.      The TRO further contained a hearing setting for a Temporary Injunction hearing to be heard on August 19, 2024, at 9:00 a.m.

4.      On August 6, 2024, Plaintiffs posted the required cash bond in the amount of $1,000.00 with the Bexar County District Clerk.

5.      Plaintiffs are currently seeking to obtain a copy of the signed temporary restraining order and have submitted their request for a copy as well as filed their request to issue citations and TRO notices which have not yet been issued. Therefore, as of date hereof, the Defendants have not yet been formally served.

6.      As of the date hereof, no appearance has been made by any attorney for the Defendants, although the Defendants local foreclosure counsel has been provided with copies of the filed Petition, signed TRO, and bond receipt.

## II.

## UNOPPOSED MOTION TO EXTEND TEMPORARY RESTRAINING ORDER AND TO RE-SCHEDULE TEMPORARY INJUNCTION HEARING

7.      Accordingly, pursuant to TRCP Rule 680, Plaintiff hereby requests that the TRO be extended one time for up to fourteen (14) days from August 19, 2024, for the reasons that the Defendants have not yet been formally served, and no appearance or answer has been filed by any attorney on behalf of the Defendants.

Copy from re:SearchTX

8.      TRCP Rule 680 provides in pertinent part as follows:

> *"...and shall expire by its own terms within such time after signing, not to exceed fourteen days, <u>unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period</u>..."* (emphasis added).

9.      TRCP Rule 680 provides the only method for extending a [TRO] beyond 14 days. Rule 680 governs an extension of a [TRO], whether issued with or without notice, and permits but one extension for no longer than fourteen (14) days unless the restrained party agrees to a longer extension. *In re Texas Nat. Res. Conserv. Comm'n*, 85 S.W.3d 201, 204-05 (Tex.2002).

10.     Therefore, in the interest of justice and fairness, and for good cause shown, Plaintiffs hereby request that the Court cancel the current setting of the Temporary Injunction hearing scheduled on  August 19, 2024, and extend the TRO for a period of up to fourteen (14) days from August 19, 2024, and reschedule the Temporary Injunction hearing to a date and time before the expiration of the fourteen (14) day period from August 19, 2024.

11.     No party will be harmed or prejudiced by the Court's granting of the relief requested herein, and no party is opposed since no attorney has appeared herein on behalf of the Defendants, who are the only Defendants against whom injunctive relief is sought.

12.     This motion is not brought for purposes of delay or harassment, but rather so that justice may be done.

13.     Plaintiffs further aver that the bond previously posted by Plaintiffs for the TRO is sufficient and that no further bond is necessary to extend the TRO.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully requests that the Court enter an Order canceling the current hearing setting for the Temporary Injunction hearing that is currently scheduled on August 19, 2024, and for good cause shown, extend the TRO for a period of up to fourteen (14) days from August 19, 2024, and reschedule the Temporary Injunction

Copy from re:SearchTX

hearing on a date and time within the extended fourteen day period from August 19, 2024, and for

such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly

entitled.

Respectfully submitted,

**J. GANNON HELSTOWSKI LAW FIRM**

*/s/ John G. Helstowski*
John G. Helstowski
Texas State Bar No. 24078653
5209 Heritage Ave, Suite 510
Colleyville, Texas 76034
Telephone – (817) 382-3125
Facsimile – (817) 382-1799
Email:  jgh@jghfirm.com
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2024, a true and correct copy of the foregoing *Plaintiffs' Unopposed Motion to Extend Temporary Restraining Order and Reschedule Temporary Injunction Hearing* was served upon all parties and counsel of record in this cause.

*/s/ John G. Helstowski*
John G. Helstowski
Attorney for Plaintiffs

## CERTIFICATE OF CONFERENCE

I hereby certify that prior to the filing of the foregoing *Plaintiffs' Unopposed Motion to Extend Temporary Restraining Order and Reschedule Temporary Injunction Hearing*, I attempted to confer with counsel, but since no counsel has appeared herein on behalf of the Defendants, and the Defendants have not been served or otherwise filed an answer or appeared herein. and therefore, a good faith effort was made to confer but no conference could be had so the matter is submitted to the Court for determination of the merits.

*/s/ John G. Helstowski*
John G. Helstowski
Attorney for Plaintiffs

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 90878170
Filing Code Description: MOTION TO
Filing Description: EXTEND TEMPORARY RESTRAINING ORDER
Status as of 8/19/2024 3:32 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 8/14/2024 9:33:38 AM | SENT |

Copy from re:SearchTX

FILED
8/12/2024 11:52 AM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: Maria Herrera
Bexar County - 57th District Court

# J. GANNON HELSTOWSKI LAW FIRM
# 5209 HERITAGE AVENUE, SUITE 510
# COLLEYVILLE, TEXAS 76034
# (817) 382-3125 - Telephone
# (817) 382-1799 – Facsimile

---

August 13, 2024

Gloria A. Martinez, District Clerk
Bexar County District Clerk's Office
100 Dolorosa
San Antonio, TX 78205

      **RE:**     **Request to Issue Citations and TRO Notices**
                ***Reagent Lonestar Group, LLC et al., Plaintiffs Vs Massachusetts Mutual Life***
                ***Insurance Company, et al., Defendants***
                **Cause No. 2024CI16604, 57th Judicial District of Bexar County**

Dear District Clerk:

      Please issue original **Citations** for the following Defendants regarding the above referenced matter as follows:

          1.     **Massachusetts Mutual Life Insurance Company**
                  c/o Texas Secretary of State
                  Citations Unit, James E. Rudder Building
                  1019 Brazos Street, Room 105
                  Austin, Texas 78701

          2.     **Shellpoint Mortgage Servicing**
                  c/o Corporation Service Company
                  211 E. 7th Street, Suite 620
                  Austin, Texas 78701

          3.     **Lonestar Capital Holdings, LLC**
                  c/o Weatherby Echols Law Group, PLLC
                  20333 SH 249, Ste. 200
                  Houston, Texas 77070

Please **issue TRO Notices** for the following Defendants regarding the above referenced matter as follows:

1

Copy from re:SearchTX

1.       **Massachusetts Mutual Life Insurance Company**
c/o Texas Secretary of State
Citations Unit, James E. Rudder Building
1019 Brazos Street, Room 105
Austin, Texas 78701

2.       **Shellpoint Mortgage Servicing**
c/o Corporation Service Company
211 E. 7th Street, Suite 620
Austin, Texas 78701

Once issued, please upload the same and email to jgh@jghfirm.com with courtesy copy to hnk@jghfirm.com. We will then forward to a private process server for service.

Thank you for your assistance in this matter, and please feel free to contact me should you have any questions.

Respectfully submitted,

*/s/ John G. Helstowski*
John G. Helstowski
State Bar No. 24078653
J. GANNON HELSTOWSKI LAW FIRM
5209 Heritage Avenue, Suite 510
Colleyville, Texas 76034
(817) 382-3125 – Telephone
(817) 382-1799 – Facsimile
Email: jgh@jghfirm.com
Attorney for Plaintiffs

2

Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 90854597
Filing Code Description: REQUEST FOR SERVICE AND PROCESS
Filing Description:
Status as of 8/20/2024 12:30 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 8/13/2024 3:28:18 PM | SENT |

Copy from re:SearchTX

FILED
9/9/2024 1:24 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: KayLynn Lopez
Bexar County - 57th District Court

PRIVATE PROCESS

**Case Number: 2024CI16604**

| | |
|---|---|
| Reagent Lonestar Group, LLC ET AL VS Massachusetts Mutual Life Insurance Company ET AL (Note: Attached Document May Contain Additional Litigants) | IN THE **57TH DISTRICT COURT** BEXAR COUNTY, TEXAS |

## CITATION

"THE STATE OF TEXAS"

Directed To:    **Massachusetts Mutual Life Insurance Company**
**BY SERVING TEXAS SECRETARY OF STATE**

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00am on the Monday next following the expiration of twenty days after you were served this CITATION and PETITION a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org" Said **Original Verified Petition For Trespass To Try Title And Application For Temporary Restraining Order And Temporary Injunction** was filed **on this the 5th day of August, 2024.**
ISSUED UNDER MY HAND AND SEAL OF SAID COURT **on this the 26th day of August, 2024.**

**JOHN G HELSTOWSKI**
**ATTORNEY FOR PLAINTIFF**
**5209 HERITAGE AVE STE 510**
**COLLEYVILLE TX 76034**



**Gloria A. Martinez**
**Bexar County District Clerk**
**101 W. Nueva, Suite 217**

**San Antonio, Texas 78205**
By: /s/ Wilna Williams
Wilna Williams, Deputy

---

| | |
|---|---|
| REAGENT LONESTAR GROUP, LLC ET AL VS MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY ET AL | Case Number: 2024CI16604 |
| | 57th District Court |

### Officer's Return

I received this CITATION on the _____ day of _____, 20_____ at _____ o'clock ____M. and ( ) executed it by delivering a copy of the CITATION with attached **ORIGINAL VERIFIED PETITION FOR TRESPASS TO TRY TITLE AND APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION** the date of delivery endorsed on it to the defendant _____ in person on the _____ day of _____, 20____ at _____ o'clock ____M.

at _____ City_____ State_____ Zip_____

or ( ) not executed because _____.

Fees: _____ Badge/PPS #: _____ Date certification expires: _____

_____ County, Texas

BY: _____

OR: VERIFICATION OF RETURN (if not served by a peace officer) SWORN TO THIS _____

_____
NOTARY PUBLIC, STATE OF TEXAS

OR:  My  name  is  _____,  my  date  of  birth  is  _____,  and  my  address  is
_____ County.

I declare under penalty of perjury that the foregoing is true and correct. Executed in _____ County, State of Texas, on the _____ day of _____, A.D., _____.

_____
Declarant

Copy from re:SearchTX

## CAUSE NO. <u>2024CI16604</u>

| | | |
|---|---|---|
| REAGENT LONESTAR GROUP, LLC and MARK DANIELS, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § | |
| v. | § § | 57th JUDICIAL DISTRICT |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, SHELLPOINT MORTGAGE SERVICING, and LONESTAR CAPITAL HOLDINGS, LLC, its/their successors and/or assigns, | § § § § § § § | |
| Defendants. | § § § | OF BEXAR COUNTY, TEXAS |

Documents:  <u>**CITATION WITH ATTACHED PLAINTIFFS' ORIGINAL VERIFIED PETITION AND SIGNED TEMPORARY RESTRAINING ORDER**</u>

Received on: <u>August 26, 2024 at 3:30 p.m.</u> the above documents to be delivered to:

> Massachusetts Mutual Life Insurance Company
> c/o Texas Secretary of State
> Citations Unit, James E Rudder Building
> 1019 Brazos Street, Room 105
> Austin, Texas 78701

I, Ronald Wade Monroe, the undersigned, being duly sworn, deposed and say that I am duly authorized to make delivery of the document(s) listed herein in the above style case. I am over the age of 18, and I am not a party to or otherwise interested in this matter. Delivery of said documents occurred in the following manner:

By delivery to: <u>Texas Secretary of State</u>

Title/Relationship: <u>Texas Secretary of State</u>

Address of Service: <u>1019 Brazos Street, Room 105, Austin, Texas 78701</u>

Date/Time of Service: <u>09/03/2024 at 9:00 a.m.</u>

Type of Service: <u>Certified mail return receipt requested.</u>

Copy from re:SearchTX

Ronald Wade Monroe II, Private Process Server
ID number PSC-11829, Expiring July 31, 2025

Signed and sworn to by the said, Ronald Wade Monroe II before me this ___9___ day of __Sept__, 2024, to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

My Commission expires __10/29/2024__

(Seal)

Amanda Jean Norton
My Commission Expires
10/29/2024
ID No 126566321

# EXHIBIT "A"

Copy from re:SearchTX

Copy from re:SearchTX

COMPLETE THIS SECTION

Ensure items 1, 2, and 3 are completed.

Attach this card to the back of the mailpiece, or on the front if space permits.

**1. Article Addressed to:**

Massachusetts Mutual Life Ins. Co
c/o Texas Secretary of State
1019 Brazos St Rm 105
Austin TX 78701-2413

9490 9142 0620 5897 1804 12

Number *(Transfer from service label)*

7112 0620 5897 1800 79

11 Facsimile, July 2015 (SDC 3930)

**A. Signature:** *(☐ Addressee or ☐ Agent)*

X TX Comptroller

**B. Received By:** *(Printed Name)*    **C. Date of Delivery**

SEP 03 2024

**D.** Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

**3. Service Type**

   ☑ Certified Mail

Domestic Return Receipt

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 91793433
Filing Code Description: Return of Service Successful
Filing Description: MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY
Status as of 9/10/2024 2:20 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 9/9/2024 1:24:53 PM | SENT |

FILED
9/9/2024 1:26 PM Case 5:24-cv-01094-FB-RBF    Document 1-1    Filed 09/27/24    Page 184 of 205
Gloria A. Martinez
Bexar County District Clerk
Accepted By: KayLynn Lopez
Bexar County - 57th District Court

**PRIVATE PROCESS**

CASE NUMBER:**2024CI16604**

Reagent Lonestar Group, LLC ET AL VS Massachusetts Mutual Life Insurance Company ET AL     IN THE **57TH DISTRICT COURT**

BEXAR COUNTY, TEXAS

### TEMPORARY RESTRAINING ORDER
### WITH BOND

"THE STATE OF TEXAS"
DIRECTED TO:    **Massachusetts Mutual Life Insurance Company**
              **BY SERVING TEXAS SECRETARY OF STATE**

WHEREAS, IN A CERTAIN CAUSE PENDING ON THE DOCKET OF THE **57th District Court** OF BEXAR COUNTY, TEXAS, BEING CAUSE NUMBER **2024CI16604**, WHEREIN **LONESTAR GROUP, LLC AND MARK DANIELS** ARE PLAINTIFFS AND **Massachusetts Mutual Life Insurance Company** IS DEFENDANT. IN SAID SUIT THE PLAINTIFF HAS FILED AN ORIGINAL PETITION, ASKING AMONG OTHER THINGS, FOR THE GRANTING AND ISSUANCE OF A TEMPORARY RESTRAINING ORDER, TO RESTRAIN THE DEFENDANT, **Massachusetts Mutual Life Insurance Company**, AS FULLY SET OUT AND PRAYED FOR, A COPY OF WHICH IS ATTACHED HERETO AND TO WHICH REFERENCE IS HEREBY MADE FOR THE INJUNCTIVE RELIEF SOUGHT BY THE PLAINTIFF. UPON PRESENTATION AND CONSIDERATION OF SAID PETITION, THE HONORABLE **Norma Gonzales** HAS ENTERED THE FOLLOWING, TO WIT: COPY OF ORDER ATTACHED TO WRIT SERVED. AND WHEREAS, BOND (IF REQUIRED) HAS BEEN FILED AND APPROVED;

THESE ARE THEREFORE, TO RESTRAIN, AND YOU THE SAID DEFENDANT, **Massachusetts Mutual Life Insurance Company** IS HEREBY RESTRAINED AS FULLY SET OUT IN THE TEMPORARY RESTRAINING ORDER, A COPY OF WHICH IS ATTACHED HERETO, MADE A PART HEREOF AND TO WHICH REFERENCE IS HEREBY MADE FOR A FULL AND COMPLETE STATEMENT OF THE INJUNCTIVE RELIEF SOUGHT BY THE COURT

AND YOU ARE FURTHER NOTIFIED THAT THE HEARING ON THE APPLICATION FOR TEMPORARY INJUNCTION IS SET AT THE BEXAR COUNTY COURTHOUSE IN THE CITY OF SAN ANTONIO, TEXAS ON THE **30th day of August, 2024** AT **9:00 AM** IN **Room 1.09 PRESIDING** DISTRICT COURT, AT WHICH TIME YOU ARE REQUIRED TO APPEAR AND SHOW CAUSE, IF ANY, WHY SAID INJUNCTION SHOULD NOT BE GRANTED AS PRAYED FOR.

HEREIN FAIL NOT TO OBEY THIS WRIT, UNDER THE PAINS AND PENALTIES PRESCRIBED BY LAW! ISSUED AND GIVEN UNDER MY HAND AND SEAL OF OFFICE, AT SAN ANTONIO, TEXAS THE **26TH DAY OF AUGUST, 2024**.



__JOHN G HELSTOWSKI__
**ATTORNEY FOR PLAINTIFF**
**5209 HERITAGE AVE STE 510**
**COLLEYVILLE TX 76034**

**Gloria A. Martinez**
**BEXAR COUNTY DISTRICT CLERK**
**101 W. NUEVA, SUITE 217**
**SAN ANTONIO, TEXAS 78205**

BY: /s/ Wilna Williams
Wilna Williams, DEPUTY

---

| Reagent Lonestar Group, LLC ET AL VS Massachusetts Mutual Life Insurance Company ET AL | **OFFICER'S RETURN** | CASE NUMBER: 2024CI16604 |
|---|---|---|

**COURT: 57th District Court**

I RECEIVED THIS TEMPORARY RESTRAINING ORDER ON THE _____ DAY OF _____ A.D., _____ AT _____O'CLOCK __M. AND: (   ) EXECUTED IT BY DELIVERING A COPY OF THE **TEMPORARY RESTRAINING ORDER** ON THE DATE OF DELIVERY ENDORSED ON IT TO _____, IN PERSON ON THE _____ DAY OF _____, 20_____ AT _____ O'CLOCK __M. AT: _____ OR ) ) NOT EXECUTED BECAUSE _____.

FEES: _____      BADGE/PPS #: _____      DATE CERTIFICATION EXPIRES: _____

_____, COUNTY, TEXAS

BY _____

OR: VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER) SWORN TO THIS _____ DAY OF _____ 20_____.

_____
NOTARY PUBLIC, STATE OF TEXAS

OR: MY NAME IS _____, MY DATE OF BIRTH IS _____, AND MY ADDRESS IS _____,
_____ COUNTY.
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED IN _____ COUNTY, STATE OF TEXAS, ON THE _____ DAY OF _____, 20_____.

DECLARANT

Copy from re:SearchTX

CAUSE NO. <u>2024CI16604</u>

| | | |
|---|---|---|
| **REAGENT LONESTAR GROUP, LLC** and **MARK DANIELS,** | § § § | **IN THE DISTRICT COURT** |
| **Plaintiffs,** | § § | |
| **v.** | § § | |
| | § | **57th JUDICIAL DISTRICT** |
| **MASSACHUSETTS MUTUAL LIFE** **INSURANCE COMPANY,** **SHELLPOINT MORTGAGE** **SERVICING, and LONESTAR** **CAPITAL HOLDINGS, LLC, its/their** **successors and/or assigns,** | § § § § § § | |
| **Defendants.** | § § § | **OF BEXAR COUNTY, TEXAS** |

**Documents:** <u>CITATION WITH ATTACHED PLAINTIFFS' ORIGINAL VERIFIED PETITION AND SIGNED TEMPORARY RESTRAINING ORDER</u>

Received on: <u>August 26, 2024 at 3:30 p.m.</u> the above documents to be delivered to:

> Massachusetts Mutual Life Insurance Company
> c/o Texas Secretary of State
> Citations Unit, James E Rudder Building
> 1019 Brazos Street, Room 105
> Austin, Texas 78701

I, Ronald Wade Monroe, the undersigned, being duly sworn, deposed and say that I am duly authorized to make delivery of the document(s) listed herein in the above style case. I am over the age of 18, and I am not a party to or otherwise interested in this matter. Delivery of said documents occurred in the following manner:

By delivery to: <u>Texas Secretary of State</u>

Title/Relationship: <u>Texas Secretary of State</u>

Address of Service: <u>1019 Brazos Street, Room 105, Austin, Texas 78701</u>

Date/Time of Service: <u>09/03/2024 at 9:00 a.m.</u>

Type of Service: <u>Certified mail return receipt requested.</u>

Copy from re:SearchTX

Ronald Wade Monroe II, Private Process Server
ID number PSC-11829, Expiring July 31, 2025

Signed and sworn to by the said, Ronald Wade Monroe II before me this ___9___ day of __Sept__, 2024,
to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

My Commission expires _10/29/2024_

(Seal)

Amanda Jean Norton
My Commission Expires
10/29/2024
ID No 126566321

# EXHIBIT "A"

Copy from re:SearchTX

Copy from re:SearchTX

**COMPLETE THIS SECTION**

Ensure items 1, 2, and 3 are completed.
Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Massachusetts Mutual Life Ins. Co
c/o Texas Secretary of State
1019 Brazos St Rm 105
Austin TX 78701-2413

9490 9142 0620 5897 1804 12

le Number (Transfer from service label)
4322 7112 0620 5897 1800 79

11 Facsimile, July 2015 (SDC 3930)

A. Signature: ( ☐ Addressee or ☐ Agent)
X  TX Comptroller

B. Received By: (Printed Name)   C. Date of Delivery
SEP 03 2024

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type

☑ Certified Mail

Domestic Return Receipt

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 91793560
Filing Code Description: Return of Service Successful
Filing Description: MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY
Status as of 9/10/2024 2:21 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 9/9/2024 1:26:30 PM | SENT |

Copy from re:SearchTX

FILED
9/9/2024 1:28 PM
Gloria A. Martinez
Bexar County District Clerk
Accepted By: KayLynn Lopez
Bexar County - 57th District Court

Case 5:24-cv-01094-FB-RBF    Document 1-1    Filed 09/27/24    Page 190 of 205

PRIVATE PROCESS

**Case Number: 2024CI16604**

Reagent Lonestar Group, LLC ET AL VS
Massachusetts Mutual Life Insurance Company ET
AL
(Note: Attached Document May Contain Additional
Litigants)

IN THE **57TH DISTRICT COURT**

BEXAR COUNTY, TEXAS

<u>CITATION</u>

"THE STATE OF TEXAS"

Directed To:    **Shellpoint Mortgage Servicing**
                **BY SERVING ITS REGISTERED AGENT CORPORATION SERVICE COMPANY**

"You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10:00am on the Monday next following the expiration of twenty days after you were served this CITATION and PETITION a default judgment may be taken against you. In addition to filing a written answer with the clerk, you may be required to make initial disclosures to the other parties of this suit. These disclosures generally must be made no later than 30 days after you file your answer with the clerk. Find out more at TexasLawHelp.org" Said **Original Verified Petition For Trespass To Try Title And Application For Temporary Restraining Order And Temporary Injunction** was filed **on this the 5th day of August, 2024.**
ISSUED UNDER MY HAND AND SEAL OF SAID COURT **on this the 26th day of August, 2024.**

**JOHN G HELSTOWSKI**
**ATTORNEY FOR PLAINTIFF**
**5209 HERITAGE AVE STE 510**
**COLLEYVILLE TX 76034**



**Gloria A. Martinez**
**Bexar County District Clerk**
**101 W. Nueva, Suite 217**

**San Antonio, Texas 78205**
By: /s/ Wilna Williams
     **Wilna Williams, Deputy**

---

REAGENT LONESTAR GROUP, LLC ET AL VS
MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY ET
AL

Case Number: 2024CI16604

57th District Court

**Officer's Return**

I received this CITATION on the _____ day of _____, 20_____ at _____ o'clock ____M. and ( ) executed it by delivering a copy of the

CITATION with attached **ORIGINAL VERIFIED PETITION FOR TRESPASS TO TRY TITLE AND APPLICATION FOR TEMPORARY RESTRAINING ORDER**

**AND TEMPORARY INJUNCTION** the date of delivery endorsed on it to the defendant _____ in person on

the _____ day of _____, 20____ at _____ o'clock ____M.

at _____ City_____ State_____ Zip_____

or ( ) not executed because _____.

Fees: _____ Badge/PPS #: _____ Date certification expires: _____

_____ County, Texas

BY:_____

OR: VERIFICATION OF RETURN (if not served by a peace officer) SWORN TO THIS _____

NOTARY PUBLIC, STATE OF TEXAS

OR:   My   name   is   _____,   my   date   of   birth   is   _____,   and   my   address   is
_____ County.

I declare under penalty of perjury that the foregoing is true and correct. Executed in _____ County, State of Texas, on the _____ day of
_____, A.D., _____.

Declarant

Copy from re:SearchTX

CAUSE NO. <u>2024CI16604</u>

| | | |
|---|---|---|
| **REAGENT LONESTAR GROUP, LLC** | § | **IN THE DISTRICT COURT** |
| **and MARK DANIELS,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | **57th JUDICIAL DISTRICT** |
| **MASSACHUSETTS MUTUAL LIFE** | § | |
| **INSURANCE COMPANY,** | § | |
| **SHELLPOINT MORTGAGE** | § | |
| **SERVICING, and LONESTAR** | § | |
| **CAPITAL HOLDINGS, LLC, its/their** | § | |
| **successors and/or assigns,** | § | |
| | § | |
| **Defendants.** | § | **OF BEXAR COUNTY, TEXAS** |
| | § | |

**Documents:  <u>CITATION WITH ATTACHED PLAINTIFFS' ORIGINAL VERIFIED PETITION AND SIGNED TEMPORARY RESTRAINING ORDER</u>**

Received on: <u>August 26, 2024 at 3:30 p.m.</u> the above documents to be delivered to:

> Shellpoint Mortgage Servicing
> c/o Corporation Service Company
> 211 East 7th Street, Ste. 620
> Austin, Texas 78701

I, Ronald Wade Monroe, the undersigned, being duly sworn, deposed and say that I am duly authorized to make delivery of the document(s) listed herein in the above style case. I am over the age of 18, and I am not a party to or otherwise interested in this matter. Delivery of said documents occurred in the following manner:

By delivery to: <u>Corporation Service Company – Registered Agent for Shellpoint Mortgage Servicing</u>

Title/Relationship: <u>Registered Agent</u>

Address of Service: <u>211 East 7th Street, Suite 620, Austin, Texas 78701</u>

Date/Time of Service: <u>08/30/2024 at 9:00 a.m.</u>

Type of Service: <u>Certified mail return receipt requested.</u>

Copy from re:SearchTX

Ronald Wade Monroe II, Private Process Server
ID number PSC-11829, Expiring July 31, 2025

Signed and sworn to by the said, Ronald Wade Monroe II before me this ___9___ day of __Sept__, 2024, to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

My Commission expires __10/29/2024__

(Seal)

NOTARY PUBLIC STATE OF TEXAS
Amanda Jean Norton
My Commission Expires
10/29/2024
ID No 126566321

Copy from re:SearchTX

# EXHIBIT "A"

Copy from re:SearchTX

Copy from SearchTX

**SENDER: COMPLETE THIS SECTION**

■ Ensure items 1, 2, and 3 are completed.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Shellpoint Mortgage Servicing
c/o Corporation Service Company
211 E 7th St Ste 620
Austin TX 78701-3218

9480 9112 0820 5899 0273 69

2. Article Number *(Transfer from service label)*
9402 7112 0820 5899 0278 53

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature: ( ☐ *Addressee or* ☐ *Agent*)

X   Viva Tejas Logistics (AA)

B. Received By: *(Printed Name)*
AUG 3 0 20

C. Date of Delivery

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No
   David

3. Service Type

☑ Certified Mail®

PS Form 3811 Facsimile, July 2015 (SDC 3930)                     Domestic Return Receipt

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 91793715
Filing Code Description: Return of Service Successful
Filing Description: Shellpoint Mortgage Servicing
Status as of 9/10/2024 2:27 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 9/9/2024 1:28:18 PM | SENT |

Copy from re:SearchTX

FILED
9/9/2024 1:29 PM Case 5:24-cv-01094-FB-RBF    Document 1-1    Filed 09/27/24    Page 196 of 205
Gloria A. Martinez
Bexar County District Clerk
Accepted By: KayLynn Lopez
Bexar County - 57th District Court

PRIVATE PROCESS

CASE NUMBER:2024CI16604

Reagent Lonestar Group, LLC ET AL VS Massachusetts Mutual Life Insurance Company ET AL    IN THE 57TH DISTRICT COURT

BEXAR COUNTY, TEXAS

## TEMPORARY RESTRAINING ORDER
## WITH BOND

"THE STATE OF TEXAS"
DIRECTED TO:    Shellpoint Mortgage Servicing
                BY SERVING ITS REGISTERED AGENT CORPORATION SERVICE COMPANY

WHEREAS, IN A CERTAIN CAUSE PENDING ON THE DOCKET OF THE **57th District Court** OF BEXAR COUNTY, TEXAS, BEING CAUSE NUMBER 2024CI16604, WHEREIN **Reagent Lonestar Group, LLC; Mark Daniels** ARE PLAINTIFFS AND **Shellpoint Mortgage Servicing** IS DEFENDANT. IN SAID SUIT THE PLAINTIFF HAS FILED AN ORIGINAL PETITION, ASKING AMONG OTHER THINGS, FOR THE GRANTING AND ISSUANCE OF A TEMPORARY RESTRAINING ORDER, TO RESTRAIN THE DEFENDANT, **Shellpoint Mortgage Servicing**, AS FULLY SET OUT AND PRAYED FOR, A COPY OF WHICH IS ATTACHED HERETO AND TO WHICH REFERENCE IS HEREBY MADE FOR THE INJUNCTIVE RELIEF SOUGHT BY THE PLAINTIFF. UPON PRESENTATION AND CONSIDERATION OF SAID PETITION, THE HONORABLE **Norma Gonzales** HAS ENTERED THE FOLLOWING, TO WIT: COPY OF ORDER ATTACHED TO WRIT SERVED. AND WHEREAS, BOND (IF REQUIRED) HAS BEEN FILED AND APPROVED;

THESE ARE THEREFORE, TO RESTRAIN, AND YOU THE SAID DEFENDANT, **Shellpoint Mortgage Servicing** ARE HEREBY RESTRAINED AS FULLY SET OUT IN THE TEMPORARY RESTRAINING ORDER, A COPY OF WHICH IS ATTACHED HERETO, MADE A PART HEREOF AND TO WHICH REFERENCE IS HEREBY MADE FOR A FULL AND COMPLETE STATEMENT OF THE INJUNCTIVE RELIEF SOUGHT BY THE COURT

AND YOU ARE FURTHER NOTIFIED THAT THE HEARING ON THE APPLICATION FOR TEMPORARY INJUNCTION IS SET AT THE BEXAR COUNTY COURTHOUSE IN THE CITY OF SAN ANTONIO, TEXAS ON THE **30th day of August, 2024** AT 9:00 AM IN Room 1.09 **PRESIDING** DISTRICT COURT, AT WHICH TIME YOU ARE REQUIRED TO APPEAR AND SHOW CAUSE, IF ANY, WHY SAID INJUNCTION SHOULD NOT BE GRANTED AS PRAYED FOR.

HEREIN FAIL NOT TO OBEY THIS WRIT, UNDER THE PAINS AND PENALTIES PRESCRIBED BY LAW! ISSUED AND GIVEN UNDER MY HAND AND SEAL OF OFFICE, AT SAN ANTONIO, TEXAS THE **26TH DAY OF AUGUST, 2024.**



JOHN G HELSTOWSKI
ATTORNEY FOR PLAINTIFF
5209 HERITAGE AVE STE 510
COLLEYVILLE TX 76034

Gloria A. Martinez
BEXAR COUNTY DISTRICT CLERK
101 W. NUEVA, SUITE 217
SAN ANTONIO, TEXAS 78205

BY: /s/Wilna Williams
Wilna Williams, DEPUTY

| Reagent Lonestar Group, LLC ET AL VS Massachusetts Mutual Life Insurance Company ET AL | OFFICER'S RETURN | CASE NUMBER: 2024CI16604 |
|---|---|---|

COURT: 57th District Court

I RECEIVED THIS TEMPORARY RESTRAINING ORDER ON THE _____ DAY OF _____ A.D., _____ AT _____ O'CLOCK __M. AND: (   ) EXECUTED IT BY DELIVERING A COPY OF THE **TEMPORARY RESTRAINING ORDER** ON THE DATE OF DELIVERY ENDORSED ON IT TO _____, IN PERSON ON THE _____ DAY OF _____, 20____ AT _____ O'CLOCK __M. AT: _____ OR ) NOT EXECUTED BECAUSE _____.

FEES: _____    BADGE/PPS #: _____    DATE CERTIFICATION EXPIRES: _____
_____, COUNTY, TEXAS
BY _____

OR: VERIFICATION OF RETURN (IF NOT SERVED BY PEACE OFFICER) SWORN TO THIS _____ DAY OF _____ 20____.

NOTARY PUBLIC, STATE OF TEXAS

OR: MY NAME IS _____, MY DATE OF BIRTH IS _____, AND MY ADDRESS IS _____, _____ COUNTY.
I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED IN _____ COUNTY, STATE OF TEXAS, ON THE _____ DAY OF _____ 20____.

DECLARANT

Copy from re:SearchTX

## CAUSE NO. <u>2024CI16604</u>

| | | |
|---|---|---|
| **REAGENT LONESTAR GROUP, LLC**<br>**and MARK DANIELS,** | §<br>§<br>§ | **IN THE DISTRICT COURT** |
| **Plaintiffs,** | §<br>§ | |
| **v.** | §<br>§<br>§ | **57th JUDICIAL DISTRICT** |
| **MASSACHUSETTS MUTUAL LIFE**<br>**INSURANCE COMPANY,**<br>**SHELLPOINT MORTGAGE**<br>**SERVICING, and LONESTAR**<br>**CAPITAL HOLDINGS, LLC, its/their**<br>**successors and/or assigns,** | §<br>§<br>§<br>§<br>§<br>§ | |
| **Defendants.** | §<br>§<br>§ | **OF BEXAR COUNTY, TEXAS** |

**Documents:** <u>CITATION WITH ATTACHED PLAINTIFFS' ORIGINAL VERIFIED PETITION AND SIGNED TEMPORARY RESTRAINING ORDER</u>

Received on: <u>August 26, 2024 at 3:30 p.m.</u> the above documents to be delivered to:

> Shellpoint Mortgage Servicing
> c/o Corporation Service Company
> 211 East 7th Street, Ste. 620
> Austin, Texas 78701

I, Ronald Wade Monroe, the undersigned, being duly sworn, deposed and say that I am duly authorized to make delivery of the document(s) listed herein in the above style case. I am over the age of 18, and I am not a party to or otherwise interested in this matter. Delivery of said documents occurred in the following manner:

By delivery to: <u>Corporation Service Company – Registered Agent for Shellpoint Mortgage Servicing</u>

Title/Relationship: <u>Registered Agent</u>

Address of Service: <u>211 East 7th Street, Suite 620, Austin, Texas 78701</u>

Date/Time of Service: <u>08/30/2024 at 9:00 a.m.</u>

Type of Service: <u>Certified mail return receipt requested.</u>

Copy from re:SearchTX

Ronald Wade Monroe II, Private Process Server
ID number PSC-11829, Expiring July 31, 2025

Signed and sworn to by the said, Ronald Wade Monroe II before me this ___9___ day of ___Sept___, 2024, to certify which witness my hand and seal of office.

Notary Public in and for the State of Texas

My Commission expires ___10/29/2024___

(Seal)

Amanda Jean Norton
My Commission Expires
10/29/2024
ID No 126566321
NOTARY PUBLIC
STATE OF TEXAS

Copy from re:SearchTX

# EXHIBIT "A"

Copy from re:SearchTX

Copy from SearchTX

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|

■ Ensure items 1, 2, and 3 are completed.

■ Attach this card to the back of the mailpiece, or on the front if space permits.

**A. Signature:** ( ☐ *Addressee or* ☐ *Agent*)

X   Viva Tejas Logistics (AA)

**B. Received By:** *(Printed Name)*      **C. Date of Delivery**

AUG 3 0 20

**1. Article Addressed to:**

Shellpoint Mortgage Servicing
c/o Corporation Service Company
211 E 7th St Ste 620
Austin TX 78701-3218

**D. Is delivery address different from item 1?** ☐ Yes
If YES, enter delivery address below: ☐ No

David Gast

9490 9112 0620 5899 0273 69

**3. Service Type**

☑ Certified Mail®

**2. Article Number** *(Transfer from service label)*
9402 7112 0620 5899 0278 53

PS Form 3811 Facsimile, July 2015 (SDC 3930)                    Domestic Return Receipt

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

John Helstowski
Bar No. 24078653
jgh@jghfirm.com
Envelope ID: 91793844
Filing Code Description: Return of Service Successful
Filing Description: Shellpoint Mortgage Servicing
Status as of 9/10/2024 2:29 PM CST

Associated Case Party: Reagent Lonestar Group, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| John GHelstowski | | jgh@jghfirm.com | 9/9/2024 1:29:59 PM | SENT |

Copy from re:SearchTX

## CAUSE NO. 2024CI16604

| | | |
|---|---|---|
| REAGENT LONESTAR GROUP, LLC and MARK DANIELS, | § § § | IN THE DISTRICT COURT |
| Plaintiffs, | § § § | |
| v. | § § | 57TH JUDICIAL DISTRICT |
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, SHELLPOINT MORTGAGE SERVICING and LONESTAR CAPITAL HOLDINGS, LLC, its/their successors and/or assigns, | § § § § § § § § | |
| Defendants. | § | OF BEXAR COUNTY, TEXAS |

### DEFENDANTS MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY AND SHELLPOINT MORTGAGE SERVICING'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

Defendants Massachusetts Mutual Life Insurance Company ("Massachusetts Mutual") and Newrez LLC d/b/a Shellpoint Mortgage Servicing, incorrectly named as Shellpoint Mortgage Servicing, ("Shellpoint" and collectively the "Defendants") by and through their counsel, answer Plaintiffs Reagent Lonestar Group, LLC and Mark Daniels' ("Plaintiffs") Petition and states as follows:

### GENERAL DENIAL

Defendants generally deny the allegations in Plaintiffs' Petition and demand strict proof thereof by a preponderance of the evidence.

### AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses, assuming no additional burden or any burden not placed on Defendants by law, and assert that the defenses bar Plaintiffs' claims and/or right to recover—in whole or in part—the damages and relief alleged against Defendants:

1

1.      Plaintiffs lack standing to bring the claims set forth in the Petition against Defendants.

2.      The Petition fails to state a claim for which relief can be granted.

3.      Plaintiffs fail to state a claim for a temporary restraining order or temporary injunction.

4.      Plaintiffs fail to state a claim for breach of contract and failure of condition precedent.

5.      Plaintiffs fail to state a claim for trespass to try title to real property.

6.      Plaintiffs fail to state a claim for violations of RESPA and Regulation X and the 2016 Amendments.

7.      Plaintiffs fail to state a claim for violations of the Texas Debt Collection Act.

8.      Plaintiffs fail to state a claim for exemplary damages.

9.      Plaintiffs fail to state a claim for attorney's fees.

10.     Plaintiffs' claims fail, in whole or in part, because they first materially breached the contract(s) upon which they base their claims.

11.     Plaintiffs' claims fail, in whole or in part, because they failed to mitigate their damages.

12.     Plaintiffs' claims fail, in whole or in part, because the alleged actions occurred notwithstanding that reasonable procedures were adopted to avoid such errors.

13.     Plaintiffs' claims are barred, in whole or in part, to the extent such claims result from Plaintiffs' contributory negligence.

14.     Plaintiffs' claims are barred, in whole or in part, by the doctrine of waiver.

15.     Plaintiffs' claims are barred, in whole or in part, by comparative fault.

16.    Plaintiffs' claims are barred, in whole or in part, by the doctrines of estoppel and unclean hands.

17.    To the extent Plaintiffs' are entitled to recover any damages, they shall be offset against the amounts they owe to Defendants.

18.    To the extent Plaintiffs recover any exemplary damages, any such damages must be capped under the Texas Damages Act, the Due Process Clause of the United States Constitution, and the Due Course of Law provisions of the Texas Constitution

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendants pray that Plaintiffs take nothing by way of their Petition and that Defendants have judgment for their costs and for such other and further relief to which they may show themselves justly entitled.

Dated:  September 26, 2024                Respectfully submitted,

                                        **HUSCH BLACKWELL LLP**

                                        By: */s/ Lauren E. Hayes*
                                             Lauren E. Hayes
                                             State Bar No. 24081961
                                             Lauren.Hayes@huschblackwell.com
                                             111 Congress Avenue, Suite 1400
                                             Austin, Texas 78701
                                             (512) 472-5456 – Telephone
                                             (512) 479-1101 - Facsimile

                                             *Attorneys for Defendants, Massachusetts*
                                             *Mutual Life Insurance Company and*
                                             *Newrez LLC d/b/a Shellpoint Mortgage*
                                             *Servicing*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was served on counsel of record on September 26, 2024 via TexFile.

<u>*/s/ Lauren E. Hayes*</u>
Lauren E. Hayes